

MAR 0 5 2004

William B. Guthrie
Clerk, U.S. District Court

By_____
                    Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

PATRICK DWAYNE MURPHY,           §
                    Petitioner,  §
                                 §
                                 §
v.                               §          Case No. CIV-03-443-WH
                                 §
                                 §
MIKE MULLIN, Warden, Oklahoma    §
State Penitentiary,              §
                    Respondent.  §


## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## PURSUANT TO 28 U.S.C.§ 2254


LISA S. McCALMONT
Assistant Federal Public Defender
Oklahoma Bar No. 017096
SCOTT BRADEN
Oklahoma Bar No. 001040
Assistant Federal Public Defender
Death Penalty Federal Habeas Corpus Division
215 Dean A. McGee, Suite 109
Oklahoma City, OK 73102
(405) 609-5930 (Telephone)
(405) 609-5932 (Facsimile)

**COUNSEL FOR PETITIONER,
PATRICK DWAYNE MURPHY**


March 4, 2004

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PRIOR PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

GROUND ONE - ABSENCE OF STATE COURT JURISDICTION . . . . . . . . . . . . . . . . . . . 18

Patrick Murphy is an Indian. The crime occurred in Indian country. Thus, jurisdiction over the crime is exclusively federal under 18 U.S.C. § 1153. The state court proceedings against Mr. Murphy were void *ab initio*, and Mr. Murphy should be released from the custody of the State of Oklahoma forthwith.

A.   Federal Law Provides for Exclusive Federal Jurisdiction Over Murders Committed by Indians, Against Indians, in Indian Country . . . . . . . . . . . . . . . . 18

B.   Mr. Murphy is an Indian Within the Meaning of the Federal Statutes . . . . . . . . 18

C.   The Victim is an Indian Within the Meaning of the Federal Statutes . . . . . . . . . 20

D.   The Crime Occurred in Indian Country . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    1.   The Location of Mr. Jacobs's Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    2.   The Crime Scene is in Indian Country . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        a.   The Crime Scene Falls Within The Muscogee (Creek) Reservation . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        b.   The Crime Scene Falls on Allotment Land to which All Indian Right And Title Has Not Been Extinguished . . . . . . . . . . . . . . . . . . . . . . . . 25

        c.   The Crime Scene Falls Within a Dependant Indian Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

E.  The State Court Had No Jurisdiction and Mr. Murphy's Prosecution
    and Conviction Were Void *Ab Initio* ................................... 29

F.  The Instant Claim is Properly Before this Court for Review ................. 30

    1.  Jurisdiction Is a Threshold Question, Never Waived,
        and Presents a Federal Question That Must be
        Decided by this Court ........................................... 30

    2.  In the Event this Court Finds Exhaustion Is Not
        Excused, Mr. Murphy's Petition Should Be Held in
        Abeyance While He Is Afforded the Opportunity to
        Present His Claim in State Court ................................. 33

GROUND TWO – INEFFECTIVE ASSISTANCE OF COUNSEL IN THE
MITIGATION CASE ...................................................... 35

Mr. Murphy's trial lawyer failed to investigate, prepare, and present to the jury
readily available and compelling mitigating evidence which would likely have led
to a different sentencing outcome had it been presented. Counsel's failure to provide
effective assistance of counsel denied Mr. Murphy the protections guaranteed to him
under the Sixth, Eighth and Fourteenth Amendments to the Constitution as well as
the rule of law established by *Wiggins v. Smith*, 123 S. Ct. 2527 (2003), *Williams v.
Taylor*, 529 U.S. 362 (2000), *and Strickland v. Washington*, 466 U.S. 668 (1984).

A.  The OCCA Denied Mr. Murphy's Claim of Ineffective Assistance of
    Counsel .......................................................... 35

B.  Standard for Counsel's Performance in the Sentencing Phase of a
    Capital Trial ...................................................... 37

    1.  The Supreme Court Adopts the ABA Guidelines as the
        Prevailing Professional Norms in Capital Cases ................... 37

    2.  The ABA Standards Require Counsel to Devote
        Adequate Time and to Investigate, Prepare and
        Present a Mitigation Case ....................................... 38

        a.  Allocation of Time to the Case ............................ 39

        b.  Specific Duty to Investigate, Prepare and
            Present a Mitigation Case ................................ 39

C.  Trial Counsel's Investigation, Development, and Presentation of the
    Mitigation Case Was Deficient Under the Prevailing Standards ............. 40

1. The Penalty Phase of the Trial ................................................ 40

    a. The Prosecution Characterized Mr. Murphy as Having a Good Life and Raising ............................................... 40

    b. The Defense Mitigation Case ............................. 42

2. The Mitigation Case That Could Have and Should Have Been Presented .................................................... 44

    a. Defense Counsel Should Have Allocated a Reasonable Amount of Time to Investigate Mr. Murphy's Life ................................................. 44

    b. What Should Have Been Uncovered Through Diligent Investigation ........................... 46

    c. What Should Have Been Done With The Information Counsel Had In His Possession ........................................... 53

3. Exhaustion of the Issue of Counsel's Deficient Performance in State Court ................................... 56

D. Mr. Murphy Was Prejudiced By Counsel's Ineffective Investigation, Development and Presentation of a Mitigation Case ....................... 57

1. The OCCA's Analysis of Prejudice .............................. 57

2. Mr. Murphy was Prejudiced by Counsel's Ineffectiveness ........... 59

GROUND THREE – HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR ........... 63

Oklahoma's use of the "especially heinous, atrocious, or cruel" aggravating circumstance, in particular the failure to assess correctly the sufficiency of the evidence and infirmities in the jury instructions, violated Mr. Murphy's rights as protected by the Sixth, Eighth and Fourteenth Amendments and warrants habeas corpus relief.

A. Trial Counsel Objected to the Heinous, Atrocious, or Cruel Aggravator ...... 63

B. The OCCA Erred in Concluding There Was Sufficient Evidence to Support the Heinous, Atrocious, or Cruel Aggravator ..................... 65

1.      The Eighth Amendment Requires Aggravators
        Narrow the Class of Murders Subject to the Sentence
        of Death By Objective Criteria ................................. 65

2.      There is Insufficient Evidence to Support The Heinous,
        Atrocious, or Cruel Aggravator ................................ 66

3.      The OCCA Engaged in Impermissible Speculation
        and Inferences Not Supported by the Evidence to
        Support its Conclusion on Conscious Suffering ................... 67

C.   The Jury Instructions on the Heinous, Atrocious, or Cruel Aggravator
     Were Not Particularized To Mr. Murphy's Individual Conduct ............. 71

D.   The Jury Instructions on the Heinous, Atrocious, or Cruel Aggravator
     Were Deficient Because They Did Not Require the Jury to Find That
     the Victim Consciously Suffered Pain ................................... 72

E.   The Heinous, Atrocious, or Cruel Aggravating Instruction Violated
     Mr. Murphy's Fourteenth Amendment Rights ........................... 73

F.   Conclusion Heinous, Atrocious, or Cruel Aggravator ..................... 73

GROUND FOUR – CONTINUING THREAT AGGRAVATOR ........................ 74

     Oklahoma's use of the "continuing threat" aggravator without definition that limits
     the circumstances under which it can be applied means that the aggravator as applied
     is vague and overbroad and fails to narrow the class of persons who are subject to the
     penalty of death in violation of Mr. Murphy's Sixth, Eighth, and Fourteenth
     Amendment rights

A.   Trial Counsel Objected to the Continuing Threat Aggravator ............... 74

B.   The OCCA Rejected Mr. Murphy's Claim that the Continuing Threat
     Aggravator was Unconstitutionally Vague and Overbroad ................. 75

C.   The Continuing Threat Aggravator is Unconstitutionally Vague and
     Overbroad in General and as Applied in this Case ....................... 75

GROUND FIVE – AGGRAVATING FACTORS MUST OUTWEIGH MITIGATING
FACTORS BEYOND A REASONABLE DOUBT ...........................79

The jury was not charged that it must find aggravating factors outweighed mitigating
factors beyond a reasonable doubt. That failure violated Mr. Murphy's right to have
his punishment determined beyond a reasonable doubt as required to insure due
process of law and as required by the Sixth, Eighth and Fourteenth Amendments as
well as the rule of law established by *Apprendi v. New Jersey*, 530 U.S. 466 (2000)
and *Ring v. Arizona*, 536 U.S. 584 (2002).

A.      The Jury Instructions on Proof Beyond a Reasonable Doubt ..............79

B.      Factual Determinations That Increase the Penalty a Defendant Faces
        must Be Determined by a Jury Beyond a Reasonable Doubt ...............80

        1.      Weighing of Aggravating Against Mitigating Circumstances Is a
                Factual Determination Which must Satisfy the *Apprendi* and *Ring*
                Standards of Determination Beyond a Reasonable Doubt ...........81

                a.      Weighing Aggravating Factors Against Mitigating Factors
                        Results in an Increase in the Penalty for First Degree Murder
                        Beyond the Prescribed Statutory Maximum ...............82

                b.      "Weighing" Is a Factual Determination like Any Other in
                        Which the Jury Engages ................................84

GROUND SIX – THE VICTIM IMPACT EVIDENCE ..............................86

The victim impact evidence which explicitly called for Mr. Murphy's execution
exceeded what is Constitutionally permissible and violated Mr. Murphy's right to a
fundamentally fair sentencing proceeding guaranteed by the Fifth, Eighth and
Fourteenth Amendments

A.      The Victim Impact Testimony ......................................87

B.      The OCCA Rejected the Claim that These Statements Constituted
        Super-Aggravators and Were Unconstitutional .........................87

C.      The OCCA Erroneously Interpreted Well Settled Law on the
        Admissibility of Victim Impact Statements as Well as Misapplied
        Existing Law to the Facts of this Case ................................89

        1.      The OCCA Misunderstood the Law ...........................89

        2.      The OCCA Misapplied the Law to the Facts of this Case ...........89

GROUND SEVEN – FAILURE TO DEFINE LIFE WITHOUT PAROLE . . . . . . . . . . . . . . . 90

    Failure to define life without parole when the jury is asked to consider future
    dangerousness is an error that denied Mr. Murphy due process of law and the right
    to a fundamentally fair sentencing in violation of the Fifth, Eighth, and Fourteenth
    Amendments

    A.    Trial Counsel Asked the Court to Define Life Without Parole . . . . . . . . . . . . . 90

    B.    The OCCA Erroneously Rejected the Need for Instruction . . . . . . . . . . . . . . . . 92

GROUND EIGHT - MR. MURPHY'S POST-ARREST STATEMENT
    WAS INADMISSIBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    Mr. Murphy's post-arrest statement was taken in violation of his right to due process
    of law protected under the Fifth and Fourteenth Amendments and his Fifth
    Amendment right against self-incrimination

    A.    Trial Counsel Moved to Suppress the Post-Arrest Statement . . . . . . . . . . . . . . 93

    B.    The OCCA Denied Mr. Murphy's Claim That it Was Error to Admit
        His Post-Arrest Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

    C.    Under the Totality of the Circumstances, Mr. Murphy's Statement
        Should Have Been Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

GROUND NINE - MENTAL RETARDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    Unlike other similarly situated defendants, Mr. Murphy was denied a jury trial on the
    issue of mental retardation. The denial of a jury trial on this issue was arbitrary and
    capricious and violated Mr. Murphy's right to equal protection under the law.
    Moreover, because mental retardation is a death "eligibility" factor it must, under
    *Apprendi* and *Ring*, be decided by a jury. Mr. Murphy was thus denied protections
    guaranteed him under the Fifth and Fourteenth Amendments and a fair sentencing
    proceeding as guaranteed under the Eighth Amendment

    A.    Mr. Murphy's Claim of Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    B.    The *Atkins* Prohibition Against Executing the Mentally Retarded . . . . . . . . . . 100

    C.    The Oklahoma Standard For Establishing Mental Retardation . . . . . . . . . . . . . 101

    D.    Mr. Murphy Is Due A Jury Trial On The Issue Of Mental Retardation . . . . . . . 103

        1.    The Evidentiary Hearing On Remand . . . . . . . . . . . . . . . . . . . . . . . . . . 103

2.     The OCCA Evaluation of Mr. Murphy's Claims
       Regarding His Evidentiary Hearing ............................ 105

E.     Mr. Murphy was Due a Jury Trial on the Issue of Mental Retardation ....... 106

       1.     The OCCA Acted Arbitrarily and Capriciously in
              Denying Mr. Murphy a Jury Trial on the Issue of
              Mental Retardation Because There Was Sufficient
              Evidence to Justify the Grant of a Jury Trial and the
              OCCA Has Granted Jury Trials to Others in Similar
              Circumstances.   Mr. Murphy's Right to Equal
              Protection under the Law and a Sentencing
              Proceeding That Comported with Due Process Was
              Thus Violated .............................................. 106

       2.     Under *Apprendi/Ring* Mr. Murphy is Due a Jury Trial ............. 109

F.     Oklahoma's Flawed Definition of Mental Retardation is Arbitrary
       and Capricious .................................................... 111

G.     Exhaustion of this Issue ............................................ 113

GROUND TEN – COUNSEL'S ADMISSION OF GUILT VIOLATED MR. MURPHY'S
       RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ....................... 115

As his only defense, Mr. Murphy's trial lawyer told the jury Mr. Murphy was too
drunk to form the intent to kill. That implicit admission of guilt was unwarranted by
the evidence, made without Mr. Murphy's permission, and was directly contrary to
Mr. Murphy's statements of innocence, his plea of not guilty, and his testimony. By
admitting his client's guilt over his client's testimony of innocence, trial counsel
made his client look like a liar, took the issue of guilt/innocence out of the hands of
the jury, and absolutely violated his duty of loyalty to his client as protected under
the Sixth and Fourteenth Amendments and as established as the rule of law in *United
States v. Cronic*, 466 U.S. 648 (1984) and *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir.
2002)

A.     Trial Counsel Effectively Told The Jury Mr. Murphy Was Guilty .......... 115

B.     Counsel's Admission of Guilt Violated Mr. Murphy's Sixth
       Amendment Right to Effective Counsel .............................. 117

       1.     Counsel's Admission of Guilt Constitutes Ineffective Assistance .... 117

       2.     Counsel's Ineffective Performance Prejudiced Mr. Murphy ......... 119

C.  Exhaustion of This Claim .......................................... 120

GROUND ELEVEN – CUMULATIVE ERROR ................................. 122

The OCCA misunderstood the principles of cumulative error believing that, if it found no issue to individually merit relief, there could be no cumulative error. The death sentence imposed on Mr. Murphy was substantially influenced by the cumulative error and cannot stand

GROUND TWELVE – THE AEDPA IS UNCONSTITUTIONAL AS APPLIED ......... 124

Because the fundamental protections underpinning the procedural bars to relief under the AEDPA depend on a functioning state court system of indigent defense which does not exist in Oklahoma, the AEDPA is unconstitutional as applied to capital petitions for writs of habeas corpus issuing from the State of Oklahoma

GROUND THIRTEEN – LETHAL INJECTION ................................. 127

The lethal injection of Mr. Murphy under the protocols currently in force in Oklahoma and any similar protocols violates the Eighth, Fifth and Fourteenth Amendments as does Oklahoma's procedure for devising said protocols

A.  Procedural Posture of this Claim ................................... 128

B.  Oklahoma's Lethal Injection Procedure Violates the Eighth
    Amendment Prohibition Against Cruel and Unusual Punishment .......... 129

    1.  The Eighth Amendment Prohibition Against Cruel and
        Unusual Punishment ....................................... 129

    2.  The State of Oklahoma's Lethal Injection Protocol
        Risks Unnecessary Pain, Torture and Lingering
        Death .................................................... 130

        a.  The Lethal Injection Process in Oklahoma ................ 131

        b.  Intravenous Processes Always Carry Risk of Failure ........ 131

        c.  The Risks Associated with Oklahoma's Lethal
            Injection Process ................................... 133

            i.  Use of Persons Untrained in IV Procedures Creates an
                Unnecessary Risk of Flawed Executions that cause
                Conscious Suffering ............................ 133

ii.   The Chemical Cocktail Creates an Unnecessary Risk of Flawed Executions that cause Conscious Suffering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

iii.   The Two-Line IV Method Creates an Unnecessary Risk of Flawed Executions that cause Conscious Suffering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

d.   Oklahoma Executions Have "Gone Wrong" . . . . . . . . . . . . . . . 137

e.   Executions in Oklahoma Need Not Risk Conscious Suffering . 138

f.   Discovery into the Lethal Injection Process is Required . . . . . . 138

REQUESTS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alaska v. Native Village of Venetie Tribal Government,*
    522 U.S. 520 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Anderson v. Groose,*
    106 F.3d 242 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

*Atkins v. Virginia,*
    536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

*Blackburn v. Alabama,*
    361 U.S. 199 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   123

*Bryan v. Mullin,*
    335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Calderon v. United States District Court,*
    134 F.3d 981 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Cargle v. Mullin,*
    317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89, 123

*In re Carmen,*
    165 F. Supp. 942 (N.D. Cal. 1958), *aff'd,* 270 F.2d 809 (9th Cir. 1959) . . . . . . . .   30, 32

*Carter v. Bell,*
    218 F.3d 581 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

*Cartwright v. Maynard,*
    822 F.2d 1477 (10th Cir. 1987), *aff'd,* 486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . .   66

*Castro v. Ward,*
    138 F.3d 810 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

*Cunningham v. Zant,*
    928 F.2d 1006 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53, 62

x

*Daniels v. United States,*
    532 U.S. 374 (2001) ................................................... 30

*Darks v. Mullin,*
    327 F.3d 1001 (10th Cir. 2003) ......................................... 123

*Demarest v. Price,*
    130 F.3d 922 (10th Cir. 1997) ........................................... 56

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982) ................................................... 37

*Ellis v. Page,*
    351 F.2d 250 (10th Cir. 1965) ........................................... 24

*Estelle v. Gamble,*
    429 U.S. 97 (1976) .................................................... 129

*Enlow v. Bevenue,*
    4 Okla. Trib. 175 (Muscogee (Cr.) S. Ct. 1994) ............................ 24

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ................................................... 129

*Fetterley v. Paskett,*
    997 F.2d 1295 (9th Cir. 1993) ........................................... 121

*Fierro v. Gomez,*
    865 F. Supp. 1387 (N.D. Cal. 1994) ...................................... 130

*Fisher v. Gibson,*
    282 F.3d 1283 (10th Cir. 2002) ..................................... 119, 120

*Francis v. Spraggins,*
    720 F.2d 1190 (11th Cir. 1983) .......................................... 118

*Glenn v. Tate,*
    71 F.3d 1204 (6th Cir. 1995) ......................................... 60, 61

*Goodwin v. Oklahoma,*
    923 F.2d 156 (10th Cir. 1991) .......................................... 114

*Grant v. Oklahoma,*
    124 S. Ct. 162 (2003) ................................................ 5, 37

xi

*HRI , Inc. v. Environmental Protection Agency,*
198 F.3d 1224 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 32

*Hain v. Gibson,*
287 F.3d 1224 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Hamblin v. Mitchell,*
354 F.3d 482 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Harjo v. Andrus,*
581 F.2d 949 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Harjo v. Kleppe,*
420 F. Supp. 1110 (D. D.C. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Harris v. Wood,*
64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*Hatch v. Oklahoma,*
58 F.3d 1447 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 71

*Hawkins v. Mullin,*
291 F.3d 658 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Hicks v. Oklahoma,*
447 U.S. 343 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 136

*In re Holladay,*
331 F.3d 1169 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Hope v. Pelzer,*
536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Indian Country, U.S.A., Inc. v. State of Oklahoma,*
829 F.2d 967 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22, 23

*Jackson v. Calderon,*
211 F.3d 1148 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Jackson v. Denno,*
378 U.S. 368 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Jackson v. Herring,*
42 F.3d 1350 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*In re Johnson,*
    334 F.3d 403 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Jurek v. Estelle,*
    623 F.2d 929 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Jurek v. Texas,*
    428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Keeble v. United States,*
    412 U.S. 205 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kelly v. Small,*
    315 F.3d 1063 (9th Cir.), *cert. denied,* 123 S. Ct. 2094 (2003) . . . . . . . . . . . . . . . . . . 121

*In re Kemmler,*
    136 U.S. 436 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*La Grand v. Stewart,*
    173 F.3d 1144 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Lewis v. Jeffers,*
    497 U.S. 764 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Lockett v. Ohio,*
    438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 58

*Lynce v. Mathis,*
    519 U.S. 433 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114, 120

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 77

*McFarland v. Scott,*
    512 U.S. 849 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Medlock v. Ward,*
    200 F.3d 1314 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 70

*Mills v. Maryland,*
    486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Mollett v. Mullin,*
    348 F.3d 902 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 92, 93

*Murphy v. Oklahoma,*
   123 S. Ct. 1795 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 16

*Muscogee (Creek) Nation v. American Tobacco Co.*,
   5 Okla. Trib. 401, No. CV-97-27, 1
   998 WL 1119774 (Muscogee (Cr.) D. Ct. Feb. 12, 1998) . . . . . . . . . . . . . . . . . . . . . . . .   24

*Mustang Production Co. v. Harrison,*
   94 F.3d 1382 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Nelson v. Campbell,*
   347 F.3d 910 (11th Cir. 2003), *cert. granted,* 124 S. Ct. 835 (2003) . . . . . . . . . . . . .   128

*Newsted v. Gibson,*
   158 F.3d 1085 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Nguyen v. Reynolds,*
   131 F.3d 1340 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

*Osborn v. Shillinger,*
   861 F.2d 612 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   118

*Payne v. Tennessee,*
   501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   86

*Penry v. Lynaugh,*
   492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41, 58

*Pittsburg & Midway Coal Mining Co. v. Watchman,*
   52 F.3d 1531 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Powell v. Alabama,*
   287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

*Preiser v. Rodriguez,*
   411 U.S. 475 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   128

*Ring v. Arizona,*
   536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

*Robison v. Maynard,*
   829 F.2d 1501 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

*Rodriguez v. Cockrell, No. CIV SA-00-CA-443-EP,*
   2003 WL 1906154 (W.D. Tex. Mar. 31, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   110

*Romano v. Gibson,*
239 F.3d 1156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70, 90

*Scott v. Dugger,*
891 F.2d 800 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  121

*Scrivner v. Tansy,*
68 F.3d 1234 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 32

*Simmons v. South Carolina,*
512 U.S. 154 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92

*Spears v. Mullin,*
343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

*Stano v. Butterworth,*
51 F.3d 942 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

*Stewart v. Martinez-Villareal,*
523 U.S. 637 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  128

*Strickland v. Washington,*
466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Thomas v. Gibson,*
218 F.3d 1213 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67, 70

*Trop v. Dulles,*
356 U.S. 86 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  128

*United States v. Cronic,*
466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  115

*United States v. Errol D.,*
292 F.3d 1159 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 23

*United States v. McCullah,*
76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

*United States v. Pelican,*
232 U.S. 442 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*United States v. Prentiss,*
273 F.3d 1277 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*United States v. Williamson,*
   53 F.3d 1500 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Walton v. Arizona,*
   497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Walton v. Johnson,*
   269 F. Supp. 2d 692 (W.D. Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Wiggins v. Smith,*
   123 S. Ct. 2527 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wiley v. Sowders,*
   647 F.2d 642 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117, 118

*Williams v. Taylor,*
   529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williamson v. Ward,*
   110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Woodson v. North Carolina,*
   428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 56

*Wright v. Angelone,*
   944 F. Supp. 460 (E.D. Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Zarvela v. Artuz,*
   254 F.3d 374 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## STATE CASES

*Abshier v. State,*
   28 P.3d 579 (Okla. Crim. App. 2001), *cert. denied*, 535 U.S. 991 (2002) . . . . . . 72, 120

*Banks. v. State,*
   43 P.3d 390 (Okla. Crim. App. 2002), *cert. denied*, 537 U.S. 1126 (2003) . . . . . . . . . 45

*Battenfield v. State,*
   816 P.2d 555 (Okla. Crim. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 76

*Brown v. State,*
   67 P.3d 917 (Okla. Crim. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 109

*Brown v. State*,
   871 P.2d 56 (Okla. Crim. App. 1994) ........................................ 77

*C.M.G. v. State*,
   594 P.2d 798 (Okla. Crim. App. 1979) ...................................... 26

*Cheney v. State*,
   909 P.2d 74 (Okla. Crim. App. 1995) ....................................... 66

*Grant v. State*,
   58 P.3d 783 (Okla. Crim. App. 2002),
   *rev'd and remanded*, 124 S. Ct. 162 (2003) ........................... 5, 37, 44

*Hawkins v. State*,
   891 P.2d 586 (Okla. Crim. App. 1995) ...................................... 71

*Hooks v. State*,
   862 P.2d 1273 (Okla. Crim. App. 1993) ..................................... 76

*Johnson v. State*,
   102 S.W.3d 535 (Mo. 2003) ................................................ 108

*Kelsey v. State*,
   744 P.2d 190 (Okla. Crim. App. 1987) ...................................... 121

*LaFevers v. State*,
   897 P.2d 292 (Okla. Crim. App. 1995) ...................................... 76

*Lambert v. State*,
   71 P.3d 30 (Okla. Crim. App. 2003) ................................... 107, 115

*Lewis v. State, __ So. 2d __*,
   No. CR-99-1155, 2003 WL. 21246584 (Ala. Crim. App. May 30, 2003) ........... 84

*Martinez v. State, __ P.3d __*,
   No. PCD-2002-972, 2003 WL. 22679725 (Okla. Crim. App. Nov. 13, 2003) ...... 107

*McElmurry v. State*,
   60 P.3d 4 (Okla. Crim App. 2002) .......................................... 44

*McGregor v. State*,
   885 P.2d 1366 (Okla. Crim. App. 1994) ..................................... 85

*Murphy v. State*,
   47 P.3d 876 (Okla. Crim. App. 2002) ................................... passim

*Murphy v. State*,
    54 P.3d 556 (Okla. Crim. App. 2002) .................................... passim

*Murphy v. State*,
    66 P.3d 456 (Okla. Crim. App. 2003) .................................... passim

*Paxton v. State*,
    867 P.2d 1309 (Okla. Crim. App. 1993) .................................... 84

*People v. Hattery*,
    488 N.E.2d 513 (Ill. 1985) .............................................. 118

*Pickens v. State*,
    74 P.3d 601 (Okla. Crim. App. 2003) ................................. 107, 114

*In re Readoption with Amendments of Death Penalty Regulations*,
    ___ A.2d ___, *A-0899-01T1*, 2004 WL 314936 (N.J. Super. Ct. App.
    Div. Feb. 20, 2004) ............................................... 140, 141

*Salazar v. State*,
    973 P.2d 315 (Okla. Crim. App. 1998) .................................... 78

*Scott v. State*,
    891 P.2d 1283 (Okla. Crim. App. 1995) ................................... 76

*Snow v. State*,
    ___ P.3d ___,PCD-2002-979, 2004 WL 309052
    (Okla. Crim. App. Feb. 19, 2004) ...................................... 108

*State v. Harbison*,
    337 S.E.2d 504 (N.C. 1985) ............................................ 120

*State v. Klindt*,
    782 P.2d 401 (Okla. Crim. App. 1989) ................................... 29

*State v. Wiplinger*,
    343 N.W.2d 858 (Minn. 1984) .......................................... 120

*Stouffer v. State*,
    742 P.2d 562 (Okla. Crim. App. 1987) ................................... 66

*Workman v. State*,
    824 P.2d 378 (Okla. Crim. App. 1991) ................................... 77

## DOCKETED CASES

*Anderson v. Mullin,*
   No. CIV-01-177-M (W.D. Okla. Jun. 11, 2003) ............................... 121

*Banks v. Mullin,*
   No. 03-CV-198 (N.D. Okla. Oct. 1, 2003) ................................... 45

*Lambert v. Mullin,*
   No. CIV 00-313-K (N.D. Okla. Aug. 12, 2002) ............................. 122

*Martinez v. Mullin,*
   No. CIV 00-1165-L (W.D. Okla. Jul. 11, 2002) ............................. 122

*Spears v. Ward,*
   No. CIV-96-1862 (W.D. Okla. Jul. 21, 1999) ................................. 33

## FEDERAL STATUTES

31 Stat. 861 (1901) ....................................................... 24, 145

32 Stat. 500 (1902) ..................................................... 24, 25, 145

18 U.S.C. § 1151 ........................................................ passim

18 U.S.C. § 1153 ........................................................ passim

18 U.S.C. §3598 ............................................................ 31

21 U.S.C. § 848 ......................................................... 7, 34

28 U.S.C. § 2254 ........................................................ passim

## OTHER FEDERAL LEGISLATIVE DOCUMENTS

*Ad Hoc Committee of the Judicial Conference on Federal Habeas Corpus in Capital Cases*, 135 Cong. Rec. S13471-04 (1989) .................................... 125

H.R. Rep. No. 104-23, 104th Cong., 1st Sess. at 10 (1995) .......................... 124

## STATE STATUTES

Ariz. Rev. Stat. Ann. § 13-703.02 .............................................. 111

Okla. Stat. tit. 22, §9, rule 9.7 ................................................. 125

Okla. Stat. tit. 21, § 701.9 ..................................................... 82

Okla. Stat. tit. 22, § 701.10a ................................................... 115

Okla. Stat. tit. 21, § 701.11 ................................................. passim

Okla. Stat. tit. 21, §701.12 ..................................................... 63

Okla. Stat. tit. 22, § 1014 ..................................................... 127

Okla. Stat. tit. 22, § 929 ..................................................... 115

Okla. Stat. tit. 22, § 1089 ..................................................... 125

## OTHER REFERENCES

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (Rev. ed. Feb. 2003) ..................................... passim

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989) ............................................... passim

WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW (3d ed.1998) ..................... 20, 26

FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (1982 ed.) ................. 18, 26

GISLI H. GUDJONSSON, THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS, A HANDBOOK (2003) ......................................................... 97, 98

*Craig Haney, The Social Context of Capital Murder: Social Histories and the Logic of Mitigation,* 35 SANTA CLARA L. REV. 547, 561 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 59

*Kevin McNally, Death Is Different: Your Approach to a Capital Case Must be Different, Too,* THE CHAMPION (Mar. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

MENTAL RETARDATION, DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS (AAMR 10th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*Old Habits die Hard: The death penalty in Oklahoma* (Amnesty International April 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Joshua N. Sondheimer, A Continuing Source of Aggravation: the Improper Consideration of Mitigating Factors in Death Penalty Sentencing,* 41 HASTINGS L.J. (1990) . 58

HOWARD R. WILLIAMS AND CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS (9th ed. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## ABBREVIATIONS USED IN THIS PETITION

District Court Clerk's Record (preceded by volume number, followed by page number) . . . . CR

Transcript of Motions Hearing (followed by date of hearing) . . . . . . . . . . . . . . . . . . . . . . . Tr. Mot.

Transcript of Preliminary Hearing (followed by date of hearing) . . . . . . . . . . . . . . . . . . . . Tr. Pr.

Transcript of Jury Trial (preceded by volume number, followed by page number) . . . . . . . . . Tr.

Transcript of Evidentiary Hearing on Remand (followed by page number) . . . . . . . . . . Tr. Evid.

Mr. Murphy's Direct Appeal Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appellant's Br.

Mr. Murphy's Post- Conviction Application . . . . . . . . . . . . . . . . . . . . . . . . . . Post-Conviction Br.

N.B. The original records of the state direct appeal and state post-conviction proceedings will be referred to by document name as there is no consecutive page numbering system used by the Oklahoma Court of Criminal Appeals for documents filed directly with that court.

**Prisoner's Name:**          **Patrick Dwayne Murphy**
**Prisoner's DOC Number:**    **372682**
**Place of Confinement:**     **Oklahoma State Penitentiary, McAlester, Oklahoma**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **PATRICK DWAYNE MURPHY**, | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| v. | § | Case No. CIV-03-443-WH |
| | § | |
| | § | |
| **MIKE MULLIN**, Warden, Oklahoma | § | |
| State Penitentiary, | § | |
| Respondent. | § | |

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## <u>PURSUANT TO 28 U.S.C.§ 2254</u>

Petitioner, Patrick Dwayne Murphy, is incarcerated in the Oklahoma State Penitentiary, P.O.

Box 97, McAlester, Oklahoma, 74502. Mr. Murphy is confined by the State of Oklahoma under a

sentence of death in violation of the laws and the Constitution of the United States of America. As

a result of these violations, Mr. Murphy is entitled to have the writ of habeas corpus issue on his

behalf. This is Mr. Murphy's first petition for writ of habeas corpus relief pursuant to Title 28 of

the United States Code, section 2254.

### <u>INTRODUCTION</u>

Mr. Murphy's capital trial was the second of three trials that his trial counsel tried and lost

in a sixteen and one half week period. In the five months preceding that onslaught of trials, Mr.

Murphy's trial counsel tried and lost another capital case. At the end of that terrible ten month

period, four capital trials were over, and four clients were sentenced to death.

Under the press of that horrific trial schedule, and the personal pressure of going through a divorce[1] which was finalized in the midst of Mr. Murphy's pretrial proceedings, Mr. Murphy's trial counsel failed to adequately perform his duties to Mr. Murphy at nearly every turn. The resulting trial is filled with a host of errors discussed in full herein, each of which independently merits habeas relief. Some of the most egregious errors involved the following:

- *Counsel failed to investigate the crime.* Consequently, counsel failed to recognize that the Oklahoma State Bureau of Investigation had *mislocated the crime scene* by some *2.5 miles*, calling into question the accuracy and veracity of all the crime scene work and, most importantly, showing that jurisdiction over the crime falls squarely in Federal Court because the crime occurred in Indian County and both the victim and the accused were Native American members of the Muscogee (Creek) Nation Indian tribe.

- *Counsel admitted his client's guilt to the jury.* Had he interviewed his client and investigated the case, counsel would not have concluded that all that could be said in Mr. Murphy's defense was that he was too drunk to form the intent to kill. That implicit admission of guilt was unwarranted by the evidence, made without Mr. Murphy's permission, and was directly contrary to Mr. Murphy's statements of innocence, his plea of not guilty, and his testimony. By admitting his client's guilt over his client's testimony of innocence, trial counsel made his client look like a liar, took the issue of guilt/innocence out of the hands of the jury, and absolutely violated

---

[1]It is with the express permission of trial counsel that the occurrence of his divorce during the pendency of these cases is mentioned here.

2

his duty of loyalty to his client as protected under the Sixth and Fourteenth Amendments.

- *Counsel failed to investigate, develop, and present a meaningful mitigation case.* An investigation would have disclosed that Mr. Murphy did not have "a good life and raising" as the prosecution stated *without rebuttal*. Mr. Murphy grew up in a violent and troubled home in a rural area of Oklahoma called "the bottoms," a place which the police say is a violent and rough area in which a child had almost no chance. A Department of Human Services investigator who filed charges on Mr. Murphy's mother saw that violence first hand. He recalls that, on the first visit he made to that "terrible" environment, he witnessed Mr. Murphy's father shooting at Mr. Murphy's mother while she lay with her children in a ditch. There were frequent stabbings, gun fights, and abuse of alcohol at the Murphy household. Yet despite that beginning, Mr. Murphy built a life of which he could be proud. Mr. Murphy's friends, family, teachers and co-workers would have testified that Mr. Murphy is young man who had a job at which he worked successfully for some six years. Mr. Murphy has three children with whom he has a loving relationship and whom he had always supported. Mr. Murphy is a member of the Muscogee (Creek) Nation and has maintained significant community and extended family ties. Mr. Murphy was a successful athlete, having been an outstanding high school basketball player. Mr. Murphy has people who love him, miss his presence in their lives, and believe his life is worth saving. The jury knew *none* of this.

Mr. Murphy's trial counsel not only failed to investigate and develop information critical to the case, he also failed to use effectively the information he had in his possession. For example, trial

3

counsel had available *before trial* a test showing that Mr. Murphy scored a 67 on an IQ test, reflecting an intelligence that is significantly below normal. Yet, counsel failed to use that information to:

- Reurge a motion to suppress Mr. Murphy's post-arrest statement at trial;

- Place into context Mr. Murphy's post-arrest statement when it was played to the jury, or contextualize Mr. Murphy's trial testimony so that the jury could understand that Mr. Murphy's below normal intelligence impacted his answers to questions asked by police investigators and the prosecuting attorneys; or

- Challenge the absurd prosecution theory that Mr. Murphy had the capacity to plan and organize a premeditated crime, to cover up all forensic evidence of the crime, and to manipulate three other men into doing his bidding.

Trial counsel had a psychopathy report that showed Mr. Murphy to be so highly unlikely to be the kind of person to commit the kind of crime of which he was accused as to draw into question the entire prosecution theory of the case and specifically rebut the claimed aggravators. Indeed, the psychopathy report is far more consistent with Mr. Murphy's account of the events on the night of the crime than it is with the prosecution's theory of the crime.

In sum, counsel's deficient performance prevented the jury from having information they needed to fairly judge either Mr. Murphy's culpability for the crime or his moral responsibility for that crime, once convicted. His trial did not comport with the standards of justice our system of law requires before imposing the ultimate penalty. Indeed, the United States Supreme Court has already determined the first trial in that terrible crush of three capital trials in sixteen and one half weeks

4

must be reviewed in light of the Court's holding in *Wiggins v. Smith*, 123 S. Ct. 2527 (2003).[2] The same result should obtain here.

For these, and all of the additional reasons discussed herein, Mr. Murphy respectfully requests the Court issue a writ of habeas corpus and order him to be released from the custody of the State of Oklahoma forthwith, or retried in either federal or state court within a reasonable time.

## STATEMENT OF THE CASE

Patrick Dwayne Murphy was charged by information jointly with Billy Jack Long with one count of First Degree Murder with malice aforethought, in violation of Title 21 of the Oklahoma Statutes, section 701.7(A), for the August 28, 1999, death of George Jacobs. (I CR 5). Kevin King, a minor, was also later charged in the crime.

On December 17, 1999, the State filed a Bill of Particulars seeking the death penalty against Mr. Murphy and Mr. Long alleging two aggravating factors: (1) the crime was especially heinous, atrocious, or cruel; and (2) the existence of the probability that Mr. Murphy and Mr. Long would commit criminal acts of violence that would constitute a continuing threat to society. (I CR 82-86).[3]

Mr. Murphy pleaded not guilty and was tried by a jury[4] in April 2000, in a trial setting only eight and one half months after his arrest. The guilt/innocence phase of the trial lasted three and one half days. It began on Monday with a full day devoted to jury selection and the prosecutor's

---

[2]*See Grant v. State*, 58 P.3d 783, 800 (Okla. Crim. App. 2002) (finding counsel's presentation of mitigation case not outside the wide range of professionally competent assistance), *rev'd and remanded sub. nom, Grant v. Oklahoma*, 124 S. Ct. 162 (2003) (reversed and remanded for further consideration in light of *Wiggins v. Smith*, 123 S. Ct. 2527 (2003)).

[3]The State amended the Bill of Particulars on April 6, 2000, but made no substantive changes to the aggravating factors. (II CR 310-315).

[4]Mr. Murphy's and Mr. Long's cases were severed and Mr. Murphy was tried individually. *See* Tr. Mot. (Feb. 24, 2000) at 11.

5

opening statement. (I Tr. 239, 251). The three days of trial included jury deliberations and a half day break on Wednesday. (II Tr. 575; III CR 482). After hearing no more than two and one half days of evidence, the jury found Mr. Murphy guilty of first degree murder. (III CR 398). The sentencing phase of the trial began on Friday, April 14, 2000, and concluded that same day at 5:10 p.m. (III CR 482). The jury found the existence of both alleged aggravating factors (III CR 420, 482) and fixed Mr. Murphy's punishment at death (III CR 421). The district court pronounced formal judgment and sentence on the verdict on May 18, 2000. (III CR 453-54).

Mr. Murphy appealed his conviction and sentence of death to the Oklahoma Court of Criminal Appeals [hereinafter "OCCA"]. The state court denied all grounds for relief and affirmed the conviction and sentence of death. *Murphy v. State*, 47 P.3d 876 (Okla. Crim. App. 2002).

A petition for writ of certiorari was filed in the Supreme Court challenging the state court decision. The certiorari petition was denied on April 21, 2003. *Murphy v. Oklahoma*, 123 S. Ct. 1795 (2003).

Mr. Murphy petitioned the OCCA for post-conviction relief. The state court granted post-conviction relief on the sole issue of Mr. Murphy's claim of mental retardation and remanded the case for an evidentiary hearing on that issue. *Murphy v. State*, 54 P.3d 556 (Okla. Crim. App. 2002).

In written findings submitted to the Court of Criminal Appeals, the trial court reported that it conducted an evidentiary hearing and concluded there was insufficient evidence to create a fact question on the issue of Mr. Murphy's claim of mental retardation. *Findings*, *State v. Murphy*, No. CF-1999-164A (Appellate Case No. PCD-2001-1197) (McIntosh County Dist. Ct. Nov. 5, 2002). The OCCA affirmed the trial court's finding, denied Mr. Murphy's application for post-conviction relief regarding mental retardation after remand for evidentiary hearing, and again affirmed Mr. Murphy's sentence of death. *Murphy v. State*, 66 P.3d 456 (Okla. Crim App. 2003).

6

On July 30, 2003, Mr. Murphy requested this Court appoint counsel under Title 21 of the United States Code, section 848, subpart (q)(4)(B) and *McFarland v. Scott*, 512 U.S. 849 (1994). On August 28, 2003, the office of the Federal Public Defender for the Western District of Oklahoma was appointed to represent Mr. Murphy. Pursuant to an agreed scheduling order, Mr. Murphy's petition is scheduled to be filed in this Court by March 5, 2004.

## STATEMENT OF THE FACTS

On the morning of Saturday, August 28, 1999, George Jacobs, Sr. (age 49) and his cousin, Mark Sumka (age 31), met at a friend's house and decided to go drinking and driving around rural south-central Oklahoma. (III Tr. 582-83). They took Mr. Jacobs's car and made it an all-day enterprise, starting off at around 10 a.m. by driving to get a bottle of whiskey. (III Tr. 583). By early afternoon, Mr. Jacobs had already "passed out" from the whiskey they had been drinking. (III Tr. 624-25).

After Mr. Jacobs revived later in the afternoon (III Tr. 623) they got more whiskey (III Tr. 586) and beer and continued "cruising around" the countryside with Mr. Sumka driving (III Tr. 587). By the time it was dark, they ended up at Mr. G's, a tavern located on a dirt road (II Tr. 445) in the small town of Vernon (III Tr. 589-90). There, they drank more beer and ate some barbeque. (II Tr. 590). Sometime after 9:30 p.m., probably shortly after 10:00 p.m., they left Mr. G's to drive to another bar. (III. Tr. 590). As soon as they got in the car, Mr. Jacobs passed out for the second time that day and, according to Mr. Sumka, never woke up. (III Tr. 625).

While Mr. Jacobs and Mr. Sumka were spending the day drinking and driving around, Patrick Murphy was helping his cousin, Mark Taylor, move furniture in Henryetta. (III Tr. 660). Mr. Murphy and Mr. Taylor started around 11:30 a.m. or 12:00 p.m., drinking beer as they were working.

7

(III Tr. 661). By 4:30 p.m. they finished the job and got sandwiches in Okmulgee. (III Tr. 661). After eating, they picked up their cousin, Billy Jack Long. (III Tr. 662). They went visiting for a while and, around 8:00 p.m., Mr. Taylor went home. (III Tr. 664). Mr. Taylor described Mr. Murphy's condition at around 8:00 p.m. as "a little more than drunk." (III Tr. 686). Mr. Murphy was described as "lit" after having consumed a twenty-four pack, a thirty-pack, and four additional beers with his cousins. (III Tr. 686).

After Mr. Taylor left, Mr. Murphy and Mr. Long stopped by Ms. Kathleen King's house and picked up her son, Kevin King, who brought more beer with him. (IV Tr. 958). Mr. Murphy, Mr. Long, and Mr. King then went driving. At a little after 10:00 p.m., Ms. Elizabeth Younger was driving north on the Vernon road, away from Mr. G's, when she came upon a truck headed south. (II Tr. 263). The truck stopped on a curve in the road and Ms. Younger also stopped. (II Tr. 266). Ms. Younger spoke briefly with the truck's driver, and noticed but did not speak with two other occupants of the truck. (II Tr. 265). The driver of the truck introduced himself by saying: "Hi. My name is Patrick," shook Ms. Younger's hand, and asked for directions to Mr. G's bar. (II Tr. 264). Ms. Younger gave directions, and went on her way. (II Tr. 264). Ms. Younger subsequently described the exchange as "calm" and "friendly." (II Tr. 268). Mr. Murphy has no recollection of that meeting. (IV Tr. 963).

As Mr. Murphy continued on his way to Mr. G's, he met his friend Mark Sumka on the Vernon Road. (III Tr. 591-92). Mr. Sumka stopped to talk with Mr. Murphy. (III Tr. 592). When Mr. Murphy inquired about who was in the car with Mr. Sumka; Mr. Sumka replied that George Jacobs was with him. (III Tr. 592). Mr. Murphy's passengers apparently started "coming around" Mr. Murphy's truck, approaching Mr. Jacobs's car. (III Tr. 593). Mr. Sumka took off, driving north,

8

but said Mr. Murphy pulled in front of him, forcing him to stop. (III Tr. 593). Mr. Sumka testified

that, after he was stopped, the passengers again exited Mr. Murphy's truck, and this time pulled Mr.

Jacobs from his car, and started hitting him. (III Tr. 593-96).

Mr. Sumka got out of the car and went to its rear where he met Mr. Murphy. (III Tr. 594-95,

634). While Mr. Sumka stood at the rear of the car with Mr. Murphy, he could hear Mr. Long and

Mr. King hitting Mr. Jacobs. (Tr. 595-96, 632). He said "that was enough, you know, he's passed

out." (III Tr. 595). Then Mr. Murphy walked forward, and Mr. Long came to the back of the car,

where he struck Mr. Sumka in the nose, causing his nose to bleed. (III Tr. 596). After staggering

for a moment, Mr. Sumka noticed that Mr. King, not Mr. Murphy, was dragging Mr. Jacobs "out of

the ditch." (III Tr. 597).

Frightened, Mr. Sumka ran about a hundred yards away, but then returned to help Mr. Jacobs.

(III Tr. 597-98). As he returned, he was met at the rear of the vehicle by Mr. Murphy, Mr. Long, and

Mr. King. (III Tr. 598). Mr. King threatened Mr. Sumka, telling him not to tell anyone what he'd

seen. (III Tr. 598, 641-42). Mr. King then struck Mr. Sumka in the face (III Tr. 599); Mr. Murphy

intervened, telling Mr. King and Mr. Long not to hit Mr. Sumka again (III Tr. 600).

Mr. Sumka said that Mr. Murphy tossed a folding knife into the woods. (III Tr. 600). Mr.

Sumka was told that he was coming with the men. (III Tr. 600-01). When Mr. Sumka left with the

others, Mr. Jacobs was alive, but barely breathing. (III Tr. 601). The four men got into Mr.

Murphy's truck and left the scene, leaving Mr. Jacobs in the ditch and Mr. Jacobs's Dodge sedan in

the road. (III Tr. 602).

Mr. Sumka said he never saw Mr. Murphy hit, cut, or do anything whatsoever to Mr. Jacobs.

(III Tr. 638). Mr. Sumka, the only eyewitness testimony regarding Mr. Murphy's conduct that night,

9

said only that Mr. Murphy intervened to protect Mr. Sumka from being further hurt by Mr. King and Mr. Long. (III Tr. 600).

Word of trouble on the Vernon road came to the police from Mr. Anderson Fields, Jr. (II Tr. 309-310). At around 10:30 p.m., Mr. Fields went to investigate an incident he had been told was occurring on the Vernon Road, about half a mile from his residence. (II Tr. 309-10). When Mr. Fields got to the scene, he observed three or four men standing over a man who was lying in a ditch. (II Tr. 311). Mr. Fields asked what was going on, and the men standing over the body reported that the man in the ditch was drunk. (II Tr. 311). Because Mr. Fields saw blood and a fleshy object in the road, he became suspicious and, after leaving, he called the McIntosh County Sheriff's office to report the incident. (II Tr. 312). Mr. Fields then returned to the scene where he found the men with whom he had spoken gone, and the man in the ditch alive, but barely breathing. (II Tr. 313). Mr. Fields observed that the man had suffered injuries that included slashes across his stomach and throat, a bloody face, and severed genitals. (II Tr. 314-15).

Members of the McIntosh county sheriff's office arrived to the remote location over an hour later (II Tr. 320) to find a man's body in a ditch on the east side of the Vernon road (II Tr. 273-74, State's Exs. 16, 17). The genitals were found lying in the road, approximately eighteen feet from the body. (II Tr. 273-74, State's Exs. 16, 17). The police secured the area with yellow crime scene tape (II Tr. 285) and waited for the arrival of the Oklahoma State Bureau of Investigation.

The Oklahoma State Bureau of Investigation (OSBI) began an investigation of the crime. (II Tr. 288). The decedent, who was lying in a ditch to the right (or east) of a Dodge sedan car (II Tr. 428; State's Exs. 16, 17), was identified based on a driver's license photograph in his wallet as Mr. George Jacobs (II Tr. 325).

10

Based on Ms. Younger's description of the men and the truck she had encountered on the Vernon road, Mr. Fields's description of a truck at the scene of the murder, and consultation with local law enforcement, the OSBI identified Patrick Murphy as a potential suspect in the case. (II Tr. 328).

While a criminalist processed the crime scene (II Tr. 420, 426), Agent Jones of the OSBI went to Mr. Murphy's residence at approximately 3:00 to 4:00 a.m. Sunday morning (II Tr. 329). Receiving no answer to his knock, Agent Jones secured the residence by leaving an officer outside and left to apply for a search warrant. (II Tr. 329-30). Agent Jones returned with a warrant at around 11:00 a.m. or 12:00 p.m. Sunday morning. (II Tr. 330). The OSBI entered the residence, took Mr. Murphy into custody, and conducted a search of the residence. (II Tr. 330). Iris Dalley, the OSBI Criminalist who had processed the crime scene, conducted the search and took evidence from Mr. Murphy's house. (II Tr. 484).

At almost the same time that the search of Mr. Murphy's home was being conducted, Mr. Sumka gave a statement to Agent Jones. (II Tr. 332). From this statement, the OSBI learned of the involvement of Kevin King and Billy Jack Long in the night's events. (II Tr. 332). Agent Jones took Mr. Sumka to the scene of the crime, where Mr. Sumka briefly assisted in an unsuccessful effort to find the murder weapon. (II Tr. 336). A knife was recovered on Monday, August 31, 1999, some two days after the murder, by Eldon Kelough, an officer with the Creek Nation Lighthorsemen Tribal Police. (II Tr. 385, 391).

Neither Mr. King nor Mr. Long were arrested immediately. Instead, the police focused on Mr. Murphy, who was questioned shortly after his arrest. (II Tr. 340). During the interview, Mr. Murphy admitted being at the scene where Mr. Jacobs was murdered, and admitted hitting and

11

cutting Mr. Jacobs. (Tr. Mot. (April 6, 2000) Ex. 2 (Post-Arrest Statement of Patrick Murphy, Aug. 29, 1999) at 109, 106). However, during the trial, Mr. Murphy clarified that he did not remember hitting, kicking, or cutting Mr. Jacobs. (IV Tr. 969-72). Mr. Murphy explained that he said what Agent Jones wanted to hear. (IV Tr. 969-72).

The State charged Mr. Murphy and Mr. Long, and eventually Kevin King, with first degree murder. The trials of Mr. Murphy and Mr. Long were severed, and the State elected to try Mr. Murphy first. (Tr. Mot. (Feb. 24, 2000) at 11). The State's case against Mr. Murphy was not based principally on forensic evidence. Rather, the case against Mr. Murphy was based almost entirely on statements made by Mr. Murphy (a man whose IQ is below normal (V Tr. 1290)), while drunk, to people after the crime in combination with an alleged motive of jealousy over a relationship that Mr. Murphy's common-law wife had with Mr. Jacobs years before. *See, e.g.*, (III Tr. 668-69) (comments made after the crime); and (III Tr. 717) (testimony regarding relationship between Patsy and George Jacobs).

At trial, the State offered the testimony of the medical examiner to establish the cause of Mr. Jacobs's death. The medical examiner testified that Mr. Jacobs had been beaten severely and had suffered very serious head injuries (III Tr. 746-748), possibly causing fairly instantaneous loss of consciousness (III Tr. 767). In addition to physical trauma (III Tr. 750), Mr. Jacobs also sustained a variety of knife wounds, including a cut across the throat, a cut across the chest, and amputation of his genitals (III Tr. 750-55). The medical examiner concluded that George Jacobs died as a result of exsanguination from multiple sharp and blunt force injuries. (III Tr. 762).

Although the medical examiner could not say one way or another whether Mr. Jacobs was conscious and aware of his injuries (III Tr. 774), the state argued for the application of the heinous,

12

atrocious, or cruel aggravator. The medical examiner concluded "that it was a relatively short time frame between the beginning of the infliction of the injuries and [Mr. Jacobs's] ultimate death." (III Tr. 771). Mr. Jacobs's condition was not inconsistent with being unconscious throughout the attack. (III Tr. 778). Mr. Jacobs's body showed no signs of defensive wounds. (III Tr. 767). Mr. Jacobs's post-mortem blood alcohol level was .23, and the alcohol content of his ocular vitreous fluid was .29, indicating significant intoxication. (III Tr. 761, 765). Consistent with the observations of the medical examiner, OSBI Criminalist Iris Dalley testified that she saw no injuries to Mr. Jacobs's hands (II Tr. 464) and, as shown in the crime scene photographs, despite death by exsanguination and evidence of smeared blood on the victim, Mr. Jacobs had no blood on the palms of his hands or inside of his fingers, indicating that his hands had not come into contact with his wounds during his assault (II Tr. 464; State's Exs. 26, 27). There was no testimony that Mr. Jacobs ever spoke during the course of the attack which ended his life. (III Tr. 601; Tr. Mot. (April 6, 2000) Ex. 2 (Post-Arrest Statement of Patrick Murphy, Aug. 29, 1999) at 108, 141).

Agent Dalley observed blood smearing and bloody fingerprints on the victim's body which she concluded had not been caused by the victim. (II Tr. 464; 526). Agent Dalley concluded that whoever had committed the crime would have "blood on their hands at least" (II Tr. 550) and that "it would be certainly likely they would have some spatter on the clothing" and possibly the shoes (II Tr. 551). The State, however, produced virtually no forensic evidence showing any connection between Mr. Murphy and the crime.

The State chose not to test any clothes or shoes gathered from Mr. Murphy's house for blood. (II Tr. 492, 556, State's Exs. 47, 48). At the time Mr. Murphy was taken into custody, around noon the morning after the crime, the OSBI observed no blood on Mr. Murphy's hands. (II Tr. 547). The

13

OSBI took no fingernail scrapings from Mr. Murphy.  ( *See* State's Exs. 47, 48).  Agent Dalley testified that she saw no blood on the driver's side of Mr. Murphy's pickup.  (II Tr. 554).  There was blood found in Mr. Murphy's house, but Agent Dalley concluded that it "did not appear to be directly related to the injuries to the body which [she] saw on the Vernon road."  (II Tr. 552).  The knife recovered from the scene of the crime some two days after the crime, while Mr. Murphy was in custody but Mr. Long and Mr. King were free, tested positive for Mr. Jacobs's blood, but had no latent fingerprints and was never identified by anyone as Mr. Murphy's knife.  (II Tr. 537).

The State explained the absence of bloody shoes and clothes by presenting testimony that Mr. Murphy had burned incriminating clothes at his mother's house.  (II Tr. 333).  Agent Jones of the OSBI investigated a burn pile at Ms. Murphy's house (II Tr. 333; State's Exs. 1, 2), but produced no evidence of burned clothes (zippers, rivets from jeans, boot leather, etc.).  Criminalist Dalley testified that, despite her expertise in analyzing burned evidence, she was not asked to review the burn pile in this case.  (II Tr. 558-59).

The only forensic link between Mr. Murphy and the crime was a DNA test on blood spatter found on Mr. Murphy's watch.  (IV Tr. 830).  That test was inconclusive, and showed only that the blood spatter was as consistent with Mr. Sumka's blood as it was with Mr. Jacobs's blood.  (IV Tr. 830; State's Ex. 52).  Mr. Sumka was bleeding from a blow to the nose at the scene (III Tr. 595) and was still bleeding the following day (II Tr. 336-38; State's Ex. 3).  Mr. Murphy was in close proximity to Mr. Sumka throughout the night's events.

Blood found on the side of the truck where the passengers, Mr. Long, Mr. King and Mr. Sumka, were sitting was DNA tested and returned a result consistent with Mr. King.  (IV Tr. 833; State's Ex. 52).  Blood found in the back of Mr. Murphy's pickup was consistent with Mr. Sumka.

14

(IV Tr. 833). Mr. Sumka testified that, of the four men, he was the only one who took a shower after the assault on Mr. Jacobs. (III Tr. 650).

The defense raised as its only defense the proposition that Mr. Murphy was too drunk to form the intent to kill. (IV Tr. 868-69). In the guilt/innocence stage of the trial, the defense presented two witnesses: Dr. Bill Sharp, a clinical psychologist and expert in the field of substance abuse, (IV Tr. 869), and Mr. Murphy (IV Tr. 944).

After the jury returned a guilty verdict (IV-A Tr. 1160), court recessed for the night, and the sentencing phase of the case began and concluded the following day (V Tr. 1204). The defense presented four witnesses: Dr. Jeanne Russell on the alleged continuing threat presented by Mr. Murphy (V Tr. 1227); Dr. Sharp regarding Mr. Murphy's substance abuse (V Tr. 1287); Mr. Murphy's mother (V Tr. 1315); and Mr. Murphy (V Tr. 1335). Dr. Sharp mentioned for the first time that Mr. Murphy's IQ was below normal (V Tr. 1290). Unrebutted by any defense evidence, the prosecutor told the jury that Mr. Murphy had "a good life and raising." (V Tr. 1395). The jury fixed Mr. Murphy's punishment at death. (V Tr. 1401).

15

## **PRIOR PROCEEDINGS**

**A.**     **Original Conviction**

| | |
|---|---|
| **Court:** | District Court of McIntosh County, Oklahoma |
| **Case No.:** | CF-1999-164A |
| **Charge:** | First Degree Murder |
| **Plea:** | Not guilty |
| **Trial:** | By jury |
| **Verdict:** | Guilty of First Degree Murder |
| **Sentence:** | First Degree Murder–Death |

**Petitioner's Counsel:**     Mr. James Bowen (first chair)
Oklahoma Indigent Defense System
610 S. Hiawatha
Sapulpa, Oklahoma 74066

Mr. Richard Lerblance (second chair)
1008 Pennsylvania Avenue
Hartshorne, Oklahoma 74547

**B.**     **Direct Appeal**

| | |
|---|---|
| **Court:** | Oklahoma Court of Criminal Appeals ["OCCA"] |
| **Case No.:** | D-2000-705 |
| **Opinion:** | *Murphy v. State*, 47 P.3d 876 (Okla. Crim. App. 2002) |

**Petitioner's Counsel:**     Mr. Steven M. Presson
Mr. Robert Wade Jackson
Jackson & Presson, P.C.
207 West Main Street
P.O. Box 5392
Norman, Oklahoma 73070-5392

| | |
|---|---|
| **Petition for Rehearing:** | None filed |
| **Certiorari:** | Denied, *Murphy v. Oklahoma*, 123 S. Ct. 1795 (2003) |

16

C.    **State Application for Post-conviction Relief**

      **Court:**           Oklahoma Court of Criminal Appeals ["OCCA"]

      **Case No.:**        PCD-2001-1197

      **Opinions:**        Granting in part and denying in part post-conviction relief, *Murphy v. State*, 54 P.3d 556 (Okla. Crim. App. 2002); and denying post-conviction relief after remand for evidentiary hearing on mental retardation, *Murphy v. State*, 66 P.3d 456 (Okla. Crim. App. 2003).

      **Counsel:**        Mr. Brian L. Dupler
                           Capital Post-Conviction Division
                           Oklahoma Indigent Defense System
                           1660 Cross Center Drive
                           Norman, Oklahoma 73019

      **Certiorari:**     None

17

## GROUND ONE - ABSENCE OF STATE COURT JURISDICTION

**Patrick Murphy is an Indian. The crime occurred in Indian country. Thus, jurisdiction over the crime is exclusively federal under 18 U.S.C. § 1153. The state court proceedings against Mr. Murphy were void *ab initio*, and Mr. Murphy should be released from the custody of the State of Oklahoma forthwith.**

Mr. Murphy is being held in the custody of the State of Oklahoma in violation of the laws and the Constitution of the United States because the state court that tried and pronounced judgment upon him had no jurisdiction over the crime.

**A.     Federal Law Provides for Exclusive Federal Jurisdiction Over Murders Committed by Indians, Against Indians, in Indian Country**

Federal statutory law provides for exclusive federal jurisdiction over certain major crimes, of which murder is one, committed by an Indian, against an Indian, in Indian country. 18 U.S.C. § 1153.[5] The defendant in this case is an "Indian" within the meaning of the federal statutes, as is the victim. The crime occurred in Indian country. Thus, Mr. Murphy should have been prosecuted, if at all, by federal authorities. The state of Oklahoma lacked jurisdiction over this crime and the defendant and therefore the prosecution and judgment was void *ab initio*. On these grounds alone, a writ of habeas corpus should issue.

**B.     Mr. Murphy is an Indian Within the Meaning of the Federal Statutes**

The Indian Major Crimes Act, 18 U.S.C. § 1153, does not specifically define who is an "Indian" for purposes of falling within the auspices of the act. *See* FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (1982 ed.) [hereinafter COHEN'S HANDBOOK]. Where the word "Indian"

---

[5] "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153.

is used without definition, courts have decided that an Indian is one who has both Indian blood and is regarded as Indian by his or her tribe or Indian community. *See id.* at 24. "For a criminal defendant to be subject to § 1153 [the Indian Major Crimes Act], [a] court must make factual findings that the defendant (1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government." *Scrivner v. Tansy*, 68 F.3d 1234, 1241 (10th Cir. 1995) (internal quotations omitted); *see also United States v. Prentiss*, 273 F.3d 1277, 1282 (10th Cir. 2001) (affirming validity of *Scrivner's* two-part test for determining who is an "Indian" for purposes of federal law). Mr. Murphy meets both prongs of the *Scrivner* test.

First, Mr. Murphy is a member of the Muscogee (Creek) Nation of Oklahoma with a degree of Muscogee (Creek) blood percentage of 1/4. *See* Enrollment Verification of Patrick Dwayne Murphy (certifying citizenship and blood percentage), attached hereto as Ex. A. Mr. Murphy's enrollment verification, which is presented herein as a notarized certificate of tribal membership with blood percentage is satisfactory proof of Indian blood. *Cf. Prentiss*, 273 F.3d at 1282-83 (collecting cases and noting that certificates of tribal enrollment are recognized proof of membership to permit federal prosecution of crimes).

Second, "[t]he Creek Nation is a federally recognized Indian tribe located in what is today eastern Oklahoma." *Indian Country, U.S.A., Inc. v. State of Oklahoma*, 829 F.2d 967, 970 (10th Cir. 1987).

Thus, having met both prongs of the *Scrivner* test, Mr. Murphy is an "Indian" within the meaning of section 1153.

19

**C.     The Victim is an Indian Within the Meaning of the Federal Statutes**

Not only is Mr. Murphy an "Indian" within the meaning of section 1153, so also is the victim

Mr. George Jacobs. Mr. Jacobs was a member of the Muscogee (Creek) Nation. *See* Enrollment

Verification of George Jacobs (certifying citizenship and blood percentage), attached hereto as Ex.

B.

While Mr. Jacobs's status as an Indian is not essential for federal jurisdiction,[6] his status as

an Indian provides force to the argument in favor of federal jurisdiction since the historical and

primary purpose of the Major Crimes Act is to prosecute crimes of Indians against Indians occurring

on reservation land. *Keeble v. United States*, 412 U.S. 205, 210-212 (1973) (describing that the

Major Crimes Act was intended to address Indian on Indian crimes); *see also United States v. Errol

D.*, 292 F.3d 1159, 1163 n.4 (9th Cir. 2002) (citing WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW

154 (3d ed. 1998) (stating that "the primary congressional purpose in passing the [MCA] was to

permit punishment of major crimes by Indians against Indians.").

**D.     The Crime Occurred in Indian Country**

Indian country is defined as:

> (a) all land *within the limits of any Indian reservation* under the jurisdiction of the
> United States Government, notwithstanding the issuance of any patent, and,
> including rights-of-way running through the reservation, (b) all *dependent Indian
> communities* within the borders of the United States whether within the original or
> subsequently acquired territory thereof, and whether within or without the limits of
> a state, and (c) *all Indian allotments*, the Indian *titles to which have not been
> extinguished*, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added). Thus, the statute sets out three separate ways for land to fall

within Indian country, each of which is applicable in this case.

---

[6]*See* 18 U.S.C. § 1153 (federal jurisdiction is exclusive when an Indian commits a major crime against "the person or property of another Indian *or other person*") (emphasis added).

### 1.    The Location of Mr. Jacobs's Death

The testimony at trial unequivocally stated that Mr. Jacobs was assaulted on the Vernon Road, that the location of the assault was marked by a blood stain on the road (II Tr. 428; II Tr. 320; State's Ex. 17), and that Mr. Jacobs died, not in the road, but in a ditch on the east side of the road (II Tr. 319-20; State's Ex. 17).

One person who saw the body and another who saw the blood spot in the road have identified the location of the crime scene. *See* affidavits of: Mr. Anderson Fields, Jr., attached hereto as Ex. C; Mr. Anderson Fields, Sr., attached hereto as Ex. D. The crime scene is marked today by a cross dedicated to Mr. George Jacobs, located just to the east of the county road known as the Vernon Road. *See* affidavits of Mr. Anderson Fields, Jr. ¶ 4, attached hereto as Ex. C (and attachments thereto showing a picture of the cross); Mr. Anderson Fields, Sr. ¶ 2, attached hereto as Ex. D (and attachments thereto showing a picture of the cross).

The precise location of the cross was measured and attested to by the Muscogee (Creek) Nation Realty Office, which identified the location as falling on a plot of land owned by Edgar Busby et al. [hereinafter known as a the Busby tract]. *See* Aff. of Jeff O'Dell, Muscogee (Creek) Nation Realty Office ¶¶ 3-5, attached hereto as Ex. E [hereinafter Realty Aff.].

At trial, OSBI criminalist Agent Dalley testified that the crime scene was located approximately one mile south of the intersection of Highway 9 and County Road 3790 (II Tr. 421, State's Ex. 13). The Busby tract is, however, approximately 2 ½ miles south of Highway 9 on County Road 3790. Clearly there is a discrepancy between the locations. Agent Dalley was mistaken. Not only is Agent Dalley's location inconsistent with the location identified by Mr. Fields, Sr. and Mr. Fields, Jr., it is also inconsistent with other testimony at trial. For example, Ms. Younger met Mr. Murphy on a curve on the Vernon Road, north of where the assault was described

21

to have occurred. (II Tr. 266). There are only two curves on the road south of Highway 9, and both are well south of the location identified by Agent Dalley.

Although ultimately an evidentiary hearing, which Mr. Murphy requests at the end of this Petition, will be required to resolve the discrepancy regarding the crime scene location, the Court will see in the following discussion that, regardless of which location is correct, the crime scene is located in Indian country.

## 2.     The Crime Scene is in Indian Country

The crime scene is located in Indian country for at least three reasons. First, because the scene is located within the boundaries of the Muscogee (Creek) Nation Reservation. Second, because it is allotment land to which all Indian right and title has not been extinguished. Third, in the alternative, because it lies within a dependent Indian Community.

### a.     The Crime Scene Falls Within The Muscogee (Creek) Reservation

The Muscogee (Creek) Realty office has concluded that the Busby tract falls within the historical and present political Reservation boundaries of the Muscogee (Creek) Nation. *See* Realty Aff. ¶ 5. The crime scene location testified to by the Oklahoma State Bureau of Investigation also falls within the Muscogee (Creek) Nation. *Id.* ¶ 8.

Land that falls within an active reservation, that is a reservation that has not been disestablished by an act of Congress, is Indian country within the meaning of the Indian Major Crimes Act, regardless of who, today, holds title to that land. *Cf. Indian Country*, 829 F.2d at 975 n.3 (Noting that disestablishment of a reservation is relevant to the question of which "*non-Indian* lands, which remain Indian country under 18 U.S.C. § 1151(a) until the surrounding portion of a reservation is disestablished.") (emphasis in original). As the following discussion will show, the

22

Muscogee (Creek) Nation has not been disestablished and is, therefore, still an active reservation, the boundaries of which determine the limits of Indian country.

In 1987 the Tenth Circuit acknowledged that the disestablishment of the Creek Nation was an open question. *Indian Country*, 829 F.2d at 975 ("we need not decide whether the exterior boundaries of the 1866 Creek Nation have been disestablished"). Although not needing to resolve the question of disestablishment in 1987, the court did note that disestablishment must be judged according to the facts related to each tribe, is not to be lightly inferred, and that lands originally set apart as Indian country remain so until Congress expressly indicates otherwise. *Id.*; *cf. Errol D.*, 292 F.3d at 1163 (noting the standard principles of statutory construction do not have their usual force in cases involving Indian law, and ambiguous provisions should be construed liberally in favor of tribal rights).

The unique history of the Muscogee (Creek) Nation is discussed at length in *Harjo v. Kleppe*, 420 F. Supp. 1110 (D. D.C. 1976), and there the court stated, with regard to the effectuation of any intent to terminate the sovereign authority of the Creek Nation:

> the Court has arrived at the inescapable conclusion that despite the general intentions of the Congress of the late nineteenth and early twentieth centuries to ultimately terminate the tribal government of the Creeks, and despite an elaborate statutory scheme implementing numerous intermediate steps toward that end, the final ***dissolution of the Creek tribal government*** created by the Creek Constitution of 1867 ***was never statutorily accomplished***, and indeed that government was instead explicitly perpetuated.

*Id.* at 1118 (emphasis added), *aff'd sub. nom, Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978).

Other courts agree that the Muscogee (Creek) Nation Reservation has not been disestablished. For example, the Creek Nation adopted the Tenth Circuit's reasoning in *Indian Country* and considers that it has jurisdiction over land that falls within its historical reservation boundaries, even when the claim is made that title to the land is held by a non-Indian, by mere virtue

23

of the fact that the land falls within the reservation boundaries. *Enlow v. Bevenue*, 4 Okla. Trib. 175, 186 (Muscogee (Cr.) S. Ct. 1994) (property located within the boundaries of the Muscogee (Creek) Nation retains its Indian country status); *see also Muscogee (Creek) Nation v. American Tobacco Co.*, 5 Okla. Trib. 401, No. CV-97-27, 1998 WL 1119774 (Muscogee (Cr.) D. Ct. Feb. 12, 1998) (recognizing "the possibility of jurisdiction over conduct occurring on non-Indian fee lands within the territorial and political jurisdiction of the Muscogee (Creek) Nation") (no publication page numbers available).

Importantly, the federal statutes authorizing allotment of Creek land contain no language of disestablishment. *See* 31 Stat. 861 (1901) and 32 Stat. 500 (1902). The dispositive nature of the statutory language of allotment is discussed in *Ellis v. Page*, 351 F.2d 250, 251-52 (10th Cir. 1965) regarding the disestablishment of the Cheyenne and Arapaho reservations. The court in *Ellis* noted that the allotment of land which disestablished the Cheyenne and Arapaho reservation contained language to the effect that the "tribes occupying the reservation did 'cede, convey, transfer, relinquish and surrender, forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest, of every kind and character, in and to the lands embraced' within the reservation." *Id.* at 251 (quoting language of transfer in the Comanche, Kiowa and Apache reservations and noting that the Cheyenne and Arapaho transfer language was indistinguishable).

In contrast, the Creek allotment act, found at 31 Stat. 861 (1901), contains no such wholesale language of conveyance. The Creek language of allotment says only that: "Any allotee accepting such deed shall be deemed to assent to the allotment and conveyance of the lands of the tribe, as provided herein, and as a relinquishment of all his right, title, and interest in and to the same, except in the proceeds of lands reserved from allotment." *Id.* at 868, attached hereto as Ex. F. There is no

24

concomitant language relinquishing all right and title to reservation lands or surrendering forever every interest of every kind and character in the reservation. Given the admonition in *Indian Country* that disestablishment is not to be lightly inferred, the absence of clear language of disestablishment is dispositive on this point. *See also* 32 Stat. 500, 502 (1902) (supplemental agreement regarding Creek allotment and, among other things, creating easement to (but not ownership of) public roads on section lines, and adding no further language of conveyance), attached hereto as Ex. G.

In the absence of any express statutory statement to the contrary, the historical and political boundaries of the Muscogee (Creek) Nation must be considered in full force. On this basis alone, the crime occurred in Indian country.

> **b.    The Crime Scene Falls on Allotment Land to which All Indian Right And Title Has Not Been Extinguished**

Subsection (c) of section 1151 provides that "*all Indian allotments*, the Indian *titles to which have not been extinguished*, including rights-of-way running through the same" are Indian country. 18 U.S.C. § 1151(c) (emphasis added). Given the very plain language of the statute, courts have consistently held that Indian allotments are part of Indian country. *United States v. Pelican*, 232 U.S. 442, 449 (1914); *Mustang Production Co. v. Harrison*, 94 F.3d 1382, 1386 (10th Cir. 1996) (considering the right of the Cheyenne-Arapaho tribes to impose severance taxes on allotted lands confirmed that "allotted lands constitute Indian country").

Mr. Jacobs died on the Busby tract. The Busby tract is Muscogee (Creek) allotted land, originally allotted to Lizzie Smith. *See* Realty Aff. ¶ 4. The land was once fully restricted, the surface is now unrestricted, but retains Indian title by virtue of restricted mineral interests still held

by a member of the Muscogee (Creek) Nation. *Id.* ¶ 7. There are several reasons why restricted mineral interests are sufficient to characterize this land as Indian country.

First, restricted mineral rights are not too de minimus for the land to retain its inherent character as Indian country. In the absence of a specific statutory intent to limit the application of 18 U.S.C. § 1151(c) to certain percentages of Indian title and interest, it would be improper to conclude that the Indian mineral interest here is too de minimus to justify a finding of Indian country in this case. *Cf. Errol D.*, 292 F.3d at 1163 (admonishing that statutes affecting the tribes are to be construed liberally in favor of the tribes).

Second, land retains its character as Indian until *all* Indian right and title are gone. *C.M.G. v. State*, 594 P.2d 798, 801 (Okla. Crim. App. 1979) (noting that cases in which land was found not to be Indian country are lands in which Indians clearly and specifically ceded "all claim, right, title and interest to the lands without any reservation whatsoever" making no exception based on the quantum of Indian interest retained). And, in this case, all Indian right and title are not gone.

Third, surface rights are subservient to mineral rights. HOWARD R. WILLIAMS AND CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS 302 (9th ed. 1994) (Once severed, the mineral estate becomes the dominant estate, and the surface estate becomes the servient estate.). Thus, the retention of restricted mineral rights signifies retention of the incidents of property which are in fact the dominant interests in the land.

Finally, retention of restricted mineral rights maintains the connection to the Federal Government so necessary and inherent in the definition of Indian county. When restricted mineral rights are at issue, the Bureau of Indian Affairs retains aspects of its classic trust relationship with the mineral owners in the management of those mineral assets. *See generally* COHEN'S HANDBOOK at 535-36; *see also* WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW 384 (3d ed.1998) (leasing on

26

allotted lands allowed with approval of the Secretary of the Interior and supervision of leasing performed by the Bureau of Indian Affairs). When incidents of the trust relationship survive, the land is indubitably Indian country. *Cf. HRI , Inc. v. Environmental Protection Agency*, 198 F.3d 1224, 1254 (10th Cir. 2000) (noting the split nature of surface and mineral rights does not alter the analysis of Indian country status of the land for purposes of determining whether the lands are subject to the Safe Drinking Water Act).

Thus, the Busby tract falls squarely in the statutory definition of Indian country in subsection (c). On this basis alone, regardless of whether the Creek Nation reservation has been disestablished or not, the crime scene is Indian country, conferring exclusive jurisdiction over the crime on federal courts.[7]

### c.    The Crime Scene Falls Within a Dependant Indian Community

Alternatively, the scene of Mr. Jacobs's death is located in an area that falls within section 1151(b)'s dependent Indian community definition of Indian country.

The crime scene is located in an area that falls wholly within the present day and historical boundaries of the Muscogee (Creek) Nation reservation. Analysis of this land as a dependent Indian community does not, therefore, attempt to sweep land that was clearly not originally Indian, into the

---

[7]Mr. Jacobs died in a ditch appurtenant to the Busby tract. The ditch is part of the Busby tract. But in the event that the Court is concerned that the ditch does not actually belong to the Busby tract but rather is part of the county road, the Court may recall that the country road is an easement only, and title to the road does not belong to the state. *See* 32 Stat. 500, 502 (1902) (which granted easement, but not ownership to, the state for implementation of roads). If the land in the ditch does not belong to the Busby tract it is, by default, land of the Muscogee (Creek) Nation to which the Creek Nation granted an easement. Thus, regardless of whether the ditch belongs to the Busby tract or falls on the county road, the land is Indian country.

ambit of the Indian community.[8] Rather, the question in this case is, has anything occurred to cause this land to lose the Indian character with which it was originally imbued.

A dependent Indian community "refers to a limited category of Indian lands that are neither reservations nor allotments." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 953 (1998). Such land must have been set aside by the Federal Government for use of Indians as Indian land and must be under federal superintendence. *Id.* Here, the land on which Mr. Jacobs died was part of the land originally set aside by the Federal Government for the use of the Muscogee (Creek) Nation. *See* Realty Aff. ¶ 5; *HRI, Inc.*, 198 F.3d at 1251; *see also Pelican*, 232 U.S. at 449 (original reservation was Indian country because it was set aside for Indians under the supervision of the Government). Additionally, the land is subject to federal supervision through its relationship to the Muscogee (Creek) Nation and the Bureau of Indian Affairs's management of mineral assets. *See HRI, Inc.*, 198 F.3d at 1254 (noting that the split nature of surface and mineral estates does not affect the Indian country analysis).

The land in question has a definable geographic area, giving it a specific community of reference. *See Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1545 (10th Cir. 1995). The land falls outside of any claimed municipality, but within the geographical boundaries of the social services area of the Muscogee (Creek) Nation Hanna community center. *See* Realty Aff. ¶ 6. It is also within the geographical boundaries of the McIntosh District of the Muscogee (Creek) Nation which means it is a designated voting district for the purposes of participating in Muscogee (Creek) Nation elections. *Id.* As such, it is classically an area of common interests, or

---

[8]The most "traditional" use of the dependent Indian community argument has been to try to qualify land that is clearly not and never has been Indian in ownership for treatment under the Indian Major Crimes Act.

needs of the inhabitants as supplied by that locality. It is an area with discrete physical boundaries (like those establishing the voting district). It is an area with a definite Indian population in residence today which looks to the Creek Nation for provision of its social services.

There are additional clear markers throughout this area of its Indian character. There are present-day Indian burial grounds located approximately two miles north of the crime scene. *See* Realty Aff. ¶ 6. The crime scene is also adjacent to the town of Vernon, a town established by the black slaves freed by the Creek Nation. *Id.* There are markers in the small town of Vernon, approximately one mile south of the crime scene, attesting to its heritage and relationship to Indian tribes. *See* Aff. of Mike Evett, attached hereto as Ex. H. In all directions, the land bears witness to its Indian character.

Thus, in the alternative to being within the established Muscogee (Creek) reservation and on allotment land to which Indian title has not been extinguished, the land on which Mr. Jacobs died is within a dependent Indian community. For all of these reasons, the crime occurred in Indian country within the meaning of 18 U.S.C. § 1151.

## E.   The State Court Had No Jurisdiction and Mr. Murphy's Prosecution and Conviction Were Void *Ab Initio*

When a crime occurs in Indian country and is alleged to have been committed by an Indian against an Indian, jurisdiction is exclusively federal. 18 U.S.C. § 1153. Any state court conviction of a defendant involving an Indian on Indian major crime in Indian country is rendered without jurisdiction and is, therefore, void *ab initio*. *State v. Klindt*, 782 P.2d 401, 403 (Okla. Crim. App. 1989) (noting that "the State of Oklahoma does not have jurisdiction over crimes committed by or against an Indian in Indian country").

29

The state court that rendered judgment against Mr. Murphy was thus without jurisdiction. The judgment against Mr. Murphy is void. For this reason, a writ of habeas corpus should issue and Mr. Murphy should be released from the custody of the State of Oklahoma forthwith.

**F.     The Instant Claim is Properly Before this Court for Review**

This ground for relief was not presented to the OCCA. However, that fact does not preclude this Court from reviewing the claim because Mr. Murphy can show good cause as to why exhaustion is excused under the unique facts of his case.

**1.     Jurisdiction Is a Threshold Question, Never Waived, and Presents a Federal Question That Must be Decided by this Court**

Although it is true that presentation of an issue to state court is generally a prerequisite to consideration in a section 2254 habeas petition, the determination of jurisdiction presents a threshold issue, never waivable, which can be recognized, pursued, and adjudicated at any time. Indeed, "[t]he right to be tried in a Federal Court accorded petitioner by the [Indian Major Crimes Act], was not a mere procedural right, waived unless asserted. It could not have been waived even by express agreement." *In re Carmen*, 165 F. Supp. 942, 950 (N.D. Cal. 1958), *aff'd*, 270 F.2d 809 (9th Cir. 1959). Thus, jurisdiction is unlike issues typically raised in habeas proceedings which are subject to procedural default. *Cf. Daniels v. United States* , 532 U.S. 374, 381 (2001) (The Court characterized habeas limitations as procedural "[p]rocedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."). If jurisdiction is never waivable, it should never be subject to procedural bar.

30

If there were any question of whether the procedural bars of habeas should apply to this issue, consider that the implications of this issue determine Mr. Murphy's eligibility for the sentence of death. Procedural bars were never intended to determine such weighty issues.

As the Court may know, when the federal government passed the Federal Death Penalty Act it specifically excluded from the death penalty crimes occurring under 18 U.S.C. § 1153 if the defendant was "subject to the criminal jurisdiction of an Indian tribal government . . . unless the governing body of the tribe has elected that [the federal death sentence] have effect over land and persons subject to its criminal jurisdiction." 18 U.S.C. §3598.[9]

The Muscogee (Creek) Nation is vested with the authority to prosecute major crimes, including murder, occurring within the historical and political boundaries of the Creek Nation. *See* Selected Sections of the Muscogee (Creek) Nation Criminal Code, attached hereto as Ex. I. As a Creek citizen, accused of a crime occurring on Indian country, Mr. Murphy is, within the meaning of section 3598, "subject to the criminal jurisdiction of an Indian tribal government." There is no evidence that the Muscogee (Creek) Nation has elected to opt-in to the Federal Death Penalty Act. Thus, Mr. Murphy is flatly ineligible for the sentence of death in federal court.

---

[9]In full, section 3598 provides:

Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.

31

Moreover, the resolution of this jurisdictional question turns purely on federal law and should be within the exclusive purview of the federal courts to resolve. *Scrivner*, 68 F.3d at 1241 ("the determination of whether a defendant is subject to [the Indian Major Crimes Act] is one of federal law."). It is incumbent on this Court to protect the jurisdiction vested in it by the Indian Major Crimes Act. *Cf. In re Carmen*, 165 F. Supp. at 951.

Finally, as the Tenth Circuit has said, there is a special obligation supporting an "independent federal inquiry into the title and status of Indian land" such as it at issue here:

> The fundamental constitutional principles supporting independent federal inquiry into the title status of Indian land apply with even greater force to disputes over Indian country jurisdictional status. Jurisdictional status of land implicates not only ownership, but also the core sovereignty interests of Indian tribes and the federal government in exercising civil and criminal authority over tribal territory.

*HRI, Inc.*, 198 F.3d at 1245-46.

In sum, resolution of the jurisdictional question presented in this case in federal court serves three paramount purposes. It preserves the right of the federal court to resolve a purely federal question regarding the non-waivable issue of jurisdiction. It protects the independent federal inquiry into the title of Indian lands. It protects Mr. Murphy from the sentence of death the State of Oklahoma is attempting to levy against him which it has no jurisdiction to impose and for which he is flatly ineligible.

32

**2.     In the Event this Court Finds Exhaustion Is Not Excused, Mr. Murphy's Petition Should Be Held in Abeyance While He Is Afforded the Opportunity to Present His Claim in State Court**

Since the enactment of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") the ability of habeas petitioners to pursue both initial and successive habeas petitions has been severely limited. Through the AEDPA "Congress significantly altered habeas corpus procedure by imposing a one-year statute of limitations and sharply limiting the grounds for second or successive petitions." *Zarvela v. Artuz*, 254 F.3d 374, 379 (2d Cir. 2001). In recognition of the harsh limitations imposed by the AEDPA, federal courts have provided initial habeas petitioners with the ability to present unexhausted habeas claims to state appellate courts in lieu of dismissing claims or in lieu of the outright dismissal of mixed petitions. The Second, Seventh, and Ninth Circuits have all recognized the need for an alternative method for addressing unexhausted claims. *Id. at* 380; *Calderon v. United States District Court*, 134 F.3d 981, 987 (9th Cir. 1998) (describing stay pending exhaustion of claims in state court).

In the event this Court finds exhaustion on this issue is not excused, the most appropriate course of action would be to stay Mr. Murphy's timely filed habeas petition and order undersigned counsel to present Mr. Murphy's unexhausted claim(s) to the OCCA.

> Staying the exhausted claims would be a traditional way to 'defer' to another court 'until' that court has had an opportunity to exercise its jurisdiction over a habeas petitioner's unexhausted claims.

*Zarvela*, 254 F.3d at 380. Indeed, district courts in Oklahoma have previously permitted such a course of action in similar situations. *See Spears v. Ward*, CIV-96-1862, slip op. (W.D. Okla. Jul. 21, 1999) (order to hold petition in abeyance); *see also Newsted v. Gibson* , 158 F.3d 1085, 1088 (10th Cir. 1998) (describing district court procedure of holding petition in abeyance pending

exhaustion of claims in state court); *Hatch v. Oklahoma*, 58 F.3d 1447, 1452 (10th Cir. 1995) (noting Tenth Circuit order to district court to hold petition in abeyance pending exhaustion of claims in state court).

If this Court stays Mr. Murphy's petition for the purpose of permitting his return to State court, two further courses of action would be appropriate. First, undersigned counsel should be ordered by this Court to represent Mr. Murphy for the purpose of presenting his unexhausted claims to the OCCA. Such representation is contemplated by section 848 subpart (q)(8) in which Congress has advised the counsel appointed for indigent defendants seeking to vacate and set aside death sentences "shall represent the defendant throughout every subsequent stage of available judicial proceedings, including . . . all available post-conviction process." 21 U.S.C. § 848 (q)(8). Second, in the event Respondent takes the position other claims in this Petition are unexhausted, Respondent should be ordered to identify those claims prior to Mr. Murphy's return to State court. In this way the Court can make a determination as to any other potentially unexhausted claims so all claims falling into this category can be addressed simultaneously. The latter course would facilitate timely disposition of all claims and would promote judicial economy.

## GROUND TWO – INEFFECTIVE ASSISTANCE OF COUNSEL IN THE MITIGATION CASE

**Mr. Murphy's trial lawyer failed to investigate, prepare, and present to the jury readily available and compelling mitigating evidence which would likely have led to a different sentencing outcome had it been presented. Counsel's failure to provide effective assistance of counsel denied Mr. Murphy the protections guaranteed to him under the Sixth, Eighth and Fourteenth Amendments to the Constitution as well as the rule of law established by _Wiggins v. Smith_, 123 S. Ct. 2527 (2003), _Williams v. Taylor_, 529 U.S. 362 (2000), _and Strickland v. Washington_, 466 U.S. 668 (1984).**

**A.    The OCCA Denied Mr. Murphy's Claim of Ineffective Assistance of Counsel**

Mr. Murphy presented the issue of ineffective assistance of trial and appellate counsel's failure to investigate, develop, and present certain mitigation evidence to the OCCA. _See_ Post-Conviction Br. at 9; Appellant's Br. at 60-63. Mr. Murphy claimed that trial counsel's deficient performance denied him effective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights as well as denied him a fundamentally fair, reliable, and individualized capital sentencing procedure as required under the Eighth Amendment. Post-Conviction Br. at 9; _see also_ Appellant's Br. at 60-63.

To obtain relief on the grounds of ineffective assistance of counsel, Mr. Murphy must establish that trial counsel's performance was constitutionally deficient and that his defense was thereby prejudiced. _Strickland v. Washington_, 466 U.S. 668, 687 (1984). Ostensibly applying that standard and recognizing that Mr. Murphy's state post-conviction application developed "more" mitigation evidence than was presented at trial and more evidence than direct appeal counsel had presented, the OCCA denied Mr. Murphy's claim and his request for an evidentiary hearing, concluding that the "post-conviction affidavits and evidentiary materials do not demonstrate a failure by . . . trial counsel to present mitigating evidence of a constitutionally deficient magnitude,

35

as that in *Williams*." *Murphy*, 54 P.3d at 564 (citing *Williams v. Taylor*, 529 U.S. 362 (2000)). The court further concluded, without analysis, that there was not a reasonable probability that, had additional materials been presented to the jury, the sentencing proceeding would have been different causing prejudice. Thus, the OCCA denied Mr. Murphy's claim of ineffectiveness with regard to investigation, development, and presentation of mitigation evidence. *Id.* at 565 (commenting that some of the proposed mitigating evidence is "as aggravating as it is mitigating"); *see also Murphy*, 47 P.3d at 886-87 & n.9 (finding that much of the information counsel failed to explore at trial was as aggravating as it was mitigating, counsel's decision to use the information was a matter of strategy, and counsel's performance was not deficient).

As the following discussion will show, the OCCA clearly misconstrued and misapplied existing federal law because trial counsel's performance objectively fell below the standard required of defense counsel in capital cases.

The OCCA clearly also misunderstood and misapplied federal law with regard to both the prejudice prong of *Strickland*. Contrary to the OCCA's conclusion regarding counsel's strategy – counsel cannot "strategically" decide to not use information he did not investigate and develop. Moreover, the OCCA's determination that no prejudice resulted from counsel's failure to present readily available and compelling mitigation evidence is insupportable. Mr. Murphy would clearly have benefitted from the presentation of evidence of his good character and the testimony of the many people who love him and believe his life should be spared. The other evidence, which the OCCA concluded was arguably damaging, relates to Mr. Murphy's upbringing in poverty, neglect, and an atmosphere of rampant alcohol abuse and violence is, in the hands of qualified counsel, psychologists and social history experts, tremendously valuable mitigation evidence. The OCCA's conclusion to the contrary is tantamount to presuming that information would be presented by

36

incompetent counsel – a presumption which cannot be indulged on review. Moreover, Mr. Murphy, not the OCCA, makes the determination of what evidence to present in mitigation and how to present that information. He was denied that opportunity by counsel's ineffective performance.

This will not be the first time that a federal court has had to disagree with the OCCA on an ineffectiveness claim regarding *this very trial lawyer*. The United States Supreme Court has disagreed with the OCCA on this point in a nearly identical case, involving the *same trial lawyer and essentially the same conduct*. *See Grant v. State*, 58 P.3d 783, 800 (Okla. Crim. App. 2002) (finding counsel's presentation of mitigation case not outside the wide range of professionally competent assistance), *rev'd and remanded sub. nom, Grant v. Oklahoma*, 124 S. Ct. 162 (2003) (reversed and remanded for further consideration in light of *Wiggins v. Smith*, 123 S. Ct. 2527 (2003)). As the following discussion will show, the same result should obtain here.

**B.      Standard for Counsel's Performance in the Sentencing Phase of a Capital Trial**

**1.      The Supreme Court Adopts the ABA Guidelines as the Prevailing Professional Norms in Capital Cases**

Counsel has an obligation to investigate and present evidence in the sentencing phase of a capital trial so that the defendant's sentencing can take place in the full context of the defendant's life. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (affirming longstanding recognition of the importance of a wide range of evidence as relevant for purposes of mitigation); *Eddings v. Oklahoma*, 455 U.S. 104, 115-117 (1982) (family history of capital defendant is vital mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (individualized consideration of capital defendant must take place prior to Constitutional imposition of death penalty).

The Supreme Court has said that the standards set out by the American Bar Association Guidelines for Appointment and Performance of Counsel in Death Penalty Cases constitute an

37

appropriate guide to what is reasonable in the performance of capital defense counsel. *Wiggins v. Smith*, 123 S. Ct. 2527, 2537 (2003) (citing *Strickland*, 466 U.S. at 688). "[T]he *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases. This principle adds clarity, detail and content to the more generalized and indefinite 20-year-old language of *Strickland* . . . ." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) (finding trial counsel deficient in penalty phase for failing to investigate and present mitigation evidence and such failure caused prejudice, requiring a new penalty phase trial); *see also Bryan v. Mullin*, 335 F.3d 1207, 1238 n.6 (10th Cir. 2003) (Henry, J., concurring in part, dissenting in part) (recognizing the ABA Guidelines as the standard for reasonable performance). The ABA Guidelines "are *not aspirational*," rather "they embody the current consensus about what is required to provide effective defense representation in capital cases." *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 1.1 History of Guideline at 2 (Rev. ed. Feb. 2003) [hereinafter 2003 Guidelines] (emphasis added).

## 2. The ABA Standards Require Counsel to Devote Adequate Time and to Investigate, Prepare and Present a Mitigation Case

Prevailing professional norms for capital defense representation require, at a minimum, that counsel devote an adequate amount of time to the case and specifically investigate facts relevant to the sentencing or penalty phase of the trial.

### a.     Allocation of Time to the Case

The American Bar Association has said that counsel in a capital case must allot a sufficient amount of time for the defense of all phases of a capital case because "[o]ne of the single most important impediments to the furnishing of quality defense services for the poor is the presence of excessive caseloads." *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 6.1 (commentary) at 62 (1989) (internal quotations omitted) [hereinafter 1989 Guidelines]. Thus, the black letter rule of the ABA Guidelines on workload admonishes that "Capital counsel should not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations." *Id.* 6.1 at 62.

In terms of what constitutes an appropriate allotment of time, "an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889." 2003 Guidelines 6.1, at 40 (commentary).

Counsel has an affirmative obligation, under prevailing rules of professional conduct, as well as the specific rules applying to capital cases, to limit his caseload to the level needed to provide his clients with the high quality legal representation required in death penalty cases. 1989 Guidelines 6.1 at 62; 2003 Guidelines 10.3 at 62.

### b.     Specific Duty to Investigate, Prepare and Present a Mitigation Case

In addition to the general requirement that counsel allot a sufficient amount of time to the case, counsel has a specific obligation to investigate, develop and present mitigation evidence relevant to sentencing.

39

The Supreme Court has explained that there is an affirmative duty to investigate ***all reasonably available mitigation evidence*** in rebuttal to aggravating evidence offered by the prosecution. *Wiggins*, 123 S. Ct. at 2537 (citing 1989 ABA Guidelines). Counsel must conduct an "investigation regarding penalty . . . regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented." 2003 Guidelines 10.7 (A)(2) at 77; 1989 Guidelines 11.4.1. Counsel should consider, among other things, medical history, educational history, social and family history, religious and cultural influences, educational history and employment. 2003 Guidelines 10.7 at 78-81 (commentary). Mitigation evidence is especially important because, "death is different" and "avoiding execution is, in many capital cases, the best and only realistic result possible." Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION, at 8 (Mar. 1984).

## C.    Trial Counsel's Investigation, Development, and Presentation of the Mitigation Case Was Deficient Under the Prevailing Standards

### 1.    The Penalty Phase of the Trial

#### a.    The Prosecution Characterized Mr. Murphy as Having a Good Life and Raising

During the closing arguments of the penalty phase of the trial, the prosecution asked the jury to reject the notion that any mitigation factor should outweigh the aggravating factors and said:

> [Look at h]is family history. He had a ***good life and raising***. He had a mother that cared for him, a man across the road who was a father-figure to him. He had all those things. Four ***siblings*** who have ***all*** become ***productive vital citizens***. There's nothing wrong with his family raising, nothing that justifies what he did to George Jacobs.

(V Tr. 1395) (emphasis added). That erroneous statement capped off a sentencing phase of the case which was horribly deficient. Because Mr. Murphy's counsel failed to investigate, prepare and

40

present a mitigation case, he allowed the prosecutor's erroneous statements about the law and the facts to go utterly unrebutted. However there was much that could have been said.

First, the purpose of the mitigation evidence is ***not***, as the prosecution erroneously stated, to justify the murder of Mr. Jacobs, rather the purpose is ***to fulfill the Constitutional mandate*** that, before a sentence of death can be handed down, the actions of the defendant be placed into the full context of his life. The Supreme Court has been clear that, "fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (internal citations omitted). The goal of mitigation evidence is to

> place the defendant's life in a larger social context and, in the final analysis, to reach conclusions about how someone who has had certain life experiences, been treated in particular ways, and experienced certain kinds of psychologically-important events has been shaped and influenced by them.

*Craig Haney, The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 SANTA CLARA L. REV. 547, 561 (1995) [hereinafter "Haney"].

"[P]unishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Toward that end, a "sentencer [should] make an individualized assessment of the appropriateness of the death penalty." *Id.* "Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Id.* (quoting *Woodson*, 428 U.S. at 304). That individualized assessment should include factors like "mental retardation and childhood abuse" which are directly relevant to moral culpability for a crime. *Id.* at 322.

41

Thus, in contrast to the admonition of the prosecution that no factor raised in mitigation could justify the crime – the purpose of mitigation evidence is not to justify a crime, but rather to aid the jury in its constitutionally mandated task of assessing the defendant as an individual. The jury here was misinformed by the prosecution and given a completely erroneous understanding of the function of mitigation evidence.

The prosecution tactic in this case is typical and must be rebutted by mitigation evidence:

> Prosecutors will frequently try to argue, for example, that "not everybody" who is abused as a child grows up to commit capital murder or that mental illness did not "cause" the defendant to commit the crime. Both of these arguments are objectionable on Eighth Amendment grounds because they nullify the effect of virtually all mitigation. In any event, counsel can seek to counter such arguments by emphasizing the unique combination of factors at play in the client's life and demonstrating that there are causal connections between, for example, childhood abuse, neurological damage, and violent behavior.

2003 ABA Guidelines 10.11, Commentary at 119 n.314 (internal citations omitted).

Here, the prosecutor conveyed to the jury - *and defense counsel did nothing to disabuse the jury of the notion* - that Mr. Murphy had come from a good home and had been raised in a good environment. But the facts, that Mr. Murphy's trial counsel could have known had he investigated, show otherwise.

### b.    The Defense Mitigation Case

The defense presented a woefully inadequate mitigation case. Only four witnesses testified: Dr. Russell (a psychologist); Dr. Sharp (a psychologist); Patrick's mother, Elizabeth Murphy; and, finally, Patrick.

Dr. Russell testified regarding Mr. Murphy's future dangerousness. Dr. Russell interviewed the defendant, his mother, some jail employees, and Mr. Murphy's former employer. She administered and applied standardized tests to ascertain whether Mr. Murphy was a psychopath.

42

(V Tr. 1234-35, 41, 43). She concluded that, based on Mr. Murphy's history and standardized assessment, he did not present a risk for future violence if he were confined to a prison environment and unable to abuse alcohol on a regular basis. (V Tr. 1237-1242; Defendant's Ex. 3 ).

Dr. Sharp testified next. He supplemented his testimony on alcohol dependence from the guilt/innocence stage with testimony about intelligence testing of Mr. Murphy. (V Tr. 1290). Dr. Sharp discussed that Mr. Murphy was scored at 67 on a Abbreviated Wechsler Adult Intelligence test (V Tr. 1289-90) and that, as a child, Mr. Murphy was classified as "educable mentally handicapped" (V Tr. 1295).

The defense next called Mr. Murphy's mother, Elizabeth Murphy. (V Tr. 1315). She testified that Patrick was a "good boy" (V Tr. 1316), that his father not a strong presence in his life (V Tr. 1317), that other children taunted Patrick about being half African-American (V Tr. 1320), and that Patrick started changing after he was in a car accident (V Tr. 1323).

Consistent, perhaps, with Ms. Murphy's eighth grade education and the absence of any preparation for her testimony, Ms. Murphy's statement to the jury was less than coherent. For example, in response to a question from counsel regarding asking the jury to spare her son's life, she said:

> Right, um-hum, just have a little bit of forgiveness in your heart, that's all. Because I say we all got a higher place to pay. When that one day comes, I'm going to face it too. So will my son have to face the man upstairs. So if they [the jury] can forgive and go on *that would be a lot better for me.*

(V Tr. 1328) (emphasis added) (seemingly misunderstanding the point that mitigation evidence is meant to be about Patrick, not his mother).

Mr. Murphy testified in his own behalf next after his lawyer told him "it's your ass, you better get up there and save it." *See* Aff. of Patrick Murphy, attached as Ex. 3 ¶ 8, App. of Exs. in

Support of Appl. for Post-Conviction Relief (Feb. 7, 2002) [hereinafter State App.]. When Mr.

Murphy took the stand, in an attempt to elicit an apology from Mr. Murphy to the victim's family,

counsel merely succeeded in having Mr. Murphy reaffirm his claim he was not guilty and thereby

expressly disagree with the jury's verdict on his guilt. (V Tr. 1338). Consistent with counsel's

amazingly prejudicial opening statement (in which counsel effectively admitted his client's guilt to

the jury, discussed below in detail), counsel put words in Mr. Murphy's mouth and said:

> [D]o you think you would have ever done this, do you think you would ever have
> killed George Jacobs in the manner that he was killed or otherwise if you had not
> been chemically dependent on alcohol?

(V Tr. 1343).

The result of counsel's minimal preparation and his amazingly inartful presentation of Mr.

Murphy was that the prosecution had the opportunity to inquire of Mr. Murphy whether he had ever

apologized for the crime to anyone before the penalty phase of the trial and make Mr. Murphy out

to be a remorseless individual. (V Tr. 1349-1352). The result was completely predictable.

**2.      The Mitigation Case That Could Have and Should Have Been Presented**

      **a.      Defense Counsel Should Have Allocated a Reasonable Amount of Time
          to Investigate Mr. Murphy's Life**

Mr. Murphy's lead trial counsel was James C. Bowen of the Oklahoma Indigent Defense

System Capital Trial Division. In the space of ten calendar months Mr. Bowen tried and lost four

capital cases and his clients each received a sentence of death. Even more shocking, three of those

trial occurred in 16 1/2 weeks of which 3 1/2 weeks were in trial. *See Grant v. State*, 58 P.3d 783,

788 & n.2 (Okla. Crim. App. 2002) (case tried to a jury in Osage County, Oklahoma, between

February 29 and March 14, 2000), *vacated and remanded*, 124 S. Ct. 162 (2003); *McElmurry v.

State*, 60 P.3d 4 (Okla. Crim App. 2002) (tried to a jury from June 12 to June 16, 2000). Mr.

44

Murphy's case was the second in that terrible sequence of trials, and his case was tried to a jury April 10, 2000 to April 14, 2000.[10]

If, as the ABA Guidelines mandate, 1800 hours per case represents the average work commitment for a capital case, then Mr. Bowen's clients were gravely underserved. Within the ten month period between September 1999 and June of 2000, Mr. Bowen did not have 1800[11] hours to give his four capital cases combined, much less 1800 hours for each. In fact, the total for attorney time on Mr. Murphy's case was 428.5 hours, woefully short of the time recommended by the ABA Guidelines. *See* Letter from Jim Bednar, Director of the Oklahoma Indigent Defense System, to Lisa S. McCalmont (Feb. 23, 2004), attached hereto as Ex. J. Accepting, without objection, such a work schedule was a breach of his duties to his clients and prejudiced all of his clients, but especially Mr. Murphy who had one of the later trials in that horrendous schedule.

But not only did Mr. Bowen ignore his obligation to allot a reasonable amount of time to Mr. Murphy's case (which he could not have done under his schedule of cases), Mr. Bowen did virtually nothing with the time he had.[12]

---

[10]Prior to the 16 1/2 week onslaught of trials, Mr. Bowen also tried and lost another capital case. *See Banks. v. State*, 43 P.3d 390 (Okla. Crim. App. 2002) (tried to a jury from September 20, 1999, to September 29, 1999), *cert. denied*, 537 U.S. 1126 (2003). Mr. Banks's case is presently on writ of habeas corpus to the Northern District of Oklahoma, claiming, among other things, ineffective assistance of counsel in investigation, development and presentation of a mitigation case. *See Banks v. Mullin*, No. 03-CV-198 H(J) (N.D. Okla. filed Oct. 1, 2003).

[11]In a ten month period, a 40 hour work week, averaging 4 weeks per month would yield 1600 total hours.

[12]There is yet another outrageous fact showing trial counsel's general ineffectiveness in this case. In direct contradiction to the trial counsel's obligations set out under the ABA standards, trial counsel failed to *investigate the scene of the crime*. *See* 1989 Guidelines 11.4.1 Commentary at 85 (obligation to view scene of the crime); 2003 Guidelines 10.7 Commentary at 81 (view scene); *Powell v. Alabama*, 287 U.S. 45, 57 (1932) (describing "thorough-going investigation" as "vitally important").

Here, Mr. Bowen did not view the scene of the crime. If he had, he would have known that the OSBI has *mislocated the crime scene by 2.5 miles*. As a result, Mr. Bowen missed the

45

### b.   What Should Have Been Uncovered Through Diligent Investigation

Instead of spending less than one hour with Mr. Murphy in out-of-court meetings (from the time of arrest to the time of trial),[13] counsel should have prepared Mr. Murphy for his testimony and inquired of him about his life and background.

An investigation would have revealed that Mr. Murphy did not have "a good life and raising" as the prosecution said. With any effort at all, counsel would have been able to present a mitigation case that placed into context Mr. Murphy's entire life and would not have allowed the jury to judge Mr. Murphy based on the events of one tragic night. There was much to tell about Mr. Murphy's life and raising.

Mr. Murphy had an enormous amount to overcome, starting out in an area of rural Oklahoma called "the bottoms," an area permeated with alcohol abuse and violence. In what could have been highly persuasive testimony (had counsel ever inquired) a police officer who testified in the guilt/innocence phase of the trial says that "the bottoms" is a violent and rough area in which a child hardly had any chance at all. *See* Aff. of Eldon Kelough ¶ 11, attached hereto as Ex. K. Captain Kelough, expressly disagrees with prosecution's statement about the area in which Patrick grew up:

> I have been told that the prosecution said in the penalty phase of that trial said that Patrick "had a good life and raising." Based on my training and experience as a law enforcement officer in the Creek Nation Lighthorsemen, I would disagree with that statement. The bottoms was a rough and dangerous area with rampant alcohol abuse and violence. A child growing up there would not have a "good life and raising." *Kids growing up in the bottoms never really had a chance, because that life of drinking and fighting was all they know.*

---

opportunity to cross examine and undermine the credibility of the OSBI Agents who had processed the crime scene and attested to, among all the other forensic facts, the location. Further, Mr. Bowen would have been able to raise, on behalf of Mr. Murphy, the jurisdictional arguments presented in this Petition in Ground One.

[13]*See* Aff. of Patrick Murphy ¶ 5, attached as Ex. 3 to App. of Exs. in Support of Appl. for Post-Conviction Relief (Feb. 7, 2002) [hereinafter State App.].

*See* Aff. of Eldon Kelough ¶ 11 (emphasis added).

Other independent and unbiased witnesses agree with Captain Kelough's assessment. Mr. Hopkins, a Department of Human Services ["DHS"] investigator, went to the Murphy household in the bottoms many times. He specifically recalls the first occasion on which he met Ms. Murphy. She was lying in a ditch with her children while her then husband shot a gun at her. *See* Aff. of W. R. Hopkins ¶ 5, attached hereto as Ex. L. There were bullet holes all through the back of her trailer indicating that this was not the first time that bullets had flown around the Murphy household. *Id.*

The family confirms that Mr. Murphy's childhood home was a gathering place for the alcohol-fueled disputes of Patrick's mother and her siblings. *See* Affs. of Leticia Hurn (Ex. 6) (Patrick's cousin who lived in Patrick's childhood home and who saw Elizabeth Murphy stab Wallace Gambler in the back with a butcher knife); Angela Barrett (Ex. 7) (Patrick's sister who grew up with Patrick); Stephanie Loyd (Ex. 9) (Patrick's childhood girlfriend who was shot at by Patrick's uncle Wallace Gambler), attached as Exs. 6, 7, and 9 to Appendix of Exs. in Support of Appl. for Post-Conviction Relief (Feb. 7, 2002) [hereinafter State App.].

Even Patrick's mother Elizabeth, would have been willing to discuss her family history and background. She is a proud woman but, if asked, she is candid about her life and willing to discuss the facts plainly. She lost the custody of her first child because she was determined to be an unfit mother. *See* Aff. of Elizabeth Murphy (January 22, 2004) ¶ 8, attached hereto as Ex. M. ***Four out of the five*** male children she raised in her home have been convicted of crimes (ranging from murder, to cruelty to animals, to drug offenses). *Id.* ¶¶ 20, 22, 23 (Quinton Gambler - guilty possession marijuana (twice), cruelty to animals (three times); Billy Jack Long - guilty of murder; Gabriel Ramirez - guilty of drug offenses and DUI; Willie Murphy, Jr. - guilty, assault - police

47

officer). Thus, contrary to the prosecution's assertion, all of Patrick's "siblings" did not grow up to be "productive vital citizens," as defense counsel would have known, had he investigated.

Patrick's home was violent – Ms. Murphy committed assaults on her husbands (hitting one over the head with a frying pan and breaking the fingers of another). *Id.* at ¶¶ 12, 13. Ms. Murphy also stabbed her brother Wallace. *Id.* ¶ 18. Ms. Murphy also disciplined her boys with a firm hand, once throwing a barbeque pitchfork at her son Willie, which stuck in his leg. *Id.* ¶ 16. Patrick witnessed most of these events as well as the violence involving other members of Ms. Murphy's family. *Id.* ¶ 13, 18, 21. Patrick's Aunt Carmelita served two years in jail for stabbing a man; she also once stabbed and twice shot her brother Wallace. *Id.* ¶ 21. Patrick's Uncle Wallace shot at his nephew Gabriel and his wife Stephanie. *See* Aff. Stephanie Loyd ¶ 5, Ex. 9, State App.

But it was not just the violence that made Patrick's start in life so bad. There was also terrible abuse of alcohol that fueled those violent disputes. Patrick's exposure to and abuse of alcohol began in the womb. Ms. Murphy drank when she was pregnant with Patrick, a fact admitted to by Ms. Murphy and confirmed by her sister, Amelia. *See* Aff. Elizabeth Murphy ¶ 2, Ex. 4, State App.; Aff. Amelia Gambler ¶ 3, Ex. 5, State App. Elizabeth gave Patrick beer in his baby bottle. *See* Aff. Elizabeth Murphy (January 22, 2004), ¶ 15, attached hereto as Ex. M. Ms. Murphy let her boys, including Patrick, drink when they were children so they would fall asleep when she had parties. *Id.* ¶ 15.

Mr. Hopkins of DHS confirms Ms. Murphy's account of life at the Murphy household. Mr. Hopkins determined that Ms. Murphy "was bad to drink" and that she had a serious alcohol problem that likely affected Patrick. *See* Aff. W. R. Hopkins ¶ 7. Mr. Hopkins remembers Ms. Murphy's sister Carmelita and recalls that she "was meaner than a junk yard dog." *Id.* ¶ 8. Mr. Hopkins considered the Murphy household to be very deprived and, after some twenty years and three or four

48

thousand investigations, he concluded that he had not often seen a worse home.  *Id.* ¶ 9.  Yet, through all of that turmoil, Mr. Hopkins remembers Patrick well, and recalls that he was a good athlete, and the kind of little boy who wanted you to put your arm around him.  *Id.* ¶ 3.

Despite Patrick's terrible home life, trial counsel could have shown (had he investigated) that Mr. Murphy had built a life of which he could be proud and that the actions for which he was convicted, even if he had done them (which he did not), were anomalous when taken in the context of his entire life.  There is, for example, no history in Mr. Murphy's life of any violence like that which occurred to Mr. Jacobs.  Instead, there is a wealth of evidence inconsistent with the finding of guilt, and especially inconsistent with the finding that the aggravator of future dangerousness was proved beyond a reasonable doubt.

It is not hard to find people to speak for Mr. Murphy.  Simple investigative techniques, like looking up names in phone books, or asking Patrick's relatives for phone number or addresses, have yielded a wealth of information.  Mr. Murphy's state post-conviction investigator was able to find a host of willing witnesses who should have testified before the jury that was to decide Mr. Murphy's fate.  The affidavits of these witnesses cover a variety of time periods and subject matter in Mr. Murphy's life and help to put his life into its full context – a context the jury should have had. *See generally*, Affidavits, attached as Exs. 3-13, State App.

Patrick's teachers remember Patrick fondly.  Stan White, Mr. Murphy's high school basketball coach would have testified about a well-mannered, athletically gifted young Patrick Murphy.  When he read news of Patrick's arrest, he thought surely it was a misprint intended to identify Patrick's brother, Willie.  When Mr. White's wife learned that it was indeed Patrick who had been charged, she cried for a week. *See* Aff. of Stan White, attached as Ex. 11, State App.; *see also* Aff. of Danny Kennedy, attached as Ex. 12, State App. (former principal who remembers

49

Patrick well as a well-behaved student, a talented basketball player and a pleasant and well-mannered boy).

Patrick's time in school is memorialized in his high school yearbooks, where he was voted as "most athletic" and as having the "most school spirit" and played on a very successful highschool basketball team. *See* Aff. George Rawlings, attached hereto as Ex. N.

The pictures of Patrick from his school days show a happy and likeable young man, consistent with the memories of his classmates (who were never interviewed by the defense, despite their ready availability – many still live in Okmulgee County where Mr. Murphy was raised) and who, like his teachers, remember him fondly. For example, Patricia Henley (who went to high school with Patrick) reports that Patrick was voted "most likeable" by his classmates and she remembers him as "being an all-around good guy, a big goof and fun to be around." *See* Aff. Patricia Henley at ¶¶ 2-3, attached as Ex. 8, State App. Stephanie Loyd (Patrick's high school girlfriend) reports that, despite the violent and dangerous home life that she personally witnessed, Patrick was "a giving and caring person who would do anything to help others." *See* Aff. Stephanie Loyd at ¶¶ 3, 5, attached as Ex. 9, State App. Steve McKinney (a former schoolmate of Patrick's) says that "that the Patrick Murphy I knew had a peaceful and good nature. Committing a crime of violence is not like Patrick's nature." *See* Aff. of Steve McKinney ¶ 4, attached as Ex. 10 to State App. Steve says that "Patrick was always a really nice person to be around." *Id.* ¶ 2.

The picture of Patrick that his schoolmates paint is consistent with the Patrick of today. Robert Claiborne, one of Patrick's adult co-workers who has known Patrick since he was about 7 years old says that, despite his terrible upbringing, Patrick "grew up to be a good man who looked after his responsibilities and was a productive citizen before this crime" and that he "consider[s]

50

Patrick the kind of person who is a good friend." *See* Aff. Robert Claiborne at ¶¶ 5, 3, attached as

Ex. 13 to State App.

William Fletcher, who testified at Patrick's trial in the guilt/innocence stage, had many good

things to say about Patrick – good things that he was ready and willing to say at trial – but about

which he was simply not asked. As Mr. Fletcher says "you can't answer questions in court that you

haven't been asked." *See* Aff. William Lee Fletcher ¶ 5, attached hereto as Ex. O. Had he been

asked, Mr. Fletcher would have said that:

> At work, Patrick was energetic, happy go lucky and friendly with everybody.

*Id.* ¶ 3.

> Moreover, Mr. Fletcher says:

> The actions of which [Patrick] was accused was completely out of character for the
> Patrick I knew and even today, after his conviction, I cannot see him doing it.

*Id.* ¶ 4. As Mr. Fletcher said,

> I wish the defense had contacted me, because I would have been very willing to say
> what I knew about Patrick as a friend from work and that, despite being convicted
> of a terrible crime, he was a person who's life was worth saving.

*Id.* ¶ 5. Had defense counsel brought on Mr. Fletcher to testify in the penalty phase of the trial, the

impact of statements would have been significant because, despite having information relevant to

guilt/innocence, Mr. Fletcher was willing to come forward with a fair and honest assessment of Mr.

Murphy and ask that his life be spared.

With the use of simple investigative techniques, trial counsel would have been able to

present the jury with many reasons to spare Mr. Murphy's life. "[U]ncover[ing] mitigating evidence

is a necessity" not an option which counsel may forgo, as trial counsel did here. 2003 Guidelines

10.2 Commentary at 59; 1989 Guidelines 11.4.1 (C); *see also Wiggins v. Smith*, 123 S. Ct. 2572,

51

2537 (2003) (measuring the standard of competence to the 1989 Guidelines and holding counsel ineffective on basis of inadequate mitigation investigation; although counsel did arrange psychological testing for his client and obtain some government records he "acquired only rudimentary knowledge of his history from a narrow set of sources"); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (notwithstanding fact that trial counsel competently handled the guilt phase of the trial counsel's failure to begin to prepare for sentencing phase until a week before trial fell below professional standards, and counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background); *id.* at 415 (O'Connor, J., concurring) ("counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances" amounted to ineffective assistance of counsel).

Had trial counsel investigated, prepared and presented a mitigation case, the picture that would have emerged of Patrick was not that of a troublemaker, bully, or remorseless individual, but of a well-liked and close friend. Patrick is not a vicious-spirited youngster who was emulating the bad examples of his older family members, but rather is a pleasant, kind, and likeable young man with dreams and ambitions. Patrick values and has maintained friendships over long periods of time. He is a friend who is thought of and remembered fondly, even to this day (after his conviction) as a person who worked hard to overcome the obstacles of poverty and family dysfunction to make a life for himself. Many would have testified, had they been asked, that they loved him and needed him in their lives and that Patrick's life was worth saving.

Trial counsel was derelict in his duty to Mr. Murphy when he failed to investigate, prepare and present this mitigation evidence. As all the foregoing affidavits show, none of these witnesses (except Mr. Murphy's mother) were interviewed by the defense. Ms. Murphy, although interviewed, was not prepared for her testimony. *See* Aff. of Elizabeth Murphy (January 22, 2004), ¶ 3, attached

hereto as Ex. M (lawyers did not go over what she would say at trial or explain the significance of second stage proceedings). Such a deficient performance in preparing in presenting witnesses is widely acknowledged to be ineffective. *See Cunningham v. Zant*, 928 F.2d 1006, 1017 (11th Cir. 1991) (noting, as part of ineffectiveness, trial counsel did not interview the defendant's mother until the day of trial and that the consequence of such "minimal preparation" was evident).

### c. What Should Have Been Done With The Information Counsel Had In His Possession

Not only did Mr. Murphy's trial counsel fail to investigate, develop and present a wealth of relevant mitigation evidence that was readily available, he also failed to use effectively the limited evidence he had gathered.

For example, the prosecution characterized Mr. Murphy as the mastermind of a premeditated plot to kill Mr. Jacobs, who executed that plot and systematically destroyed evidence to cover up the crime. Yet there was much evidence – in the hands of the defense – that undermined that theory of the crime and Mr. Murphy's role in and responsibility for the crime.

The defense *had in its possession* evidence that Mr. Murphy scored a 67 on an *Intelligence Quotient* test. (V Tr. 1290). That information was never used, as it could have been, to show that Mr. Murphy lacked the mental abilities to plan and execute a premeditated crime and then systematically destroy all forensic evidence of the very bloody crime so that no forensic link could be established between Mr. Murphy and the victim.

The defense *had in its possession* a recommendation that Mr. Murphy be given a *neuropsychological examination* (V Tr. 1310). Yet, trial counsel failed to follow-up on that recommendation. It was not until Mr. Murphy's direct appeal that such an evaluation was done, at

53

which time it was found that Mr. Murphy showed clear-cut signs of ***organic brain damage***. *See* Appellant's Br. at 60-63; and Report of John R. Smith, M.D., attached as Ex. 16 to State App.

It is crucial, where supported by evidence (as it was here), to pursue evaluation of a defendant by mental health experts because neuropsychological and psychiatric impairment are common among capital defendants. 2003 Guidelines, 4.1 (commentary); *see also* 1989 Guidelines, 11.4.1 (D)(2)(c) (preparation for the sentencing phase of a capital case must include collecting information like medical histories, including mental heath/injury information); *id.* at 11.8.3 (preparation for the sentencing phase); *id.* at 11.8.6 (presentation of the sentencing case).

Had trial counsel followed through on Dr. Sharp's recommendation, he would have been able to present anecdotal evidence that a series of significant head injuries and exposure to alcohol as a fetus and young child (as well as exposure to alcohol as an adult) had all likely damaged Mr. Murphy's brain and contributed to the deficits in executive functioning capabilities that each of the experts who evaluated Mr. Murphy saw. *See* Appellant's Br. at 60-63; and Report of John R. Smith, M.D., attached as Ex. 16 to State App.

The defense likewise ***had in its possession*** a ***psychopathy analysis*** performed by Dr. Jeanne Russell which suggested that Mr. Murphy was not the cold-blooded monster the prosecution said he was, but instead a person who is ***not a psychopath***, a person who has great difficulty making "executive" decisions, and one who, on his best day, would be unable to plan and execute this crime in any kind of premeditated fashion. Indeed, the psychopathy analysis of Mr. Murphy was so inartfully presented by trial counsel that it was not possible for the jury to learn that this test, which was utterly unrebutted by the prosecution, showed Mr. Murphy to be the kind of person who would be far more likely to be a bystander to the crime (as indeed Mr. Murphy said he was) than he would be likely to be the perpetrator of the crime.

As Dr. Timothy Derning explains, Mr. Murphy's life history showed him to be "not typical of a man on death row." *See* Aff. of Dr. Timothy J. Derning ¶ 3, attached hereto as Ex. P. Instead of a "psychopath" who is at high risk to reoffend (*id.* at ¶ 10), Mr. Murphy shows personality characteristics like that of any normal person (*id.* at ¶ 12). As Dr. Derning said:

> [t]he fact that Patrick Murphy's psychological profile and PCL-R score clearly indicates that he is ***anything but a psychopath*** capable of such a heinous crime is a ***'gold nugget'*** for the defense . . . . [which] should have weighed very heavily toward the jury's understanding that Mr. Murphy is not a 'monster', not someone who is capable of the most vicious, predatory, and brutal violence, not someone whois likely to have been so depraved..

*Id.* at ¶ 39 (emphasis added). This information goes to guilt and innocence, and also goes to the question of Mr. Murphy's future dangerousness. Dr. Russell's psychopathy analysis showed Mr. Murphy was the kind of person who would do incredibly well in the structured setting of prison (as indeed he has). *See id.* ¶ 43.

The defense had this information available to it, yet did virtually nothing to make this evidence available to the jury. The defense used an expert who had never performed a future dangerousness evaluation in a capital case. The defense explained nothing about the reliability and predictability of the Hare Psycopathy Analysis. *See id.* at ¶¶ 5-16. The defense gave Dr. Russell virtually no background information. *See id.* at ¶¶ 22 -29. Her analysis was, therefore, presented without necessary "contextual background information" to help the jury distinguish between attributes which were the product of Mr. Murphy's upbringing and home environment, and attributes which were inherent in his character. *Id.* ¶ 29. Counsel had a duty to use the information he had, to present that information clearly, and show the jury what it meant. Yet counsel did virtually nothing to capitalize on this "gold nugget" information.

As the Court said in *Woodson*, the Eighth Amendment right to offer mitigating evidence does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those "compassionate or mitigating factors stemming from the diverse frailties of humankind." 428 U.S. at 304. Defense counsel had evidence at his disposal (in his hands as well as available to him in the community) to explain the full context of Mr. Murphy's life. Counsel failed to use what he had and failed to uncover the wealth of information available about the Mr. Murphy's life and circumstances.

**3.    Exhaustion of the Issue of Counsel's Deficient Performance in State Court**

Counsel's deficient performance in investigating, preparing and presenting a mitigation case is ripe for the Court's review as it was fully briefed and presented to the OCCA and thus is exhausted in accordance with 28 U.S.C. § 2254 (b). Undersigned counsel has added to the evidentiary support on this issue in the instant Petition; however, nothing in the added materials changes the fundamental character of the claim on ineffective assistance of counsel in the penalty phase of the trial. Thus, the issue is properly before this Court for review. *See Demarest v. Price*, 130 F.3d 922, 932 (10th Cir. 1997) ("[f]air presentation" of an issue to state court means the substance of the claim was raised in state court and a habeas petitioner may present "bits of evidence" to a federal court that were not presented to state court); *Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997) (closely related claims with arguable factual commonality are considered exhausted by prior presentation to state court). In the event that the Court considers that the added material so fundamentally changes the nature of the arguments that the issue has not been exhausted, undersigned counsel respectfully requests the Court accept the petition, but hold the petition in abeyance and allow these issues to be exhausted in state court according to the procedures discussed herein in Ground One.

**D.** **Mr. Murphy Was Prejudiced By Counsel's Ineffective Investigation, Development and Presentation of a Mitigation Case**

**1.** **The OCCA's Analysis of Prejudice**

Having decided on direct appeal that counsel's performance was not Constitutionally defective, the OCCA denied Mr. Murphy's ineffectiveness claim without reaching the issue of prejudice. 47 P.3d at 887. Having decided in post-conviction proceedings that Mr. Murphy's counsel was not ineffective, the OCCA found perfunctorily that there was no reasonable probability that the sentencing proceeding would have been different. 54 P.3d at 565. Under these circumstances, it cannot be said that the OCCA "adjudicated" the issue (that is, made a reasoned decision after consideration of the applicable law to the facts). Thus, this Court is not bound by deference to the state court required in 28 U.S.C. § 2254(d), which only applies when a state court "adjudicates" as opposed to "decides" an issue.

Nevertheless, to extent that the OCCA did discuss, or can be presumed to have discussed, prejudice, some comments are in order. The OCCA's conclusion that some of the evidence might be as aggravating as mitigating cannot support a finding that there was no prejudice in counsel's deficient performance. 47 P.3d at 887; 54 P.3d at 565. Implicit in such an assumption is that no amount of skill in preparation and presentation of this evidence could engender a sympathetic response from a jury. That assumption is logically insupportable and clearly belied by the importance the Supreme Court has placed on the need for a thorough, carefully researched mitigation presentation. If it is possible for information to be viewed through more than one lens, the jury needs to decide which lens to use. The OCCA cannot summarily presume to predict what a jury might do with information that is arguably beneficial to Mr. Murphy.

Moreover, it has long been recognized that evidence presented in mitigation may be seen by some as aggravating. *See, e.g., Penry*, 492 U.S. at 324 ("Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."); *Joshua N. Sondheimer, A Continuing Source of Aggravation: the Improper Consideration of Mitigating Factors in Death Penalty Sentencing*, 41 HASTINGS L.J. 409, 410 (1990) (recognizing that mitigators can be considered by a jury as aggravating and characterizing the use of mitigators in aggravation as "improper"). The determination of whether and how to present such information that some might consider aggravating is a strategic choice that can only be made by counsel after an adequate investigation and thorough deliberation. Here, counsel did not know there were people who would speak for Mr. Murphy, did not know of Mr. Murphy's terrible childhood that independent witnesses described as the kind of life in which a kid never had a chance. Counsel's decision not to present the information was not a reasoned decision – he did not know the information was available for presentation.

The decision of what information to present is the defendant's to make. It is well settled law that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, **any aspect of a defendant's** ***character or record*** and any of the circumstances of the offense ***that the defendant proffers*** as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (internal footnotes omitted) (emphasis added).

Finally, to presume that counsel could not have used the information effectively is likewise erroneous. Seasoned mitigation specialists routinely employed in capital cases utilize the type of

information proffered in Mr. Murphy's case all the time. As one noted commentator has said, background's like Mr. Murphy's are tremendously damaging:

> Amidst the current topical discussion of family values, there is increasing recognition across disciplinary and ideological spectrums that during their years of growth and development, children need dependable attachment, protection, guidance, stimulation, nurturance, and ways of coping with adversity. But most capital defendants have lived a lifetime without any of these things. Indeed, we know now that persons accused and convicted of capital murder are very often the victims of poverty, and they have frequently been physically abused and chronically neglected as children.

Haney, at 562-63 (internal quotations and footnotes omitted). Indeed, the jury could have been told that "[t]he nexus between poverty, childhood abuse and neglect, social and emotional dysfunction, alcohol and drug abuse, and crime is so tight in the lives of many capital defendants as to form a kind of social historical 'profile.'" *Id.* at 580. The jury would have learned that, as Mr. Hopkins and Captain Kelough had concluded, a child didn't have a chance growing up as Patrick did.

Simple force of logic tells us that the OCCA's conclusion that there was no prejudice is wrong. The OCCA implicitly admits that some jurors might find the information mitigating. Given the requirement for unanimity in imposing the sentence of death, if even one juror *might* be persuaded that a sentence other than death is warranted, the defendant deserves the chance to have that determination made. *Wiggins*, 123 S. Ct. at 2543 (ineffectiveness and prejudice if there is a chance that "at least one juror would have struck a different balance"). The OCCA's opinion on this point was objectively erroneous and an unreasonable application of federal law.

### 2.    Mr. Murphy was Prejudiced by Counsel's Ineffectiveness

To show prejudice from counsel's ineffective investigation, development, and presentation of a mitigation case, Mr. Murphy must show that, if the jury had been given adequate mitigation information, there is "a reasonable probability that it would have returned with a different sentence."

59

*Id.* To make that determination the court "must evaluate the totality of the evidence, both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* (citing *Williams*, 529 U.S. at 397-98). Here, the totality of the evidence discussed in the foregoing sections amply provides a basis for concluding that Mr. Murphy was prejudiced.

After completing the thorough investigation of Mr. Murphy's family and background that trial counsel omitted, Mr. Murphy's post-conviction counsel have found evidence of an abusive background, a dysfunctional family situation, a low IQ, and medical evidence of brain dysfunction. Of these issues, only Mr. Murphy's low IQ was presented to the jury - and then only in passing. Nothing was presented to show Mr. Murphy's family background. Nothing was presented regarding organic brain damage. Nothing was presented regarding the impact of low IQ on testimony or culpability. Commenting on the prejudice attending a failure to develop mental history and mental capacity, the Sixth Circuit has said:

> Our sister circuits have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity. ... *[S]ee, e.g., Stephens v. Kemp,* 846 F.2d 642, 652-55 (11th Cir.), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) ("the resulting prejudice is clear"); *Blanco v. Singletary,* 943 F.2d [1477, 1505 (11th Cir.), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992)] (prejudice requirement "clearly met" by counsel's failure to present evidence of epileptic seizures and organic brain damage); *Loyd v. Whitley,* 977 F.2d 149, 159-60 (5th Cir.1992), *cert. denied,* 508 U.S. 911, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993) (failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome"). We would be badly out of step with the other circuits were we to conclude that there was no prejudice in the case at bar.

*Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995).

Nothing was presented about Mr. Murphy's good character and the opinion of people who love and care for him. Mr. Murphy's trial counsel missed the opportunity to rebut the prosecution's contention that Mr. Murphy had a good life and raising with his brothers and sisters growing up into

productive and vital citizens. Mr. Murphy's trial counsel missed the opportunity to put to the jury this question: "Do you think that if you had raised this boy whom the unrebutted facts show was a loving, friendly and sweet child who was gifted in athletics, instead of Elizabeth Murphy, who raised him in "the bottoms" with rampant alcohol abuse and violence, do you think we would be here today? The answer to that question must surely be no, it wouldn't have turned out this way. And if you agree that the answer is no – then you must agree that there were factors at work in how Patrick grew up that were out of his control and for which he is not responsible."

Additionally, as discussed in full above, there was much evidence that could have been developed to directly contradict the two aggravators proposed by the prosecution. The defense had in its hands what it needed to show that Mr. Murphy was simply not the kind of person who had the capacity to act in conformance with the prosecution's theory of the case – counsel simply failed to use the information. *See Glenn*, 71 F.3d. at 1207 (Concluding defendant was prejudiced because defense counsel did nothing to develop a social history of their client, review school records, speak to friends and relatives and that, as a result, "the jury was given virtually no information in [the defendant's] history . . . . It was not that such information could not be found, or that counsel made a reasoned decision to withhold the information for tactical or strategic reasons. *The information was not presented to the jury because counsel never took the time to develop it.* ") (emphasis added). These omissions are the essence of ineffectiveness which causes prejudice. As Dr. Derning concluded in this case, "the jury would have greatly benefitted from *credible* punishment options to consider in their deliberations." Aff. of Dr. Timothy J. Derning ¶ 44. The only reason this information, which was in the possession of the defense, was not effectively presented to the jury, is that counsel never took the time to develop it.

61

Indeed, in nearly identical circumstances, the Eleventh Circuit found ineffectiveness when counsel failed to present evidence of "mental retardation, combined with [a] failure to present and argue readily available additional evidence regarding [defendant's] head injury, his socioeconomic background, or his reputation as a good father and worker." *Cunningham*, 928 F.2d at 1018. The court concluded that by "failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudiced [the defendant's] ability to receive an individualized sentence." *Id.* at 1019; *see also Carter v. Bell*, 218 F.3d 581, 596-97, 593, 600 (6th Cir. 2000) (citing the 1989 ABA Guidelines, the court found counsel's failure to develop a social or psychological background deficient performance and evidence of a violent and unstable family life including manufacture and sale of "homebrew," IQ of 87 and positive relationship with children were among mitigating factors the absence of which caused the defendant prejudice); *Jackson v. Herring*, 42 F.3d 1350, 1367-68 (11th Cir. 1995) (failure to conduct enough investigation to formulate an accurate life profile of defendant which included low intelligence, and an abusive childhood at the hands of an alcoholic mother was deficient performance that was prejudicial); *Jackson v. Calderon*, 211 F.3d 1148, 1162-64 (9th Cir. 2000) (in capital case presenting only two mitigation witnesses, one of whom was the mother of the defendant, and failing to compile an independent social history of the defendant which included neglect and instability was deficient performance which caused prejudice).

The jury could certainly have considered the wealth of information that counsel failed to present as sufficiently contrary to the proposed aggravators *or* sufficiently mitigating to warrant a different sentence. Many of the factors that could have been presented by Mr. Murphy's counsel are the very factors which the Supreme Court considered sufficient in *Williams* for the Court to conclude that the defendant there had been prejudiced. *Williams*, 529 U.S. at 398 (knowing Mr.

Williams' life was "filled with abuse and privation, or the reality that he was 'borderline mentally retarded' might well have influenced the jury's appraisal of his moral culpability"). Due to his ineffectiveness, Mr. Murphy's trial counsel made the very same omissions here – and the same result should obtain. The Court of Criminal Appeals in Oklahoma analysis was contrary to and an unreasonable application of *Strickland* when it held that Mr. Murphy had not shown ineffective assistance of counsel or prejudice thereby.

### GROUND THREE – HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR

**Oklahoma's use of the "especially heinous, atrocious, or cruel" aggravating circumstance, in particular the failure to assess correctly the sufficiency of the evidence and infirmities in the jury instructions, violated Mr. Murphy's rights as protected by the Sixth, Eighth and Fourteenth Amendments and warrants habeas corpus relief.**

#### A.    Trial Counsel Objected to the Heinous, Atrocious, or Cruel Aggravator

Before a sentence of death can be handed down in Oklahoma, the prosecution must allege and prove beyond a reasonable doubt the existence of aggravating factors. OKLA. STAT. tit. 21, § 701.12. In this case, the prosecution alleged two aggravating factors. First, that the murder was especially "heinous, atrocious, or cruel" and second, that there existed the possibility the defendant "will commit criminal acts of violence that would constitute a continuing threat to society." (II CR 310-315, Am. Bill of Particulars).

Trial counsel filed a motion to strike the heinous, atrocious or cruel aggravator for insufficient evidence. (I CR 139-141). At trial, counsel reurged that motion and specifically pointed out that there was no evidence, much less sufficient evidence or evidence beyond a reasonable doubt, that the victim was conscious at the time of the murder. (V Tr. 1175-77). The trial court denied the motion. (V Tr. 1182).

63

The jury was instructed that the prosecution claimed that two aggravating factors warranted

the imposition of the sentence of death:

### INSTRUCTION NUMBER 2

In the sentencing stage of this trial, the State has filed a document called a Bill of Particulars. In this Bill of Particulars, the State alleges the defendant should be punished by death, because of the following aggravating circumstances:

1. The ***murder*** was especially heinous, atrocious, or cruel;
2. At the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

(III CR 402) (Jury Instruction No. 2, Penalty Phase (citing the Oklahoma Uniform Jury Instruction

4-69)) (emphasis added).

The jury was given the following definitions to aid in interpreting instruction number 2:

### INSTRUCTION NUMBER 4

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

(III CR 404) (Jury Instruction No. 4, Penalty Phase (citing Oklahoma Uniform Jury Instruction 4-

73)).

The jury found the existence of both aggravating factors. (III CR 420). The jury found the

aggravating factors to outweigh the mitigating factors and fixed Mr. Murphy's punishment at death.

(III CR 421).

On direct appeal Mr. Murphy claimed there was insufficient evidence as a matter of law to

support the heinous, atrocious or cruel aggravating circumstance. 47 P.3d at 883. Further, Mr.

Murphy claimed that the jury instructions inadequately informed the jury of the findings they must make to support the aggravator. *Id.* The OCCA rejected Mr. Murphy's claim.

The Court of Criminal Appeals did not disagree with Mr. Murphy's proposition that the jury must find a conscious suffering of pain to support the heinous, atrocious, or cruel aggravator in this case. On the issue of insufficiency of the evidence, however, the court rejected proposed *de novo* review on the issue as a matter of law, and instead looked at the evidence in the light most favorable to the prosecution. *Id.* On that basis, the court concluded there was ample evidence to support the jury's findings. *Id.* The court then peremptorily rejected the contention that the jury instructions, which fail to require a finding of conscious suffering of pain, were erroneous. *Id.* at 884.

This issue was presented and addressed by the OCCA, has been exhausted and is properly before this Court for review.[14]

**B.      The OCCA Erred in Concluding There Was Sufficient Evidence to Support the Heinous, Atrocious, or Cruel Aggravator**

     **1.      The Eighth Amendment Requires Aggravators Narrow the Class of Murders Subject to the Sentence of Death By Objective Criteria**

The Eighth Amendment requires that the limited class of murderers eligible for the death sentence be narrowed through objective criteria. *See generally Maynard v. Cartwright*, 486 U.S. 356 (1988). Oklahoma purports to do so, in part, by requiring aggravating circumstances to be proved beyond a reasonable doubt before a death sentence can be imposed. OKLA. STAT. tit. 21, § 701.11. However, Oklahoma has had a checkered past with its aggravating factors, especially the

---

[14]The exhaustion doctrine, codified at 28 U.S.C. § 2254(b)-(c), requires that before a federal court exercises jurisdiction over a petitioner's constitutional claim, the claim must have been addressed in at least one complete round of the State's established appellate procedure, either on direct review or in a post-conviction challenge. *Hawkins v. Mullin*, 291 F.3d 658, 663-64 (10th Cir. 2002) (holding when state court actually decides the issue on the merits, the exhaustion requirement is met).

heinous, atrocious or cruel aggravator.  The Tenth Circuit once held that this aggravator failed to perform the narrowing mandated by the Eighth and Fourteenth Amendments.  *Cartwright v. Maynard*, 822 F.2d 1477, 1478-79 (10th Cir. 1987) (en banc) (holding the aggravator to be unconstitutionally vague), *aff'd*, 486 U.S. 356 (1988).

Oklahoma subsequently narrowed the application of the aggravator to cases involving torture or serious physical abuse. *Stouffer v. State*, 742 P.2d 562, 563 (Okla. Crim. App. 1987).  Oklahoma has further defined torture as the infliction of great physical anguish or extreme mental cruelty and physical abuse requires evidence of conscious physical suffering.  *Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995).  However, there continue to be problems with the aggravator.  As the following discussion will show, here there was no "conscious suffering of more than the brief duration necessarily accompanying all murders." *Medlock v. Ward*, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring).

### 2. There is Insufficient Evidence to Support The Heinous, Atrocious, or Cruel Aggravator

The evidence in this case does not describe a conscious suffering death.  The medical examiner could not say that Mr. Jacobs was conscious.  (III Tr. 774).  The OSBI criminalist confirmed the medical examiner's findings that there were no defensive wounds on Mr. Jacobs. (III Tr. 767; II Tr. 464).  No one testified that Mr. Jacobs spoke during the attack which ended his life. Indeed, as the following exchanges demonstrate, Mr. Murphy stated repeatedly in his OSBI interview that Mr. Jacobs *had not talked*.

> Jones:    Was he talking?
>
> Murphy:   *No*. His, his breathing, his stomach.  And we, we both, me and Mark was sitting there. He was still breathing.  He's saying oh–that was it.
>           . . .

(Tr. Mot. (April 6, 2000) Ex. 2 (Post-Arrest Statement Patrick Murphy Aug. 29, 1999) at 108) (emphasis added).

Later in that same interview, Mr. Murphy confirmed that Mr. Jacobs was not talking and simply repeated the agent's prompting - by saying that all Mr. Jacobs did was groan:

Jones:       Did he, he say anything or just groan?

Murphy:     Just groan.

*Id.* at 141. Mr. Sumka testified that Mr. Jacobs said nothing.  (III Tr. 601).

The medical examiner testified that:

- he could not say one way or another whether Mr. Jacobs was conscious and aware of his injuries (III Tr. 774);

- the victim's condition was not inconsistent with being unconscious throughout the attack (III Tr. 778);

- there was a relatively short time between the onset of injuries and death (III Tr. 771);

- the victim showed no signs of defensive wounds (III Tr. 767); and

- the victim's post-mortem blood alcohol level was .23, and the alcohol content of his ocular vitreous fluid was .29, making him significantly intoxicated (III Tr. 761, 765-66).

### 3.    The OCCA Engaged in Impermissible Speculation and Inferences Not Supported by the Evidence to Support its Conclusion on Conscious Suffering

In the face of this evidence, to support its conclusion on conscious suffering the OCCA had to engage in rank speculation about the murder that was expressly rejected as impermissible in *Thomas v. Gibson*, 218 F.3d 1213, 1228 n.17 & 1227 (10th Cir. 2000) and rejected by the OCCA itself in *Battenfield v. State*.  Indeed, in previous cases, the OCCA has refused to affirm a finding of heinous, atrocious, or cruel aggravator in circumstances eerily like this case, in which a medical examiner testified that the victim's injuries "would generally cause loss of consciousness

67

immediately." *Battenfield v. State*, 816 P.2d 555, 565 (Okla. Crim. App. 1991). The *Battenfield* reasoning should have been guiding here.

But instead of adhering to its own precedent, and the Constitutional mandate that sufficient evidence support the aggravator, the court instead engaged in rank speculation that can only be described as an attempt at preserving this sentence at any cost. The court relied primarily on three "facts" in support of its conclusion. First, the court said there was evidence the victim may have been in an upright position at one time because the OSBI testified that some of the blood spatters on Mr. Jacobs feet fell in the form of ninety degree droplets, indicating a vertical fall of blood. 47 P.3d at 883. Presumably the court wants us to conclude that Mr. Jacobs's upright position at one point during the attack means that he was conscious and walking under his own power. However, to reach that conclusion the court has to believe that the ninety degree blood droplets are from Mr. Jacobs (not Mr. Sumka – a person at the scene of the crime who was dripping blood from an upright position) and that is a fact not proven at trial. (II Tr. 473, noting bloodstains on Mr. Jacobs's shoes, but not discussing whether that blood was typed as Mr. Jacobs's blood; *and see* State's Ex. 47 (collecting shoes of George Jacobs); *and* State's Ex. 48 (DNA tests performed in case, not showing any tests on Mr. Jacobs's shoes).

Next the court has to disregard eyewitness testimony that Billy Jack Long and Kevin King were manhandling the victim, beating him and dragging him, and that, if the victim ever had been in an upright position, it was because he was being held in that position, not standing under his own power. *See, e.g.*, (III Tr. 632 (King and Long dragged Mr. Jacobs out of the car)); (III Tr. 595, 637 (King and Long hitting Mr. Jacobs)); (III Tr. 597 (King dragging Mr. Jacobs out of the ditch)); (III Tr. 625 (Mr. Jacobs passed out from alcohol and never woke up)). There was never any testimony that Mr. Jacobs walked or stood under his own power at any time.

The court next speculated that, because Mr. Murphy referenced that the victim uttered "oh" and "groaned" that the victim could have been conscious. 47 P.3d at 883. To reach that conclusion, the court has to disregard the unequivocal testimony that Mr. Jacobs was passed out, and that he never talked or said anything. A groan or "oh" is more consistent with an involuntary, unconscious expulsion of breath during his beating than it is with a conscious utterance, and when taken in the light of all the other evidence, simply does not come close to sufficient evidence of conscious suffering of pain proved beyond a reasonable doubt.

The court speculated that Mr. Jacobs might have consciously suffered pain because "[t]here was testimony that his severed genitals were placed into his mouth at one point and, if true, the victim may still have been *alive* after this point, for the genitals were found at a distance from the body." *Id.* (emphasis added). First, it is important to appreciate the quality of the evidence on which the OCCA relies. There was hearsay testimony that Kevin King *said* he put the victim's genitals on Mr. Jacobs's face. No one ever saw the genitals in that position. Thus, the OCCA does not know that the act considered by the court as so dispositive actually occurred. Second, the presumption of the court seems to be that Mr. Jacobs was conscious and dragged himself from the middle of the road (where the genitals were found) to the side of the road, where his body was found. To reach that conclusion the court has to disregard the testimony, discussed above, that Kevin King and Billy Jack Long were dragging the victim around. The court has to disregard the evidence that Mr. Jacobs has scratches consistent with drag marks on his buttocks, but none on his hands. (State's Ex. 19 (buttocks); Exs. 26, 27 (hands)). If Mr. Jacobs dragged himself (bearing in mind that his pants were down around his ankles, preventing him from walking) then he would have had to use his hands, yet his hands show no signs of scratches or marks.

69

The court OCCA says that the distance between the genitals and the body shows the victim might still have been *alive* at one point in the assault – as if being alive equated with consciousness. *Id*. That reasoning indicates that, as expressly rejected in *Thomas*, the OCCA has endorsed an aggravator that applies to every murder. Such a broad, sweeping, definition of the heinous, atrocious, or cruel aggravator cannot stand as it does not narrow the class of murderers who will be subject to the ultimate penalty.

Finally, the OCCA stated that the process of dying took as little as four and possibly more than twelve minutes. 47 P.3d at 883. However, the OCCA did not venture to guess, out of that time, how long the victim (in its estimation) consciously suffered. It is no wonder that the OCCA could not venture a guess on this point, as there was no testimony that the victim had consciously suffered at all, much less testimony to support a finding of the duration of conscious suffering. As Judge Lucero has pointed out, "we must examine the state court's findings as to the duration of the conscious suffering on the part of the victim." *Medlock*, 200 F.3d at 1324 (Lucero, J., concurring). The OCCA's decision is deficient for this reason as well.

The OCCA reached its decision on conscious suffering by considering factors that make this case unlike other cases where conscious suffering has been found (for example where there was evidence that the victim had struggled and was bound in order to restrain him and despite a number of wounds which could have caused death, he was strangled prior to the infliction of those wounds) here the victim shows no signs that he ever struggled or resisted. *Romano v. Gibson*, 239 F.3d 1156, 1176-77 (10th Cir. 2001); *Thomas*, 218 F.3d at 1228 n.17 & 1227 (Holding no reasonable trier of fact could conclude that the victim, although severely beaten, consciously suffered before death and rejecting assumption that a murderer would continue striking a victim if the first blow rendered the victim unconscious. It is impermissible to conclude simply based on evidence of multiple injuries

70

that there was conscious suffering). Indeed, assumptions regarding consciousness based solely on the circumstances of the crime when not supported by facts "completely unwind the requirement of conscious suffering." *Thomas*, 218 F.3d at 1228 n.17 (and remanding with instructions to grant the writ).

Thus, the OCCA reached its conclusion that there was sufficient evidence to support the heinous, atrocious, or cruel aggravator by unreasonably interpreting and unreasonably applying well settled federal law to the facts of this case, and additionally the court relied on factual errors and inferences simply not supported by the evidence. *See Wiggins*, 123 S. Ct. at 2539 (noting the unreasonable state court denial of relief was based, in part, on factual error concerning the state court record and holding "partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision").

## C. The Jury Instructions on the Heinous, Atrocious, or Cruel Aggravator Were Not Particularized To Mr. Murphy's Individual Conduct

Not only is there insufficient evidence to support the submission of the heinous, atrocious, or cruel aggravator to the jury, this aggravating circumstance is particularly inapplicable to Mr. Murphy absent sufficient evidence to establish beyond a reasonable doubt that he, ***individually***, engaged in an activity that would support the circumstance. *Hawkins v. State*, 891 P.2d 586, 597 n.3 (Okla. Crim. App. 1995); *cf. Hatch*, 58 F.3d at 1471 (assuming, without deciding, that a capital defendant is Constitutionally responsible for aggravating conduct attributable to only that defendant). It is not enough that other defendants may have engaged in aggravating activity – the state must prove beyond a reasonable doubt that Mr. Murphy so engaged. Yet the instructions given ask only whether the "murder" was heinous, atrocious or cruel" not whether Mr. Murphy's conduct

71

resulted in a death which was heinous, atrocious, or cruel. The State's instruction and evidence is lacking in this regard as well.

**D.   The Jury Instructions on the Heinous, Atrocious, or Cruel Aggravator Were Deficient Because They Did Not Require the Jury to Find That the Victim Consciously Suffered Pain**

Notwithstanding the lack of evidence that should have precluded presenting the jury with the heinous, atrocious, or cruel question, and the OCCA's implicit and explicit acceptance that conscious suffering of pain must be proved, the jury instructions did not require the jury to pass on the very question which was central to the application of this aggravator. The jury was ***not instructed*** in this case that "[i]n order to sustain its burden of proof to establish that a murder was 'especially heinous, atrocious, or cruel' the State must prove that the victim ***consciously suffered*** before death." *Abshier v. State*, 28 P.3d 579, 610 (Okla. Crim. App. 2001) (emphasis added), *cert. denied*, 535 U.S. 991 (2002). Indeed, it is for this reason that Mr. Murphy's appellate counsel claimed that the heinous, atrocious, or cruel aggravator is vague and overbroad as used in Oklahoma. *See* Appellant's Br. at 19; and *Murphy*, 47 P.3d at 883-84 (rejecting the vague/overbroad claim).

The Supreme Court has required that where the jury is the final sentencer, the jury must be informed of "all facets of the sentencing process." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled in part, Ring v. Arizona*, 536 U.S. 584 (2002) (requiring jury sentencing in all capital cases); *Mills v. Maryland*, 486 U.S. 367, 377 n.10 (1988) (requiring proper sentencing instructions). A jury must make the determination of all the factors which enhance a sentence. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Here, despite its presence as an integral element of the heinous, atrocious, or cruel aggravator, the jury never found that Mr. Jacobs consciously suffered. Mr. Murphy's basic due process rights, rights to a fair trial and reliable capital sentencing proceeding

72

were thus violated. *See Spears v. Mullin*, 343 F.3d 1215, 1258-59 (10th Cir. 2003) (Hartz, J., concurring).

## E.    The Heinous, Atrocious, or Cruel Aggravating Instruction Violated Mr. Murphy's Fourteenth Amendment Rights

In addition to his federal rights, Mr. Murphy was also entitled, pursuant to state law, to a fair jury determination of the heinous, atrocious, or cruel aggravating circumstance. OKLA. STAT. tit. 21, § 701.11. As a result of his statutory entitlement to a jury finding on aggravating circumstances, Mr. Murphy had a substantial and legitimate expectation that he would be sentenced pursuant to a complete and correct jury understanding of the aggravating circumstance. In Mr. Murphy's case, Oklahoma interfered with the jury sentencing process by hiding a core aspect of the capital sentencing calculus from the jury, in this case, the need for a finding of conscious suffering of pain.

While Mr. Murphy's statutory entitlement to a fair and complete jury determination arose solely under Oklahoma law, it created a liberty interest within the protection of the Fourteenth Amendment. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Accordingly, Oklahoma violated Mr. Murphy's liberty interest in jury sentencing, just as it did in Mr. Hicks's case in 1980.

## F.    Conclusion Heinous, Atrocious, or Cruel Aggravator

There is, in sum, insufficient evidence to support the especially heinous, atrocious, or cruel aggravating factor. Even if there had been sufficient evidence to support the submission of this aggravator to the jury, the instructions on this aggravator were so flawed as to deny Mr. Murphy his Constitutional rights. The jury was not required to find, among other things, that the victim had consciously suffered pain – an element which the OCCA acknowledges is required to support the aggravator in this case. Oklahoma's use of the heinous, atrocious, or cruel aggravator in Mr. Murphy's case violated Mr. Murphy's Sixth, Eighth and Fourteenth Amendment rights, the OCCA

73

made an unreasonable application of clearly established federal law to this issue as well as an

unreasonable determination of facts in light of the evidence presented at trial. Accordingly, the

Court should grant the writ.

## GROUND FOUR – CONTINUING THREAT AGGRAVATOR

**Oklahoma's use of the "continuing threat" aggravator without definition that
limits the circumstances under which it can be applied means that the
aggravator as applied is vague and overbroad and fails to narrow the class of
persons who are subject to the penalty of death in violation of Mr. Murphy's
Sixth, Eighth, and Fourteenth Amendment rights.**

## A.     Trial Counsel Objected to the Continuing Threat Aggravator

As the second aggravating factor, the prosecution alleged that there existed the possibility

the defendant "will commit criminal acts of violence that would constitute a continuing threat to

society." (II CR 310-315, Am. Bill of Particulars). Trial counsel objected and filed a motion to

strike the continuing threat aggravator as "unconstitutionally vague" (I CR 164-168) and requested

a "Brewer" hearing on "continuing threat" (I CR 172-174). Counsel reurged that motion at trial and

further objected to the aggravator because it was "based only upon the criminal act itself." (V Tr.

1182). The trial court denied that motion. (V Tr. 1187).

In explanation of the continuing threat aggravator, the jury was told:

### INSTRUCTION NUMBER 6

The State has alleged that there exists a probability that the defendant will
commit future acts of violence that constitute a continuing threat to society. This
aggravating circumstance is not established unless the State proved beyond a
reasonable doubt:

First,         that the defendant's behavior has demonstrated a threat to
               society; and

Second,        a probability that this threat will continue to exist in the
               future.

74

(III CR 406) (citing Oklahoma Uniform Jury Instructions No. CR 4-74).

## B. The OCCA Rejected Mr. Murphy's Claim that the Continuing Threat Aggravator was Unconstitutionally Vague and Overbroad

On direct appeal Mr. Murphy claimed that Oklahoma's continuing threat aggravator is unconstitutionally vague and overbroad and that its use violated his federal Constitutional rights. 47 P.3d at 884. Mr. Murphy argued that the continuing threat aggravator as applied by Oklahoma does nothing to narrow the class of defendants who will be subject to the ultimate penalty and that the aggravator is so broad and encompassing that any defendant could qualify. In a brief two paragraph statement, the OCCA rejected Mr. Murphy's arguments. *Id.* This issue has been exhausted and is preserved for review.

## C. The Continuing Threat Aggravator is Unconstitutionally Vague and Overbroad in General and as Applied in this Case

In rejecting Mr. Murphy's claim, the OCCA relied on *Jurek* v. *Texas*, 428 U.S. 262 (1976) to support its conclusion on the constitutionality of the continuing threat aggravator. 47 P.3d at 884 (noting the court's reliance on *Jurek* and rejecting that such reliance is misplaced). There are, however, a number of reasons Oklahoma's interpretation of *Jurek* is unreasonable as applied to this case. First, *Jurek* considered a challenge to the "continuing threat" language in Texas based only on the requirement that a jury make predictions about a defendant's future conduct. 428 U.S. at 274-75. Mr. Murphy does not complain that the predictive component of the aggravator is unconstitutional; the holding in *Jurek* is simply inapposite to this case. Moreover, the primary thrust of the *Jurek* is whether, in light of the five aggravators then used in Texas, the sentencing scheme is constitutional provided the defendant has the right to put mitigating evidence before the jury. *Id.* *Jurek* simply does not stand for the proposition that the continuing threat aggravator is always Constitutional under all applications and circumstances; the case is simply not the constitutional

75

touchstone on the continuing threat aggravator that Oklahoma treats it as. Second, there are a number of differences between the procedural posture of the aggravator as used in Texas and as used in Oklahoma that make the reasoning in *Jurek* in large part inapposite in Oklahoma (for example, in Oklahoma, unlike Texas, any first degree murder is a candidate for the death penalty). Oklahoma's reliance on *Jurek* to justify the use of Oklahoma's continuing threat aggravator is misplaced and is an unreasonable application of clearly established federal law which requires an objective and individualized capital sentencing determination.

As Mr. Murphy argued to the OCCA, notwithstanding *Jurek*, the aggravator as used in Oklahoma encompasses an almost unthinkably wide range of circumstances making it unconstitutionally vague and overbroad. Oklahoma applies the aggravator "in cases where the evidence established, *inter alia*, the defendant participated in other unrelated criminal acts, the nature of the crime exhibited the calloused nature of the defendant, and the defendant had previously been convicted of a crime involving violence." *Battenfield*, 816 P.2d at 566 (internal citations omitted). "[A]ny relevant evidence" can support the aggravator. *Id.* at 566 (internal quotation omitted); *see also LaFevers v. State*, 897 P.2d 292, 311 (Okla. Crim. App. 1995) ("The most common grounds for this aggravating circumstance include a history of violent conduct, including unadjudicated offenses, the facts of the homicide of which the defendant was convicted, and other grounds including threats, lack of remorse, attempts to prevent calls for help, testimony of experts, and mistreatment of family members."); *Scott v. State*, 891 P.2d 1283, 1296 (Okla. Crim. App. 1995) (holding continuing threat to society "can be established through introduction of evidence detailing the defendant's participation in unrelated crimes as well as the sheer callousness with which a defendant commits a particular murder.") (footnotes omitted); *Hooks v. State*, 862 P.2d 1273, 1282 (Okla. Crim. App. 1993) ("[T]he nature and circumstances of the killing itself are

76

sufficient to show a propensity towards future acts of violence."); *Workman v. State*, 824 P.2d 378, 383-84 (Okla. Crim. App. 1991) ("[T]he calloused manner in which a crime is committed may support a finding of a continuous threat.").

The litany of factors which can support future dangerousness (as the court in *Battenfield* said, *any* relevant evidence) is so broad that potentially any negative fact about one's life could be used in support of the aggravator to satisfy Oklahoma's standards. Indeed, it has come to that in Oklahoma where in *Brown v. State* the court upheld the continuing threat aggravator based on defendant's "*attitude* in blaming everyone else for his misfortunes." *Brown v. State*, 871 P.2d 56, 77 (Okla. Crim. App. 1994) (emphasis added). This aggravator has become the standardless catch-all that the heinous, atrocious, or cruel aggravator once was. *See Maynard*, 486 U.S. at 363-64. The aggravator as used in Oklahoma gives unfettered discretion to the jury and thus violates due process and renders the resulting death sentence violative of the Eighth Amendment.

Moreover, as applied to Mr. Murphy, most, if not all, of the possible factors which could figure into the future dangerousness calculus simply do not apply to him. To the extent that any factor arguably applies – it is only the factor about the crime itself which applies. Yet that is the very factor which is used to support the heinous, atrocious, or cruel aggravator. Using the same facts in support of both aggravators creates an impermissible overlap between the two aggravators. *See United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996) ("double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally").

It is not just the range of circumstances to which this aggravator applies that presents a problem, it is also how the jury is instructed about the aggravator. Perhaps reflecting the range of

77

circumstances in which a conviction of continuing threat can be upheld, the Oklahoma pattern jury instructions make *no attempt* to *define* this aggravator. *See* Oklahoma Uniform Jury Instructions (Criminal) (2d ed. Supp. 2003) (Instruction 4.73 setting out the elements of the aggravator, but no concomitant instruction defining the terms used). An Oklahoma jury is never told what, of all the evidence it has heard, can support the aggravator. The jury's decision is thus unconstrained – clearly undermining the Constitutional mandate that the sentencing procedure must be guided by objective criteria and individually tailored.

Most glaringly, the jury is not told that, although the OCCA has said that the term "society" as used in the aggravator is "not limited to any segment of the population" (*Salazar v. State*, 973 P.2d 315, 326 (Okla. Crim. App. 1998)), it is permissible for the jury to surmise that the society affected by a risk of future dangerousness for a defendant sentenced to life without parole is *only* the prison population. Where, as here, there is unrebutted testimony that Mr. Murphy is ideally suited to do well in a prison environment, the failure to explain that the jury's analysis could be restricted to that segment of society is error. *See* Defendant's Ex. 3, V Tr. 1257-1260; *see also Murphy*, 54 P.3d at 563 (acknowledging that, at trial, Mr. Murphy's "score on the psychopath test is considered low in comparison to other criminals, indicating he is a very low risk for future violence in a prison setting"). Indeed, as Dr. Derning has said, the risk assessment prepared for trial was "accurate" and Mr. Murphy's conduct at the Oklahoma State Penitentiary bears witness to the accuracy of that prediction. Aff. of Dr. Timothy J. Derning ¶ 43, attaching hereto as Ex. P (noting that Mr. Murphy's field jacket reveals his consistent "excellent" performance at the Oklahoma State Penitentiary).

For all of the foregoing reasons, Oklahoma's and the Tenth Circuit's rulings that the aggravator is Constitutional are, respectfully, inapplicable to this case. *See, e.g., Nguyen v.*

78

*Reynolds*, 131 F.3d 1340, 1353-54 (10th Cir. 1997) (continuing threat not vague simply because it

requires jury to make predictions about defendant's future conduct); *Castro v. Ward*, 138 F.3d 810,

816-17 (10th Cir. 1998) (continuing threat aggravator neither vague or overbroad). A finding should

be made that the instructions on continuing threat given in Mr. Murphy's case failed to adequately

narrow the class of defendants subject to the ultimate penalty of death and thus violated his Sixth,

Eighth, and Fourteenth Amendment rights. For this additional reason, the writ should be granted.

## GROUND FIVE – AGGRAVATING FACTORS MUST OUTWEIGH MITIGATING FACTORS BEYOND A REASONABLE DOUBT

**The jury was not charged that it must find aggravating factors outweighed mitigating factors beyond a reasonable doubt. That failure violated Mr. Murphy's right to have his punishment determined beyond a reasonable doubt as required to insure due process of law and as required by the Sixth, Eighth and Fourteenth Amendments as well as the rule of law established by *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002).**

### A.   The Jury Instructions on Proof Beyond a Reasonable Doubt

The jury was instructed that, in the event they found the aggravating factors outweighed the

mitigating circumstances, they could consider the sentence of death. *See* III CR 410 and 414 (Jury

Instructions No. 10 and 14, Penalty Phase). The instruction given was as follows:

### INSTRUCTION NUMBER 14

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the ***death penalty shall not be imposed*** unless you also unanimously find that any such ***aggravating circumstance*** or circumstances ***outweigh*** the finding of one or more ***mitigating circumstances***. Even if you find that the aggravating circumstances outweighs [sic] the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.

79

(III CR 414) (emphasis added) (citing Oklahoma Uniform Jury Instruction (Criminal) 4-80). The jury was not instructed that it must find the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

**B.   Factual Determinations That Increase the Penalty a Defendant Faces must Be Determined by a Jury Beyond a Reasonable Doubt**

Due process requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Capital defendants are entitled to *Apprendi* protections in the sentencing phase of their cases, including in the determination of aggravating factors. *Ring*, 536 U.S. at 589. In state post-conviction proceedings, Mr. Murphy challenged that his sentencing proceeding violated the protections due him under *Apprendi*.

The Court of Criminal Appeals denied Mr. Murphy's claim for four reasons. First, the court commented that *Apprendi* was only a five to four decision (as if that made the decision anything less than the law of the land). *Murphy*, 54 P.3d at 566.[15] Second, the OCCA held that the language in *Apprendi* does not expressly require the balancing of aggravating factors against mitigating factors to be performed beyond a reasonable doubt. *Id*. Third, the court commented that the decision in *Ring* (although expressly extending the *Apprendi* reasoning to capital sentencing proceedings) does not shed light on the question. *Id*. Fourth, the court concluded that, under Oklahoma's unique capital sentencing scheme, once the aggravating factors are found beyond a reasonable doubt, the maximum sentence is death. Thus, the determination of the jury that aggravating factors outweigh

---

[15]Indeed, Judge Chapel expressly calls the court to task for their attitude about *Apprendi* and their failure to apply *Ring* to the analysis of this issue. *See Murphy v. State*, 54 P.3d 556, 577-78 & n.25 (Okla. Crim. App. 2002) (Chapel, J., concurring in result) (but ultimately concluding the application of *Ring* would not mandate a different result).

mitigating factors is not a determination which increases the maximum penalty for a crime and *Apprendi* protections do not apply. *Id.*

The OCCA has recognized that the Supreme Court has held "that a capital jury must make any factual finding bearing on capital punishment beyond a reasonable doubt." *Brown v. State*, 67 P.3d 917, 918 (Okla. Crim. App. 2003). However, because the OCCA construes the Oklahoma capital sentencing scheme as a two-part process where first, a defendant's "eligibility" for death is established by finding of aggravating factors beyond a reasonable doubt, then second, his "selection" for death is the result of balancing or weighing aggravating against mitigating factors, *Ring* and *Apprendi* are applied appropriately in the first stage, and simply do not apply to the second. Distinguishing the Oklahoma sentencing scheme based on an "eligibility" and "selection" step is an artificial distinction, decried by the Tenth Circuit. *Mollett v. Mullin*, 348 F.3d 917 (10th Cir. 2003) (rejecting rigid division of Oklahoma's sentencing scheme into an eligibility and imposition step for purposes of applying Supreme Court precedent on jury instructions on the phrase life without parole). Indeed, Mr. Murphy does not agree that the process only involves two steps. As the plain language of the statute states, sentencing in Oklahoma requires three steps: (1) finding aggravating factors beyond a reasonable doubt; (2) finding aggravators outweigh mitigators; and then, and only then, (3) selecting between life, life without parole, and death. *See* Okla. Stat. tit. 21, § 701.11. Plainly, simply proving an aggravator beyond a reasonable doubt does not create death eligibility. Eligibility is only available if an aggravator outweighs the mitigating factors.

1. **Weighing of Aggravating Against Mitigating Circumstances Is a Factual Determination Which must Satisfy the *Apprendi* and *Ring* Standards of Determination Beyond a Reasonable Doubt**

However, notwithstanding the OCCA's misreading of the sentencing statute, the particular presumptions of the Court of Criminal Appeals in denying Mr. Murphy relief on this claim are

81

twofold. First, the OCCA presumes that the process of weighing the aggravating factors against mitigating factors is not a process which "increases the penalty for a crime beyond the prescribed statutory maximum." Second, the OCCA presumes that the process of weighing aggravating factors against mitigating factors is not a fact determination within the meaning of *Apprendi*.

> ### a.  Weighing Aggravating Factors Against Mitigating Factors Results in an Increase in the Penalty for First Degree Murder Beyond the Prescribed Statutory Maximum

In Oklahoma, the prescribed punishments for first degree murder are found at OKLA. STAT. tit. 21, § 701.9 (A):

> A person who is convicted of or pleads guilty or nolo contendere to murder in the first degree shall be punished by death, by imprisonment for life without parole or by imprisonment for life.

If we were only to look at were this provision of the Oklahoma statutes, we might be inclined to agree with the OCCA's reading that the weighing of aggravating and mitigating circumstances is not something that increases the maximum statutory penalty – because it is clear that, as written, the maximum penalty is death. However, the Sixth Amendment rule of *Apprendi* is not confined so easily. In *Apprendi*, the Supreme Court expressly stated that "the relevant inquiry" for triggering the right to trial by jury and proof beyond a reasonable doubt "is one not of form, but of effect–does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494. When Oklahoma's sentencing provisions are taken in their entirety, the weighing or balancing of aggravating and mitigating factors reveals itself as a factor that exposes the defendant to greater punishment.

After determination of guilt, Oklahoma's capital sentencing scheme requires two separate, additional factual findings before a sentencer is authorized to increase the maximum sentence for first degree murder from the non-capital sentence of life imprisonment without parole (the maximum

sentence available based solely on proof of the elements of first degree murder), to a sentence of death. The elements of first degree murder, without additional findings, expose the defendant to a *maximum* punishment of life imprisonment without parole and a *minimum* punishment of life imprisonment. This is made clear in the text of OKLA. STAT. tit. 21, § 701.11, which provides in part:

> *Unless at least one of the statutory aggravating circumstances enumerated in this act is so found* or if it is found that any such aggravating circumstance is *outweighed* by the finding of one or more mitigating circumstances, *the death penalty shall not be imposed*. If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life without parole or imprisonment for life.

(emphasis added).

Thus, when viewed in the totality of the statutory scheme, a jury's finding (evidenced by their verdict of guilt) that the elements of first degree murder have been proved beyond a reasonable doubt does not *authorize* the death sentence at all. Under Oklahoma law, the death sentence is expressly forbidden unless the jury makes two further, unanimous findings that: (1) one or more aggravating factors exist; and (2) the aggravating factors outweigh all mitigating factors.

The instructions given to the jury in this case bear witness to the way in which sentencing authority is conferred in capital cases. After the finding of guilt, the jury was instructed that it must find one or more aggravating factors before it is authorized to consider (not impose) increasing the penalty to death. The jury was told: "Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are *authorized to consider* imposing a sentence of death." (III CR 410) (emphasis added). The jury was further instructed that they were prohibited from fixing the sentence at death unless it made the further finding: "If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable double, the

83

death penalty *shall not* be imposed unless you *also unanimously find* that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances." (III CR 414) (emphasis added).

Indeed, the OCCA has, in previous cases, referred to the weighing process as one with a burden of proof, authorizing the imposition of the sentence of death "only when the aggravating circumstances *clearly outweigh* the mitigating may the death penalty be imposed." *Paxton v. State*, 867 P.2d 1309, 1322 (Okla. Crim. App. 1993) (emphasis added).

The process of weighing the aggravating factors against the mitigating factors is a necessary and critical element which, unless performed to an acknowledged standard of proof, prohibits the imposition of the death penalty. Such a factor is within both the letter and the spirit of *Apprendi's* admonition that factors which increase punishment be submitted to a jury for determination beyond a reasonable doubt.

**b.    "Weighing" Is a Factual Determination like Any Other in Which the Jury Engages**

Many courts, like the OCCA, believe they have adroitly sidestepped the application of *Apprendi* to their sentencing proceedings by simply concluding that "weighing" is not "fact finding." *See Lewis v. State*, __ So. 2d __, No. CR-99-1155, 2003 WL 21246584, at *76 (Ala. Crim. App. May 30, 2003) (collecting cases). The question becomes – do the Supreme Court holdings in *Ring* and *Apprendi* apply to all questions affecting sentencing which a jury decides (all fact-determinations as opposed to determinations of law), or are the holdings restricted only to those "facts" which can be proven by reference to a certain datum of experience.

A jury makes all kinds of findings which involve weighing evidence that are not subject to comparison to a certain datum of proof (evaluating the credibility of witnesses, choosing what

weight to give circumstantial as opposed to direct evidence, or deciding guilt or innocence). However, we would not say that those jury determinations are not matters of fact.

Indeed, in this case, the jury was specifically told that the process it was to undertake (including the weighing of aggravating against mitigating factors) was a factual determination. In the trial judge's closing instruction, the jurors were told:

### INSTRUCTION NUMBER 17

In arriving at your determination as to what *sentence* is appropriate under the law, you are authorized to consider only the *evidence* received here in open court presented by the State and the defendant during the sentencing phase of this proceeding. . . .

\* \* \*

You determine *the facts*. The importance and worth of *the evidence* is for you to decide.

\* \* \*

(III CR 418).

When the OCCA has invalidated a jury's finding of an aggravating circumstance it has held that "independent reweighing of aggravating and mitigating circumstances where one of several aggravating circumstances has been invalidated is implicit to our statutory duty to determine the *factual substantiation* of a verdict and validity of a death sentence." *McGregor v. State*, 885 P.2d 1366, 1386 (Okla. Crim. App. 1994) (emphasis added). Since the weighing determination of the jury is one reviewed for its factual substantiation, it cannot be denied that the finding is anything other than one of fact which, according to *Apprendi*, must be found by the jury *beyond a reasonable doubt*. The failure to properly instruct this jury concerning that rigorous burden of proof therefore infects the death sentence with constitutional error.

The reasoning of *Apprendi* demonstrates that the trial court's instructions failed to comport with the Sixth and Fourteenth Amendments' requirement that "any fact that increases the penalty

85

for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The jury was not instructed that the weighing determination – clearly the most critical factual inquiry and the one which actually *authorizes* the jury to return a verdict of death – must also be proved to its satisfaction beyond a reasonable doubt. Error denying a defendant's right to an instruction concerning the finding of the essential elements of an offense beyond a reasonable doubt infects the very structure in which the capital sentencing proceeds. The trial court's error in its instructions resulted in a sentence which violates Mr. Murphy's Sixth and Fourteenth Amendment rights recognized by the Supreme Court in *Apprendi*, and further violates his right to due process of law and a fair and reliable capital sentencing proceeding in violation of the Eighth Amendment.

## GROUND SIX – THE VICTIM IMPACT EVIDENCE

**The victim impact evidence which explicitly called for Mr. Murphy's execution exceeded what is Constitutionally permissible and violated Mr. Murphy's right to a fundamentally fair sentencing proceeding guaranteed by the Fifth, Eighth and Fourteenth Amendments.**

Three relatives of the victim read victim impact statements to the jury. One of the witnesses read two statements, his own and that of Mr. Jacobs's sister who could not attend the trial. The four statements exceeded what is Constitutionally permissible, and thus denied Mr. Murphy a fundamentally fair trial and due process of law. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (victim impact evidence permitted unless evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, in which case the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief).

86

## A.    The Victim Impact Testimony

Ruben Harjo, the victim's oldest brother, told the jury he could not understand why Mr. Murphy would want to kill his brother. (V Tr. 1219-20). He testified that "Mr. Murphy should get the death penalty for taking an innocent life. I pray that he will not ever get out of jail and do bragging." (V Tr. 1220).

Frank Jacobs, also the victim's brother, testified: "And I believe in the Bible. I believe in an eye for an eye and they should be put to death." (V Tr. 1221). Frank Jacobs also read a statement from his sister, Irene, which commented on the "way [George] was murdered" and which noted "he had the right to be here and alive today" and concluded "I hope you see that no one in the world should ever be free to commit such a crime." (V Tr. 1222-23).

Nadine Francisco, Mr. Jacobs's older sister, concluded the State's penalty state evidence and concluded her statement by saying "I just hope and pray these killers just get the most severe punishment. There is no mercy for them." (V Tr. 1225).

Finally, in closing rebuttal, the prosecution reemphasized to the jury that the family wanted the death sentence for Mr. Murphy. (V Tr. 1398).

## B.    The OCCA Rejected the Claim that These Statements Constituted Super-Aggravators and Were Unconstitutional

Mr. Murphy's trial counsel objected to the victim impact statements in a pretrial motion. (I CR 153-58). That objection was reurged with specificity at trial identifying the significant Constitutional infirmities in each statement outside the hearing of the jury moments before the statements were read. (V Tr. 1187-99). Objection was made to: Reuban Harjo's statement about bragging and not understanding why anyone would want to kill Mr. Jacobs (V Tr. 1194-95); Frank Jacobs's comments regarding the death penalty (V Tr. 1197); and a general opposition to victims

making a recommendation on punishment (V Tr. 1198). However, because that objection was not reurged (minutes later) contemporaneously as the statements were read in court, the OCCA treated the error as reviewable for "plain error" only. 47 P.3d at 885.

The OCCA finding that trial counsel did not make a "contemporaneous" objection strains credulity and is clearly unreasonable. *Id.* ("Appellant did not object to the statements when they were read in court, thus waiving all but plain error."). Trial counsel made his specific objections in a bench conference on the record moments before the penalty phase of the trial began. Only the Judge's admonition to the jury and the opening statements of the penalty phase preceded the victim impact testimony. Trial counsel's objections clearly were intended and, under any reasonable interpretation, did preserve this issue for review. The Court is, therefore, free to depart from the OCCA's factual analysis of this claim.

The OCCA began its analysis by reaffirming that it view that *Payne* (which permits states to introduce victim impact evidence) overruled *Booth*, then existing Supreme Court precedent regarding whether such statements could properly characterize the defendant or the crime and include opinions regarding sentencing. *Id.* The OCCA refused to reconsider that its previous interpretations of *Payne* and *Booth* were erroneous or unconstitutional. *Id.*

Then, despite acknowledging that the testimony of Frank Jacobs regarding biblical retribution was "inappropriate overamplification that should have been stricken," the OCCA decided that the testimony, taken as a whole, was not outside the bounds of permissible evidence. *Id.* The OCCA never expressly considered the request for the sentence of death or the effect of the prosecution's closing rebuttal argument which reemphasized to the jury that the family wanted the death sentence for Mr. Murphy. (V Tr. 1398).

**C.     The OCCA Erroneously Interpreted Well Settled Law on the Admissibility of Victim Impact Statements as Well as Misapplied Existing Law to the Facts of this Case**

### 1.     The OCCA Misunderstood the Law

The OCCA was simply wrong in its assumption that *Payne* had overruled *Booth* in its entirety. Recently the Tenth Circuit commented on this issue and said that *Payne* (which simply held that the Eighth Amendment did not create a *per se* bar to victim impact statements) only "partially reversed [the] course" of previous precedent, like *Booth*. *Hain v. Gibson*, 287 F.3d 1224, 1238 (10th Cir. 2002). The Tenth Circuit expressly concluded that "*Payne* left one significant portion of *Booth* untouched." *Id.* The portion of *Booth* which prohibits family members from stating characterizations and opinions about the crime and which recommend a sentence are still valid. *Id.* at 1238-39.

Thus, the OCCA reviewed the victim impact statements through a distorted lens – one of misunderstanding the well settled Constitutional law which should govern this point. The decision of the OCCA was therefore clearly contrary to federal law.

### 2.     The OCCA Misapplied the Law to the Facts of this Case

Even if the OCCA had understood federal law in full on this point, it would have misapplied that law because it also misunderstood the facts of this case. Here witnesses did not just request biblical retribution. The victims also expressly requested the death sentence, and then the prosecution reminded the jury of those statements in closing argument. There are special concerns regarding victim impact statements which recommend death. *Cargle v. Mullin*, 317 F.3d 1196, 1224 (10th Cir. 2003). Testimony requesting that defendant receive the death sentence is "clearly contrary to *Payne* and *Booth* and result[s] in a violation of [the defendant's] Eighth Amendment rights." *Hain*, 287 F.3d at 1239; *Robison v. Maynard*, 829 F.2d 1501, 1505 (10th Cir. 1987)

("allowing any person to opine whether the death penalty should be invoked would interfere with the jury's performance of its duty to exercise the conscience of the community"), *overruled on other grounds*, *Romano v. Gibson*, 239 F.3d 1156, 1169 (10th Cir. 2001).

The OCCA's analysis of the harm of the victim impact cases cannot stand, as it was not informed by an understanding of well settled Constitutional law on this point. Moreover, the focus of the court on the factual nature of the statements was misplaced. Here, the clear error was not just the biblical reference, but also the specific request for the sentence of death.

Moreover, in the absence of overwhelming evidence of guilt (much less of the aggravators) in combination with all the other errors (the erroneous absence of mitigation evidence, counsel's unwarranted admission of guilt) there can be no doubt that the admission of this victim impact testimony was harmful. The OCCA's determination to the contrary was based on an error in law, and was objectively unreasonable. Mr. Murphy is entitled to remand of his case for a new sentencing proceeding.

### GROUND SEVEN – FAILURE TO DEFINE LIFE WITHOUT PAROLE

**Failure to define life without parole when the jury is asked to consider future dangerousness is an error that denied Mr. Murphy due process of law and the right to a fundamentally fair sentencing in violation of the Fifth, Eighth, and Fourteenth Amendments.**

A.   **Trial Counsel Asked the Court to Define Life Without Parole**

Prior to trial, the defense asked the trial court to provide the jury with instructions on the meaning of life without parole and evidence regarding the opportunity (or lack thereof) to request sentencing relief at any time after trial from the Department of Corrections. (I CR 175-76). Specifically, counsel requested that evidence be presented including, but not limited to, the following topics: "[t]he distinction between life imprisonment and life without the possibility of

90

parole," "[t]he opportunity or lack of opportunity for relief from the Department of Corrections,"

"[t]he conditions of imprisonments and restrictions on a sentence of life without the possibility of

parole," and any "[o]ther information relevant to the jury's determination." (II CR 175). The trial

court ruled he would instruct the jury per the uniform jury instructions and allow counsel to state

their positions on the point, but would not allow evidence. (I CR 192; Tr. Mot. (Feb. 24, 2000) at

33-35).

At trial, the jury was instructed that the crime of murder in the first degree is punishable by

death, or imprisonment for life without parole, or by imprisonment for life. (III CR 401). The jury

was told the prosecution alleged that the defendant's continuing threat was one of the two charged

aggravators in this case. (III CR 402).

In argument, the prosecutor focused on continuing threat:

> But then we have a second thing we want to discuss with you, ***a continuing threat to society***. Mr. Murphy says if you let me I'll never touch a beer again, I won't hurt anybody. But lets look at what happened when he was out there that night and two days before that. . . .

(V Tr. 1371) (emphasis added). And then in closing, the prosecution asked the jury to condemn Mr.

Murphy:

> I don't come to these decisions lightly, ladies and gentlemen. But I do come to them for a very good reason. And I do ask you to condemn and find a punishment —
>
> [intervening objection - sustained]

(V Tr. 1373).

In rebuttal the prosecutor continued to emphasize that prison was not good enough for Mr.

Murphy: "In that prison community he's going to continue to be a threat. . . . He's a continuing

threat beyond any doubt." (V Tr. 1392-93). The prosecutor continued: "even in a prison community

where he can throw more pebbles, and make more ripples." (V Tr. 1397).

**B.    The OCCA Erroneously Rejected the Need for Instruction**

The OCCA ruled that this was not a case in which trial counsel proffered an instruction, which was then rejected by the trial court. 47 P.3d at 886. Rather, the court found that discussion was allowed on the point and defense counsel was specifically allowed to say that "life without parole means life without parole." *Id.* However, the OCCA missed the point regarding explanation of the phrase life without parole. The trial judge in Mr. Murphy's case merely allowed the phrase to be defined by itself – which is no definition at all. Indeed, as Justice Souter noted, "Because . . . juries in general are likely to misunderstand the meaning of the term 'life imprisonment' in a given context, the judge must tell the jury what the term means, when the defendant so requests." *Simmons v. South Carolina*, 512 U.S. 154, 173-74 (1994) (Souter, J., concurring) (internal citations omitted).

Moreover, it is well settled law that, in a case where the jury is asked to consider the future dangerousness of the defendant, and the defendant's future dangerousness is specifically focused upon by the prosecutor, the meaning of life without parole is not self-evident and the failure to explain that term in the context of the sentencing options is not harmless. *See generally, Simons*, 512 U.S. at 161-62.

The Tenth Circuit has recently addressed this very question in *Mollett v. Mullin*, 348 F.3d 902 (10th Cir. 2003). That opinion explains why the OCCA's application of well settled federal law on this point was unreasonable and why the failure to define life without parole, under Oklahoma's sentencing scheme as applied in this case, violated Mr. Murphy's right to due process of law and a fundamentally fair trial.

In *Mollet*, future dangerousness was alleged and discussed extensively by the prosecution, just as it was in this case. *Id.* at 906. Like Mr. Murphy's jury, the jury in *Mollet* was given

Oklahoma's plain vanilla sentencing options. *Id.* The only difference between the *Mollet* case and Mr. Murphy's case is that the jury in *Mollet* sent out a question to the judge regarding life without parole that the judge answered by telling the jury that they should not consider parole options. *Id.* at 907. However, those differences are insignificant when, as here, the continuing threat aggravator was alleged and continuing threat was referenced repeatedly by the prosecution. Mr. Murphy's future dangerousness was at issue. For these reasons, the trial court's failure to allow evidence on the definition of life without parole denied Mr. Murphy due process of law, in violation of his Fifth, Eighth, and Fourteenth Amendment rights. The OCCA therefore unreasonably applied well settled federal law to the facts of this case and Mr. Murphy is due habeas relief. *Wiggins*, 123 S. Ct. at 2534-35.

## GROUND EIGHT - MR. MURPHY'S POST-ARREST STATEMENT WAS INADMISSIBLE

**Mr. Murphy's post-arrest statement was taken in violation of his right to due process of law protected under the Fifth and Fourteenth Amendments and his Fifth Amendment right against self-incrimination.**

**A.      Trial Counsel Moved to Suppress the Post-Arrest Statement**

Trial counsel moved to suppress Mr. Murphy's post-arrest statement arguing that, under the totality of the circumstances, Mr. Murphy's waiver of rights was invalid. (Tr. Mot. (April 6, 2000) at 3; I CR 186). After a hearing, pursuant to *Jackson v. Denno*, 378 U.S. 368 (1968), at which the trial court heard evidence, the trial court denied that motion. (Tr. Mot. (April 6, 2000) at 34). Counsel reurged the motion to suppress motion during trial claiming again that Mr. Murphy was coerced. (II Trial Tr. 341).

In denying the motion, the trial court commented that Mr. Murphy's questions to the agents were a sign that Mr. Murphy gave a knowing and voluntary waiver. (Tr. Mot. (April 6, 2000), at

93

33). However, the trial court focused predominantly on the fact "that the O.S.B.I. agents properly informed the Defendant"– and not predominantly on Mr. Murphy's comprehension of the waiver. (Tr. Mot. (April 6, 2000), at 32-33). The involuntariness of Mr. Murphy's post-arrest statement was raised by appellate counsel in Mr. Murphy's direct appeal. *See* Appellant's Br. at 55. The issue of Mr. Murphy's comprehension of waiver was fully presented and this issue is exhausted. *Id.* at 56.

**B.      The OCCA Denied Mr. Murphy's Claim That it Was Error to Admit His Post-Arrest Statement**

On appeal, Mr. Murphy claimed that his post-arrest statement should have been suppressed because, when viewed in its totality, it is clear that Mr. Murphy wanted an attorney and was confused about his right to have an attorney appointed. Appellant's Br. at 57-58. The OCCA denied Mr. Murphy's claim that it was error to admit his post-arrest statement. 47 P.3d at 881-82. The OCCA said that "vague and noncommital statements to police officers" were insufficient to invoke the right to counsel. *Id.* Like the trial court, the OCCA did not focus on Mr. Murphy's understanding of his rights.

**C.      Under the Totality of the Circumstances, Mr. Murphy's Statement Should Have Been Suppressed**

As courts have noted for decades, a waiver of the right to counsel must be "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). There are special concerns regarding the statements of defendants, like Mr. Murphy, with intellectual limitations:

> In considering the voluntariness of a confession, ***this court must take into account a defendant's mental limitations***, to determine whether through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of his own free will. The Supreme Court has made clear that such an inquiry involves a weighing of the circumstances of pressure against the power of resistance of the person confessing. ***The concern in a case involving a defendant of subnormal intelligence is one of suggestibility***. Doubtless, if the prosecutors

94

pursue a specific object in the interrogation of such an accused, and the resulting confession bears the precise fruit of their aims, it will be doubly suspect.

In this case, the district court did not find, and the record would not support a finding that [the defendant] was so mentally deficient that his confessions must necessarily be held involuntary, or that he could not understand the circumstances surrounding his interrogation and confession. Questions of suggestibility and possible overreaching are raised, however, and must be factored into a consideration of the totality of the circumstances.

*Jurek v. Estelle*, 623 F.2d 929, 937-38 (5th Cir. 1980)[16] (en banc) (internal quotations and citations omitted) (emphasis added); *Id.* at 936 (considering the voluntariness of confession of a defendant who, like Mr. Murphy, is "below average" "dull normal" with "possible organic brain damage.").

Indeed, the facts in this case show those concerns to be warranted. The colloquy between the agents of the Oklahoma State Bureau of Investigation and Mr. Murphy is revealing:

| | |
|---|---|
| Jones | I'm an Agent of the Oklahoma State Bureau of Investigation. I wish to advise you, that you have an absolute right to remain silent. That anything you say, can and will be used against you in a court of law. Okay. You have the right to talk to an Attorney, before, and have an Attorney present with you during questioning. That if you cannot afford to hire an Attorney, one will be appointed to represent you without charge before any questioning if you so desire. If you decide to answer any questions. You may stop any time you wish. Do you understand what I just read to you? Okay. You initial this right here for me. That I read you that. Just put your initials right there. Okay. Reading on here. I fully understand the statement advising me of my rights. And I'm willing to answer questions. I do not want an Attorney. And I understand that I may refuse to answer questions at any time during questioning. No promises have been made to me nor has any threat been made against me. Do you wish to talk to us? |
| Murphy | Well, it ain't no difference cause I ain't done anything. |
| Jones | Do you want to talk to us? Yes or no? |
| Murphy | Well, I can't answer that question right now. |

---

[16]Abrogation of this case recognized by *Stano v. Butterworth*, 51 F.3d 942, 944 (11th Cir. 1995) on the standard of review of district court findings of fact.

| | |
|---|---|
| Murphy | I don't know this, this, this, I'm not for sure if I'm gonna to have an attorney. |
| Jones | This is your Miranda Rights. |
| Murphy | Right. |
| Jones | It is your right to have an attorney.  Do you want one or do you want to talk to us?  It's your choice.  Do you want an attorney, yes or no? |
| Murphy | Well, can I still talk to ya'll and still have an attorney present? |
| Jones | Do you want, you want an attorney?  You can have an attorney.  If not, you can talk to us right now.  It's your choice.  I can't tell you what to do. |
| Murphy | I mean, I mean, your saying I can't do both? |
| Jones | Yeah.  Eventually, sure.  If you want an attorney, we'll get you an attorney.  If that's what you're saying. |
| Murphy | What I'm saying, I probably won't have an attorney, but, still yet, I'm, I'm going to talk to ya'll too, if that's what ya'll want.  You see what I'm saying. |
| Harshaw | What, what this is Patrick, it's, it's uh - is your, advising you of your - |
| Murphy | Yeah I - I - fully - |
| Harshaw | Miranda Rights. |
| Murphy | I fully understand this. |

(Tr. Mot. (April 6, 2000) Ex. 2 (Post-Arrest Statement of Patrick Murphy, August 29, 1999) at 60-62).

A noted investigator on the subject of the psychology of interrogations has explained that there is a significant risk of coerced statements with persons who have a mental disability, among other reasons, because "[t]here is substantial empirical evidence to support [the] view" that "people with learning disabilities are more suggestible than normal people." GISLI H. GUDJONSSON, THE

PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS, A HANDBOOK 324 (2003) [hereinafter GUDJONSSON]. Likewise, Gudjonsson identifies an "eagerness to please people in authority" as an issue for those with learning disabilities. *Id.* at 325.

These behaviors are readily observed in Mr. Murphy's post-arrest colloquy with agents of the OSBI wherein the agents tell him that:

| | |
|---|---|
| Harshaw | . . . I'm mean all you have to say is, I, I don't want to talk to you right now. But, you know, this is saying yes *I'm willing to talk* to you without an Attorney present. |
| Murphy | Mh. |
| Harshaw | Simple as that. |
| Murphy | Yeah, I'm, *I'm willing to talk*. |

(Tr. Mot. (April 6, 2000) Ex. 2 (Post-Arrest Statement of Patrick Murphy, August 29, 1999) at 63) (emphasis added). Mr. Murphy shows his high suggestibility by simply repeating back the statement of the agent - "I'm willing to talk."

Mr. Murphy shows a willingness to please the agents by doing what they want him to do:

| | |
|---|---|
| Murphy | What I'm saying, I probably won't have an attorney, but, still yet, I'm, *I'm going to talk to ya'll too, if that's what ya'll want*. You see what I'm saying. |

*Id*. at 62 (emphasis added).

The results of an empirical study of normal as compared to impaired persons' reactions to a custodial interrogation show:

> the participants with intellectual disability were particularly likely to say that no legal advice was needed if the suspect was innocent of the offense. . . . This is an interesting finding, because I have encountered many defendants of borderline or significantly impaired intelligence, who had failed to request legal advice while at the police station on the basis that they were innocent and therefore did not need legal advice.

GUDJONSSON at 326.  Mr. Murphy said exactly that to the OSBI agents when, in response to questioning he said:

**Well, it ain't no difference cause I ain't done anything.**

(Tr. Mot. (April 6, 2000) Ex. 2 (Post-Arrest Statement of Patrick Murphy, August 29, 1999) at 61) (emphasis added).

Mr. Murphy clearly was confused about his rights.  He said he wasn't sure he was going to have an attorney – and did not understand that he could have one before he talked with OSBI agents. Mr. Murphy's tape recorded statement was taken in violation of his right to due process of law and his right against self-incrimination protected under the Fifth and Fourteenth Amendments.  The trial court erred in not suppressing the statement and the OCCA erred in its interpretation of constitutional law when it found no Constitutional violation.

### GROUND NINE - MENTAL RETARDATION

**Unlike other similarly situated defendants, Mr. Murphy was denied a jury trial on the issue of mental retardation.  The denial of a jury trial on this issue was arbitrary and capricious and violated Mr. Murphy's right to equal protection under the law.  Moreover, because mental retardation is a death "eligibility" factor it must, under *Apprendi* and *Ring*, be decided by a jury.  Mr. Murphy was thus denied protections guaranteed him under the Fifth and Fourteenth Amendments and a fair sentencing proceeding as guaranteed under the Eighth Amendment.**

A.     **Mr. Murphy's Claim of Mental Retardation**

The evidence adduced at trial was that Mr. Murphy scored a 67 on an IQ test, that he was mildly mentally retarded, and had been evaluated as a child as "educably mentally handicapped" (an antiquated phase which equates, in today's nomenclature, to mild mental retardation).  (IV Tr. 1290, 1295; and Def.'s Ex. 4, p. 3-4).  Mild mental retardation was listed as one of a number of possible mitigating factors.  (III CR 413).

98

In state post-conviction proceedings, counsel raised Mr. Murphy's mental retardation and claimed that to execute him would violate the Eighth Amendment's prohibition against cruel and unusual punishment.  Post-Conviction Br. at 32.  Mr. Murphy's counsel directed the OCCA's attention to the then-pending *Atkins* case, which was considering the constitutional propriety of executing the mentally retarded.  *Id.*  During the pendency of state post-conviction proceedings, the Supreme Court's announced its prohibition on the execution of mentally retarded defendants in *Atkins v. Virginia*, 536 U.S. 304 (2002).

The OCCA granted Mr. Murphy partial relief on the issue of mental retardation, commenting that his claim of mental retardation was arguably "borderline" and, instead of prohibiting his execution as requested, remanded his case for an evidentiary hearing before the same judge who had presided over his trial "on the sole issue of [Mr. Murphy's] claim of mental retardation." *Murphy*, 54 P.3d at 567 n.17, & 570.  The purpose of the hearing was to ascertain whether Mr. Murphy had raised a sufficient evidence of mental retardation (in accordance with the definition set out by the OCCA) to warrant presenting that issue as a question of fact to a jury at a resentencing hearing.  *Id.* at 570.

The remand for an evidentiary hearing was made over the dissent of Vice Chief Judge Johnson, who disagreed with the "procedure established by the Court as to the determination of mental retardation."  *Id.* at 572 (Johnson, V.C.J., concurring in part and dissenting in part). Specifically, Judge Johnson recommended that the issue of mental retardation be presented to a jury, even if a trial judge were to make a determination that no mental retardation existed.  *Id.*  Judge Chapel, although concurring in the result, was troubled by the OCCA's definition of mental retardation which, among other things, incorporated a rigid cut-off on qualifying intelligence quotients of seventy (70) and below.  *Id.* at 573 (Chapel, J., concurring in result).

99

Mr. Murphy's case was the first of its kind Oklahoma. Thus, the opinion of the OCCA was the first articulation of the factors to be considered in evaluating mental retardation for purposes of establishing eligibility for the death sentence in Oklahoma; habeas review of these claims presents an issue of first impression in this Circuit.

**B.     The *Atkins* Prohibition Against Executing the Mentally Retarded**

In *Atkins v. Virginia*, a six-justice majority Court held that it was a violation of the Eighth Amendment to execute a mentally retarded individual. 536 U.S. 304, 321 (2002). This decision was cast in light of the nation's evolving standards of decency and the Court's recognition that mentally retarded persons are regarded as less culpable because they have:

> diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, to understand the reactions of others . . . . [T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Id.* at 318 (footnotes omitted).

In announcing its prohibition against executing the mentally retarded, the Court noted that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317. Thus, the Court concluded that it should "'leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.'" *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

The Court did not, however, leave the States without guidance. The Court acknowledged that the American Psychiatric Association (APA) and the American Association on Mental Retardation (AAMR) both endorse a three-prong test for diagnosing mental retardation. *Id.* at 308 n.3. The hallmark of the condition and the most essential criterion is significant sub-average

100

intellectual functioning, defined by a standardized Intelligence Quotient test of 70-75 or below. *Id*. at 309 n.5. The second criterion is marked impairment in at least two of the following areas of adaptive functioning: self-care; home living; self-direction; use of community resources; communication; interpersonal skills; academic skills; work; leisure; health; and safety. *Id*. at 308 n.3. The final criterion is manifestation of the condition prior to age eighteen. *Id*.

## C.    The Oklahoma Standard For Establishing Mental Retardation

Since Mr. Murphy's case was the first *Atkins* case in Oklahoma, the OCCA defined mental retardation for the purposes of *eligibility* for execution for State of Oklahoma:

> A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

54 P.3d at 567-68 (internal footnotes omitted).

There are several additional caveats. It is defendant's burden to prove he or she is mentally retarded *by a preponderance of the evidence*. *Id*. at 568 (emphasis added). Moreover,

> no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent [sic] quotient test.

*Id.* (internal footnote omitted). A contemporary intelligence quotient test is an "intelligent [sic] quotient test *registering seventy or below* was administered some time after the capital crime was committed or is one that may be understood by contemporary standards." *Id*. at 568 n.21 (emphasis added).

101

Although not applied to Mr. Murphy (whose claim of mental retardation, although proven at trial was not raised as a bar to execution until post-conviction proceedings), the OCCA endorsed jury instructions and verdict forms for the question of mental retardation. The instruction enforced by the OCCA differs from the definition of mental retardation promulgated in the text of the OCCA's opinion; instead of a firm cut-off of a 70 IQ, the instruction says only that a person is mentally retarded if "he or she functions at a significantly sub-average intellectual level" *Id.* at 570, Appendix "A."[17]

---

[17] Oklahoma's pattern jury instructions, which follow the OCCA's definition of mental retardation say:

### OUJI-CR 4-68A

### 1. DEATH PENALTY - MENTAL RETARDATION

You must first determine if the Defendant is mentally retarded as it is defined below. This must be done before deciding what sentence to impose. A Defendant who is mentally retarded cannot be sentenced to death. It is the Defendant's burden to prove by a preponderance of the evidence that he/she is mentally retarded. Preponderance of the evidence means more probable than not.

A person is mentally retarded if he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative.

In reaching your decision, you must determine:

(1) Is the Defendant a person who is mentally retarded as defined in this instruction?

(2) Was the mental retardation present and known before the Defendant was eighteen (18) years of age?

(3) Does the Defendant have significant limitations in adaptive functions in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work?

If you find by a preponderance of the evidence that the answer to each of these questions is yes, then you must find that the Defendant is mentally retarded and so indicate on your verdict form. You must then decide whether the Defendant shall be sentenced to life imprisonment or life imprisonment without the possibility of parole and so indicate on your verdict form.

The OCCA envisions a procedure whereby the claim of mental retardation (if raised before trial) could initially be presented to a judge and decided before trial. *Id.* at 568. If a judge upholds the claim, the defendant would be flatly ineligible for the death sentence. However, if the issue is not resolved before trial, the OCCA mandates that the issue be resolved by a jury. *Id.* In the event that a jury resolved that issue in the negative, a judge could hold a post-judgment evidentiary hearing (upon defendant's request) to ensure that the jury's decision on mental retardation had not resulted in an excessive sentence. *Id.*

Oklahoma procedure thus envisions multiple layers of protection for a defendant who claims mental retardation when that claim is raised *before* trial. Mr. Murphy has not been afforded the protections of a hearing before a judge (prior to the introduction of evidence in his case), or the protection of presentation of the issue to a jury.

**D.    Mr. Murphy Is Due A Jury Trial On The Issue Of Mental Retardation**

**1.    The Evidentiary Hearing On Remand**

Mr. Murphy's case was remanded for an evidentiary hearing before the same judge who had presided over his capital trial. At the outset of the hearing, Mr. Murphy's post-conviction counsel objected to:

1.    the definition of mental retardation as promulgated by the OCCA (Tr. Evid. 12);
2.    the adequacy of the standard set out by the OCCA which incorporated a bright-line test for IQ (Tr. Evid. 13); and
3.    determination of mental retardation by a judge in an evidentiary hearing when "mental retardation will invariably be determined by a jury in a capital sentencing trial." (Tr. Evid. 13).

---

If you find that the answer to any of these questions is no, then you must find that the Defendant is not mentally retarded and so indicate on your verdict form. You must then consider the remainder of the instructions relating to the death penalty and decide whether the defendant shall be sentenced to life imprisonment, life imprisonment without the possibility of parole or death.

In his objection, post-conviction counsel specifically referenced Judge Chapel's concurring opinion in which the Judge disagreed with the proposed procedures, was troubled by definition of mental retardation, believed a jury should hear mental retardation evidence before aggravating circumstances, and advocated permitting a jury to evaluate mental retardation even after a Judge has determined that mental retardation has not been proven by a preponderance of the evidence. (Tr. Evid. 14); *and see Murphy*, 54 P.3d at 573-78 (Chapel, J., concurring). The objections were noted for the record and, in response, the trial judge acknowledged that the procedure for *Atkins* hearings on mental retardation was very much in flux and under discussion in Oklahoma. (Tr. Evid. 15).

Mr. Murphy's counsel then presented witnesses who attested to the recognition of childhood learning disabilities in Mr. Murphy. Ms. Jerry Davis, a school counselor and psychometrist (who develops Special Education Classes) for the Oklahoma State Department of Education summarized the childhood psychological testing done on Patrick Murphy. (Tr. Evid. 19). She describes that, as a child, Mr. Murphy was administered the Wechsler Preschool and Primary Scale of Intelligence (WPPSI) and his scores indicate an IQ functioning of between 65 and 73. (Tr. Evid. 38). The recommendation based on that testing was that "Patrick needs to be placed in a special education class for the educable mentally handicapped." (Tr. Evid. 41). In 1975, educably mentally handicapped meant "mildly mentally retarded." (Tr. Evid. 42).

Ms. Janice Todd (a retired school teacher and former remedial reading specialist) had Patrick in her classes more than one year. (Tr. Evid. 57). She testified that Patrick was two or three years behind his age level in his reading/vocabulary skills by the time he was in fifth or six th grade. (Tr. Evid. 61).

Dr. Bill Sharp (a psychologist who testified at trial), describes his intelligence quotient testing of Mr. Murphy and the resultant IQ score of 67 (Tr. Evid. 89), which is mildly mentally

retarded (Tr. Evid. 90). He concludes that when Patrick was tested "he scored in the mildly mentally retarded range, but I believed that he could do better" possibly when further removed from alcohol (although at the time of Dr. Sharp's test Mr. Murphy has been in custody some six months) and if the test were performed in better testing conditions. (Tr. Evid. 107).

At the close of the hearing, Mr. Murphy's post-conviction counsel believed he had made his point that there was a valid controversy regarding Mr. Murphy's mental retardation that warranted a jury trial by saying:

*If we were in a different context, I certainly would have exercised myself more to try and fill those holes, but I think what we have here is a controversy.*

(Tr. Evid. 131) (emphasis added).

## 2. The OCCA Evaluation of Mr. Murphy's Claims Regarding His Evidentiary Hearing

Notwithstanding the facts proved at trial – that Mr. Murphy was "borderline mentally retarded" – the OCCA nevertheless required Mr. Murphy to relitigate the issue and re-present the issue of his mental retardation to the trial court to ascertain whether there was a sufficient fact question regarding his mental retardation to require presentation of the issue to a jury.

On review of the evidentiary hearing, over two dissents and counsel's presentation of the many factual errors made by the trial court,[18] the OCCA concluded there was no clear error in the trial court's finding that Mr. Murphy had not presented sufficient evidence to satisfy the first and third prongs of the mental retardation, and thus affirmed the sentence of death. *Murphy v. State*, 66 P.3d 456, 461 (Okla. Crim. App. 2003).

---

[18] *Br. of Petitioner After Remanded Evidentiary Hearing*, at 5-8 (Nov. 25, 2002).

105

Judges Chapel and Strubhar dissented on the basis that there was sufficient evidence presented to the trial court to justify submitting the question of mental retardation to a jury. *Id.* at 461-62 (Chapel, J., dissenting); *id.* (Strubhar, J., dissenting). Further, Judge Johnson said in future cases (following Mr. Murphy's) "if there is a prima facie showing of evidence of possible mental retardation under any of the three prongs, then a jury issue is established." *Id.* at 461 (Johnson, P. J., specially concurring).

Thus, three of the judges of the OCCA agreed that proof of the kind submitted by Mr. Murphy should ordinarily be sufficient to submit the issue to a jury, and Judge Johnson implicitly admitted that Mr. Murphy was being treated differently than other similarly situated defendants would be in the future. *Id.*

The OCCA did not address, or "adjudicate" the other issues preserved for review by Mr. Murphy's counsel – that of the definition of mental retardation and the fact of remand for an evidentiary hearing as opposed to direct presentation to a jury in a resentencing proceeding. (Tr. Evid. 12-13).

**E.    Mr. Murphy was Due a Jury Trial on the Issue of Mental Retardation**

       **1.    The OCCA Acted Arbitrarily and Capriciously in Denying Mr. Murphy a Jury Trial on the Issue of Mental Retardation Because There Was Sufficient Evidence to Justify the Grant of a Jury Trial and the OCCA Has Granted Jury Trials to Others in Similar Circumstances. Mr. Murphy's Right to Equal Protection under the Law and a Sentencing Proceeding That Comported with Due Process Was Thus Violated.**

Mr. Murphy showed at his evidentiary hearing that there was some evidence to support a determination of mental retardation on each of the three prongs of the OCCA's test: (1) manifest before age 18; (2) significantly sub-average intellectual level; and (3) significant limitations in adaptive functioning. Mr. Murphy's  mental limitations were recognized in childhood, he was

106

categorized as educably mentally handicapped and would have optimally been placed in special education classes. (Tr. Evid. 38, 41, 46); *see also Br. of Petitioner After Remanded Evidentiary Hearing*, at 7 (Nov. 25, 2002). Mr. Murphy tested 67 on an IQ test that was taken as nearly as possibly "contemporaneously" with the crime. (Tr. Evid. 88-89). Mr. Murphy's life skills, although not the focus of the evidentiary hearing, were discussed in the context of possible organic brain damage, his poor decision making, and alcohol abuse, all of which show poor adaptive skills. (Tr. Evid. 94, 96, 98).

Other cases in the same procedural posture as Mr. Murphy's case have been sent directly for a jury determination of the issue of mental retardation. *See, e.g., Lambert v. State*, 71 P.3d 30, 31 (Okla. Crim. App. 2003) (holding evidentiary hearing in abeyance and remanding for jury determination of mental retardation); *Pickens v. State*, 74 P.3d 601, 603-04 (Okla. Crim. App. 2003) (holding evidentiary hearing in abeyance and remanding directly for jury trial on issue of mental retardation and describing the evidence in support of mental retardation and essentially identical to that in Mr. Murphy's case: educably mentally handicapped before age 18, IQ score of 63-80, and deficits in communication skills). The OCCA itself has acknowledged that it is presently departing from the evidentiary hearing then jury trial process established in Mr. Murphy's case. *See Pickens*, 74 P.3d at 604 (Lumpkin, J., dissenting) (noting the process endorsed by the court "'skips a step' in the *Murphy* analysis").

The OCCA also acknowledges the varied results issuing from trial courts on the issue of mental retardation by noting difficulty that trial courts in Oklahoma have had in handling the determination of how much evidence justifies submission of a claim of mental retardation to a jury: "[w]e recognize that trial courts have been struggling to a certain degree to understand their role in these remanded evidentiary hearings." *See, e.g., Martinez v. State*, __ P.3d __, No. PCD-2002-972,

107

2003 WL 22679725, at *2 (Okla. Crim. App. Nov. 13, 2003). Recently, when a trial court ruled after an evidentiary hearing that there was insufficient evidence to submit the question of a defendant's mental retardation to a jury because the defendant did not have a contemporaneous IQ test of 70 or less, the OCCA overruled the trial court and ordered the case submitted to a jury. *Snow v. State*, ___ P.3d ___, PCD-2002-979, 2004 WL 309052, at *2 (Okla. Crim. App. Feb. 19, 2004) (noting IQ test of 68 in third grade and concluding that the question on remand is only whether there exists a fact question on the issue of mental retardation, not whether the record would ultimately support the conclusion).

In Mr. Murphy's case there was ample evidence to show that there existed a fact question regarding the issue of mental retardation and that the OCCA treated Mr. Murphy differently than other similarly situated defendants; the OCCA acted arbitrarily and capriciously, in violation of Mr. Murphy's right to due process of law guaranteed under the Fifth and Fourteenth Amendments and in violation of the Eighth Amendment, in denying him a jury trial on this issue and in violation of his right to equal protection under the law. *Cf. Lewis v. Jeffers*, 497 U.S. 764, 781-83 (1990) (federal habeas review proper when claim is court acted so arbitrarily and capriciously as to deny petitioner due process of law); *see also In re Holladay*, 331 F.3d 1169 (11th Cir. 2003) (resolving *seemingly irreconcilable court findings on mental retardation* – once instructing a jury that defendant was mildly mentally retarded and later concluding after a hearing that defendant was not mentally retarded by granting stay of execution and granting leave to file second or successive habeas petition); *Johnson v. State*, 102 S.W.3d 535, 540-41 (Mo. 2003) (en banc) (where reasonable minds could differ regarding defendant's mental retardation (scores as high as 84 and as low a 70) defendant is due *new penalty phase hearing* especially when jury treated mental retardation as a mere mitigating circumstance, not as a bar to execution).

108

2.    Under *Apprendi/Ring* Mr. Murphy is Due a Jury Trial

There is yet an additional reason why Mr. Murphy should be granted a jury trial on the issue

of mental retardation.  Due process requires that "any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

reasonable doubt."  *Apprendi*, 530 U.S. at 490.  Capital defendants are entitled to *Apprendi*

protections in the sentencing phase of their cases, including the determination of aggravating factors.

*Ring*, 536 U.S. at 589.  As the following discussion will show, the determination of mental

retardation falls squarely under *Apprendi* and *Ring*.

The OCCA claims that Oklahoma has a two-phase sentencing procedure.[19]  The OCCA

describes the first phase as involving the determination of aggravating factors beyond a reasonable

doubt. This phase is referred to as the "eligibility" phase because, unless the jury finds the existence

of aggravators beyond a reasonable doubt, the defendant is simply ineligible for the sentence of

death.  *Brown*, 67 P.3d at 920 ("The jury determined that [the defendant] was *eligible* for the death

penalty by finding the aggravating circumstances.") (emphasis added).  The second phase of the

sentencing procedure is called the "selection" phase where, having established the defendant is

eligible for death, the jury selects the defendant for death after weighing the aggravating factors

(already proven beyond a reasonable doubt) against any mitigating factors.  The OCCA has

concluded that a defendant's eligibility for death must comport with the standards set out in

*Apprendi* and *Ring*, whereas selection for death need not.  *Id.* (if a jury determines eligibility for

---

[19]Mr. Murphy presents this argument based on the OCCA's view of the Oklahoma sentencing proceeding as previously discussed in this Petition. By presenting this argument Mr. Murphy does not waive his other argument that Oklahoma engages in a three-part sentencing scheme of which the finding and weighing of aggravators both constitute determinations of eligibility for death.

death beyond a reasonable doubt "[t]his is all that the holding in *Ring* requires"). The determination of mental retardation is an "eligibility" determination for at least two reasons.

First, the OCCA itself characterizes the determination of mental retardation as an "eligibility" determination (just like the determination of aggravating factors). *Murphy*, 54 P.3d at 567 (the determination of mental retardation is one that establishes "eligibility for a death sentence"); *id*. at 568 ("If the jury determines a defendant is mentally retarded . . . that defendant shall no longer be eligible for the death penalty."); *id*. at 575 (Chapel, J., concurring in result) ("Further, this issue of death-eligibility is fundamental. If a defendant is not eligible for the death penalty, there should be no capital trial."). Like other "eligibility" determinations that the OCCA has said must be determined by a jury, the mental retardation determination should be made by a jury.[20]

Second, the OCCA has said that *Apprendi/Ring* protections are only required when a factor must meet a specific burden of proof. Where, "specific standards for balancing aggravating and mitigating circumstances are not required under Oklahoma's capital sentencing scheme" there are no concomitant *Apprendi/Ring* protections required. *Murphy*, 54 P.3d at 566 (internal quotations

---

[20]Courts have only recently recognized the troubling interplay between *Atkins* and *Apprendi/Ring*. One court commented that the factual determination of mental retardation is "perplexing question" in light of *Apprendi/Ring*. *Rodriguez v. Cockrell*, No. CIV SA-00-CA-443-EP, 2003 WL 1906154, at *5 n.59 (W.D. Tex. Mar. 31, 2003). There, the court conditioned its comments on the observation that, as of March 2003, the Fifth Circuit had not provided guidance on this point. *Id.* However, shortly thereafter, in June of 2003, the Fifth Circuit rejected a conflict between *Atkins* and *Apprendi/Ring*, in *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003) ("neither *Ring* and *Apprendi* nor *Atkins* render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt"); *and see Walton v. Johnson*, 269 F. Supp. 2d 692, 698 n.3 (W.D. Va. 2003) (concluding, among other things, that *Ring* does not apply to determinations of mental retardation because the finding of mental retardation does not increase the penalty for the crime and is not an equivalent of an element of the offense).

omitted). The determination of mental retardation has a burden of proof, that is, proof by a preponderance of the evidence. *Id.* at 568. Since the mental retardation determination is factual, held to a standard of proof, and distinguishable from the standardless "moral" determination that accompanies weighing aggravating factors against mitigating factors, the determination should, like other similar factors, be governed by the *Apprendi/Ring* protections. For this additional reason, Mr. Murphy is due a jury trial on the issue of mental retardation.

**F.    Oklahoma's Flawed Definition of Mental Retardation is Arbitrary and Capricious**

Judge Chapel of the OCCA voiced concern that Oklahoma has adopted a definition of mental retardation that selects an intelligence quotient of 70 as a rigid cut-off. *Murphy*, 54 P.3d at 573 (Chapel, J., concurring in result). That rigid cut-off is at odds with the Supreme Court's holding in *Atkins* (which does not recommend a specific intelligence quotient as a cut-off for the determination of mental retardation and indeed notes a range of IQ scores establish subaverage intellectual functioning). *Atkins*, 536 U.S. at 300 n.3 & 309 n.5 (AAMR definition of mental retardation has no specific cut-off in IQ numbers, and noting in IQ tests the range between 70 and 75 sets the mark for subaverage intellectual functioning). The rigid cut-off is at odds with other jurisdictions which have implemented the *Atkins* rule without a bright line IQ cut-off. *See, e.g.*, ARIZ. REV. STAT. ANN. § 13-703.02 (2002) (mental retardation involves "significantly subaverage general intellectual functioning" and using an IQ of 75 as a prescreening number above which the intent to seek the death penalty will not be dismissed).

The rigid cutoff is also at odds with the most current definition of mental retardation as promulgated by the American Association on Mental Retardation which eschews any specific IQ number as defining mental retardation:

111

**The AAMR Definition of Mental Retardation**

Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

The following five assumptions are essential to the application of this definition:

1.  Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.
2.  Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.
3.  Within an individual, limitations often coexist with strengths.
4.  An important purpose of describing limitations is to develop a profile of needed supports.
5.  With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

MENTAL RETARDATION, DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS at 1 (AAMR 10th ed. 2002).

The rigid IQ cut-off means that people like Mr. Murphy, whose IQ test scores have ranged from 65 to 80 will necessarily be determined to fall outside of the range of those with "significantly sub-average intellectual functioning." That result flies in the face of the admonition of the AAMR that IQ scores considered to indicate mental retardation have changed through time as testing methodologies and scientific understanding of the disorder have changed and as individuals have responded to their environmental conditions and their life functioning improves through time. *Id.* at xi& 1 (noting changes in definition of mental retardation through time specifically referencing different IQ scores, and promulgating current AAMR definition which does not choose a specific IQ cut-off in the definition of mental retardation).

The rigid cut-off of 70 as a qualifying IQ score is not based on any scientific recommendation, does not reflect the guidance of the Supreme Court, and is arbitrary and capricious in that it rejects out of hand the claims of people like Mr. Murphy whose IQ scores fall both above

112

and below that bright line cut-off. Oklahoma's definition of mental retardation is arbitrary and capricious and denies Mr. Murphy due process protections guaranteed under the Fifth and Fourteenth Amendments.

**G.     Exhaustion of this Issue**

The challenges made by state post-conviction counsel to the failure to provide Mr. Murphy a jury trial on the issue of mental retardation and to the definition of mental retardation adopted by the OCCA were preserved and presented to the OCCA. (Tr. Evid. 12-13). The OCCA rejected those claims without adjudication. The Court is therefore free to review this issue de novo, without deference to the factual findings of the OCCA.[21]

Mr. Murphy's claim that Oklahoma's denial of a jury trial on mental retardation was arbitrary and capricious in violation of his Fourteenth and Fifth Amendment rights was not specifically presented to the OCCA. Exhaustion of issue, however, is excused for at least two reasons.

First, there was no effective means for presenting this issue to the OCCA. 28 U.S.C. § 2254 (b)(1)(B) (absence of state corrective process and circumstances rendering process ineffective excuse exhaustion). This issue could not have been raised and presented to the OCCA in a timely fashion as Mr. Murphy was the first person in Oklahoma to have an *Atkins* hearing. It was not apparent until other defendants received *Atkins* hearings (well after the expiration of Oklahoma's 60 day period for filing a successive petition) that Mr. Murphy's claim of mental retardation was treated differently and arbitrarily and capriciously compared to other similarly situated defendants.

---

[21]When the OCCA decides, but does not analyze or evaluate an issue, in other words, adjudicate the issue, this Court is not bound by the deferential review set out in 28 U.S.C. § 2254(d). *Cf. Wiggins*, 123 S. Ct. at 2542 (federal review of issue not reached by state court is not circumscribed by the deference ordinarily required under 28 U.S.C. § 2254(d)).

113

Second, the OCCA has acknowledged that Mr. Murphy was and is being treated differently than other similarly situated defendants. In issuing its opinion on review of the evidentiary hearing, Judge Johnson said in future cases (following Mr. Murphy's) "if there is a *prima facie* showing of evidence of possible mental retardation under any of the three prongs, then a jury issue is established." 66 P.3d at 461 (Johnson, P. J., specially concurring). Judge Johnson was implicitly acknowledging that the proof adduced in Mr. Murphy's evidentiary hearing would, in all future cases, be sufficient to justify submission of the issue to a jury. After the issuance of the *Murphy* opinion the members of the OCCA specifically noted that the court was deviating from the procedure applied to Mr. Murphy. *Pickens*, 74 P.3d at 604 (Lumpkin, J., dissenting) (noting the process endorsed by the court "'skips a step' in the *Murphy* analysis"). It would be futile to return Mr. Murphy to the OCCA for review of the arbitrary and capricious treatment of his mental retardation claim when the court itself has acknowledged that anomalous treatment without concomitantly acknowledging error. For this additional reasons, exhaustion of this specific factual and legal support for the claim of failure to give Mr. Murphy a jury trial on the issue of mental retardation should be excused as futile. *See Lynce v. Mathis*, 519 U.S. 433, 436 n.4 (1997) (exhaustion of issue in state court not required when the state announces a decision of state law contrary to federal rights and "exhaustion would have been futile"); *Goodwin v. Oklahoma*, 923 F.2d 156, 157 (10th Cir. 1991) (exhaustion of state remedies is not required where the state's highest court has recently decided the precise legal issue that petitioner seeks to raise on his federal habeas petition); 28 U.S.C. § 2254 (b)(1)(B) (exceptions to exhaustion in the event of futility of presenting issue to state court).

Mr. Murphy thus requests the Court consider this issue and grant him a jury trial on the issue of mental retardation. Upon a favorable determination of the issue of mental retardation, Mr.

114

Murphy requests resentencing as contemplated under the Oklahoma statutes. *See* OKLA. STAT. tit. 22, §§ 929, 701.10a.[22]

## GROUND TEN – COUNSEL'S ADMISSION OF GUILT VIOLATED MR. MURPHY'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

**As his only defense, Mr. Murphy's trial lawyer told the jury Mr. Murphy was too drunk to form the intent to kill. That implicit admission of guilt was unwarranted by the evidence, made without Mr. Murphy's permission, and was directly contrary to Mr. Murphy's statements of innocence, his plea of not guilty, and his testimony. By admitting his client's guilt over his client's testimony of innocence, trial counsel made his client look like a liar, took the issue of guilt/innocence out of the hands of the jury, and absolutely violated his duty of loyalty to his client as protected under the Sixth and Fourteenth Amendments and as established as the rule of law in *United States v. Cronic*, 466 U.S. 648 (1984) and *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002).**

**A.    Trial Counsel Effectively Told The Jury Mr. Murphy Was Guilty**

Mr. Murphy pleaded not guilty to the charge of murder in the first degree[23] and has consistently maintained his innocence throughout the State's proceedings against him.

In his police interview, Patrick stated: "I didn't murder nobody." (Tr. Mot. (April 6, 2000) Ex. 2 (Post- Arrest Statement of Patrick Murphy, Aug. 29, 1999) at 60). Mr. Murphy reiterated throughout the interview that "I did not kill him" (*id.* at 84), and has always maintained that Billy Jack Long and Kevin King (the people he was with on the night Mr. Jacobs died) were "the one[s] that killed [Mr. Jacobs] not me" (*id.* at 87).

In his trial testimony, Mr. Murphy again asserted that he did not kill Mr. Jacobs. (IV Tr. 1051).

---

[22]Mr. Murphy herein notes his objection for the record to any procedure for resentencing that would automatically resentence him to life without parole as has been done in several cases in Oklahoma to date. *See Lambert v. State*, 71 P.3d 30, 33-34 (Okla. Crim. App. 2003) (Lumkin, J., concurring).

[23]*See* I CR 8 (Commitment); III CR 364 (Jury Instruction No. 2 Guilt/Innocence Phase).

115

However, in the defense's opening statement (made on April 13, 2000 after the prosecution had rested), defense counsel *effectively admitted Mr. Murphy's guilt* of the crime of murder.

The *entirety* of the defense statement is as follows:

> Ladies and gentlemen, you've heard a great deal of evidence in this case so far. It is now our opportunity to put on our case although we have - - you have heard a lot of evidence during the course of the State's case that we believe is very relevant and important to our case. Essentially, ladies and gentlemen, you're going to hear from a psychologist by the name of Dr. Bill Sharp who is going to, we believe the evidence will be, that he evaluated Patrick Murphy, that he's an expert in the areas of chemical dependency and chemical slash chemical abuse, which would include alcohol.
>
> And you're going to hear, we believe, evidence of his results with regard to his evaluation of the Defendant Patrick Murphy. And you are going to hear from the Defendant Patrick Murphy.
>
> And essentially, ladies and gentlemen, I'll be direct and to the point we believe that the evidence will show that *Mr. Murphy was so under the influence of alcohol that he could not, was incapable of forming the specific intent to kill Mr. Jacobs*.
>
> Thank you.

(IV Tr. 868-69) (emphasis added).

There can be no question that the only rational interpretation of trial counsel's statement was that counsel was admitting his client's guilt to the jury. When asked about the statement, both first and second chair trial counsel admitted they had not asked Mr. Murphy's permission to use the "intoxication defense" or to present that defense to the jury, as they did through an admission of guilt. *See* Aff. James C. Bowen ¶ 7, attached hereto as Ex. Q; Aff. Lerblance ¶ 6, attached hereto as Ex. R. Naturally, there is no record of Mr. Murphy giving his permission on this point. Defense counsel simply decided Mr. Murphy was guilty and then said so to the jury.

There were a host of adverse consequences stemming from counsel's statement to the jury. First, counsel breached his absolutely unwaivable duty of loyalty to Mr. Murphy. Second, counsel's

116

admission of guilt shows that his mindset at trial was not directed to aggressive adversarial testing of the issue of guilt and innocence, but directed only to establishing the defense of intoxication. That focus denied Mr. Murphy of the right to have the prosecution's case put to its proof. Third, in a case where the issue of witness credibility was key (remembering that there was no forensic evidence linking Mr. Murphy to the crime, only the statements of others recounting allegedly incriminating statements made by Mr. Murphy after the crime) counsel undermined his client's testimony when he made an admission of guilt then immediately turned around and elicited from Mr. Murphy a statement of innocence. He made his client look like a liar. Finally, counsel's admission of guilt took the issue of guilt and innocence out of the hands of the jury. Even though "not guilty" was still a verdict option, counsel effectively told the jury not to worry about it – because, in his view, Mr. Murphy was guilty.

**B.    Counsel's Admission of Guilt Violated Mr. Murphy's Sixth Amendment Right to Effective Counsel**

To obtain relief on the grounds of ineffective assistance of counsel, Mr. Murphy must establish that trial counsel's performance was constitutionally deficient and that his defense was thereby prejudiced. *See Strickland v. Washington*, 466 U.S. at 687.

**1.    Counsel's Admission of Guilt Constitutes Ineffective Assistance**

It is well settled law that a defendant is *"deprived of effective assistance of counsel when his own lawyer admit[s] his client's guilt, without first obtaining his client's consent to this strategy."* *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir. 1981) (emphasis added) (upholding writ of habeas corpus claim of ineffective assistance of counsel based on defendant's lawyers statements to jury that client was guilty). "[A]n attorney may not admit his client's guilt which is contrary to

his client's earlier entered plea of 'not guilty' unless the defendant unequivocally understands the consequences of the admission." *Id.* at 649.

The Tenth Circuit has long recognized that "an attorney who adopts and acts upon a belief that his client should be convicted 'fail[s] to function in any meaningful sense as the government's adversary.'" *Osborn v. Shillinger*, 861 F.2d 612, 625 (10th Cir. 1988) (quoting *Cronic*, 466 U.S. at 666); *accord Francis v. Spraggins*, 720 F.2d 1190, 1194 (11th Cir. 1983) ("Where a capital defendant, by his testimony as well as his plea, seeks a verdict of not guilty, counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury."); *Wiley*, 647 F.2d at 650 (counsel's complete concession of the defendant's guilt nullifies the defendant's right to have the issue of guilt or innocence presented to the jury as an adversarial issue and therefore constitutes ineffective assistance of counsel); *People v. Hattery*, 488 N.E.2d 513, 519 (Ill. 1985) (counsel's strategy of conceding guilt in order to concentrate efforts at avoiding death penalty was "totally at odds with defendant's earlier plea of not guilty" and although strategy may have been a reasonable one in light of the overwhelming evidence of client's guilt, it was an impermissible one).

Here, counsel admits he did not have Mr. Murphy's permission to proceed with an admission of guilt. *See* Aff. James C. Bowen ¶ 7, attached hereto as Ex. Q; Aff. Lerblance ¶ 6, attached hereto as Ex. R.  Moreover, there is no record of any waiver on this point from Mr. Murphy. *Wiley*, 647 F.2d at 650 n.8 (noting that consent to trial strategy of effectively conceding guilt "without the protection of an on the record inquiry . . . is a nullity.").

118

Counsel's performance reflected a blatant and fundamental violation of his duty of loyalty to Mr. Murphy, and his conduct fell far below the objective standards of conduct required of capital defense counsel.

### 2.    Counsel's Ineffective Performance Prejudiced Mr. Murphy

Prejudice is inherent when counsel admits his client's guilt to the jury. "There is no question but that . . . the admission by counsel of his client's guilt to the jury, represents a paradigmatic example of the sort of breakdown in the adversarial process that *triggers a presumption of prejudice*." *United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995) (emphasis added). Prejudice attaches even when there is no concomitant presentation of evidence of innocence or exculpatory evidence. *Fisher v. Gibson*, 282 F.3d 1283, 1310 (10th Cir. 2002) (granting writ of habeas corpus to defendant). The "right to counsel is not limited to those defendants who can produce exonerating evidence or prove their innocence." *Id.*

Admissions of guilt have "a particularly devastating impact" when the state does not produce overwhelming direct evidence of guilt and the credibility of the witnesses is key to establishing guilt and innocence. *Id.* at 1311. In this case, there was no eyewitness testimony or direct forensic evidence linking Mr. Murphy to the crime. Mr. Murphy maintained his innocence throughout the proceedings, even in the penalty phase of the trial. The jury was placed in the impossible situation in this case of deciding to believe defense counsel's admission of guilt, or to believe Mr. Murphy's assertions of innocence. Mr. Murphy's lawyer undermined his credibility with the jury and effectively made it impossible for the jury to return a verdict of not guilty. Indeed, it is only reasonable to assume that the jury likely determined Mr. Murphy to be guilty at least in part because they assumed Mr. Murphy had told his lawyer that he was guilty. Mr. Murphy was indeed prejudiced by counsel's statement, and was denied a fair trial as a result. *See also State v. Harbison*,

337 S.E.2d 504, 507-08 (N.C. 1985) (concluding per se ineffective assistance of counsel is established in every case where a defendant's counsel admits the defendant's guilt to the jury without the defendant's consent); *State v. Wiplinger*, 343 N.W.2d 858, 861 (Minn. 1984) (even if defense counsel only impliedly concedes guilt without client's consent, error requires reversal "even if it can be said that the defendant would have been convicted in any event.").

As a result of counsel's ineffective performance and the prejudice Mr. Murphy suffered thereby, Mr. Murphy's Sixth Amendment right to effective assistance of counsel was violated.

## C.      Exhaustion of This Claim

This claim is presented for the first time in these proceedings but should have been presented on appellate review in the Oklahoma courts. Exhaustion of this issue in the Oklahoma state courts should, however, be excused because the State of Oklahoma has recently announced a contrary rule of law on this direct point. *Lynce*, 519 U.S. at 436 n.4 (exhaustion of issue in state court not required when the state announces a decision of state law contrary to federal rights and "exhaustion would have been futile"); 28 U.S.C. § 2254 (b)(1)(B) (exceptions to exhaustion in the event of futility of presenting issue to state court).

The OCCA has recently confirmed that it will reject claims of ineffective assistance of counsel based on counsel's admission of a client's guilt when such a concession is "reasonable" in light of the evidence. *Abshier*, 28 P.3d at 594-98. Although the admission of guilt was clearly not reasonable in this case, the OCCA's statement of law flies in the face of the extensive body of federal law which clearly states that "reasonableness" of counsel's choice is not the standard by which a lawyer's fundamental duty of loyalty to his client is tested. *Cf. Fisher*, 282 F.3d at 1310 (the right to effective counsel not conditioned on claim of innocence). Moreover, Oklahoma has also shown its willingness to reject claims that a defendant's Sixth Amendment rights have been

violated by counsel's admission of guilt when the claim is not founded on an express statement of guilt, no matter how otherwise clear the concession of guilt may be. *Kelsey v. State*, 744 P.2d 190, 191 (Okla. Crim. App. 1987) (distinguishing affirmative or express concession of guilt from implied admissions of guilt). Oklahoma's interpretation of federal law on this point is clearly at odds with prevailing federal standards.

If, however, the Court considers that exhaustion would not be excused as futile under prevailing Oklahoma law, then, in the interests of judicial economy and of justice, Respondent should waive exhaustion of this issue.

Failing that, Mr. Murphy requests this Court to either stay or hold the Petition in abeyance to that he may return to State court and accomplish any necessary exhaustion. *See Kelly v. Small*, 315 F.3d 1063, 1070 (9th Cir.) (when evaluating a mixed petition, district court "must consider the alternative of staying the petition after dismissal of unexhausted claims, in order to permit Petitioner to exhaust those claims and then add them by amendment to his stayed federal petition"), *cert. denied*, 123 S. Ct. 2094 (2003). Abeyance for exhaustion is an approved practice. *See, e.g., Fetterley v. Paskett*, 997 F.2d 1295, 1301-02 (9th Cir. 1993) (pre-AEDPA case in which the Ninth Circuit found abuse of discretion for failure to hold federal proceedings in abeyance while petitioner litigated unexhausted claims in state court); *Scott v. Dugger*, 891 F.2d 800, 802 (11th Cir. 1989) (pre-AEDPA case in which district court stayed execution and federal habeas proceedings pending exhaustion of state remedies).

Abeyance procedure has been followed in capital habeas corpus cases in the district courts of Oklahoma. *See, e.g., Anderson v. Mullin*, No. CIV-01-177-M, Order on Abeyance (W.D. Okla. Jun. 11, 2003) (holding petition with exhausted and unexhausted issues in abeyance while Petitioner exhausts state remedies).

Recently, federal district courts have followed the practice in addressing efforts to exhaust claims pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding execution of mentally retarded unconstitutional). *See, e.g., Martinez v. Mullin*, Case No. CIV 00-1165-L, Order on Abeyance (W.D. Okla. July 11, 2002) (holding case in abeyance to allow petitioner to present *Atkins* claim to state court); *Lambert v. Mullin*, Case No. CIV 00-313-K, Order on Abeyance (N.D. Okla. Aug. 12, 2002) (granting abeyance of petition pending submission and determination of *Atkins* claim in Oklahoma state courts).

Mr. Murphy has demonstrated that his Constitutional rights were violated. Accordingly, Respondent should waive any exhaustion issues and this Court should grant relief. Alternatively, the Court should hold this Petition in abeyance and permit any necessary exhaustion of this claim in the Oklahoma courts. Ultimately, this Court should grant the Writ.

### GROUND ELEVEN – CUMULATIVE ERROR

**The OCCA misunderstood the principles of cumulative error believing that, if it found no issue to individually merit relief, there could be no cumulative error. The death sentence imposed on Mr. Murphy was substantially influenced by the cumulative error and cannot stand.**

Mr. Murphy's appellate counsel complained that the cumulative effect of the errors in this case warranted relief. Appellant's Br. at 72. The OCCA disagreed saying simply that "[w]e have found no error, and thus we find no cumulative error." 47 P.3d at 887.

It can hardly be said that the OCCA, with its thirty-three word analysis of cumulative error, adjudicated this issue within the meaning of 28 U.S.C. § 2254(d). *Cf. Wiggins*, 123 S. Ct. at 2542 (federal review of issue not reached by state court is not circumscribed by the deference ordinarily required under 28 U.S.C. § 2254(d)). Moreover, the OCCA erroneously concluded that simply because it found no individual errors to be harmful that the combined effect of the errors was

necessarily harmless. This Court may, therefore, address the issue of cumulative error de novo. *Cargle*, 317 F.3d at 1224 (commenting that, when a cumulative error claim is exhausted in state court, but rejected because the state court has found no errors, the federal court may address the issue de novo); *see also Darks v. Mullin*, 327 F.3d 1001, 1017-18 (10th Cir. 2003) (holding that review a cumulative error claim de novo is proper when the OCCA erroneously concludes that, because it found no individual errors, the propositions considered collectively cannot yield a different result and applies the harmless error standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993) to determine whether the error had substantial and injurious effect or influence in determining the jury's verdict) (internal quotations omitted).

A cumulative-error analysis aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and analyzes whether the cumulative effect of the errors on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Thus, even when errors like those in admitting victim impact statements (discussed above) will not themselves justify relief, they can justify relief when combined with the cumulative impact of all the other errors in this case.

> [Even if] *Payne* [victim impact statement] error . . . will not support habeas relief on its own, it is still relevant to our analysis of cumulative penalty-phase error. We agree with the district court's observation that the adverse effect of *the victim impact evidence becomes significant* 'when [it] is considered *within the context* of the *meager amount of mitigating evidence* put on by Petitioner's trial counsel, and the fact that counsel's constitutionally ineffective investigation and capital-stage presentation failed to develop and put on a substantial amount of additional mitigating evidence.'

*Cargle*, 317 F.3d at 1224 (quoting District Court analysis of cumulative error) (emphasis added). Cumulative error relief is particularly appropriate in this case, which like *Cargle*, suffered from "counsel's dereliction of his professional duty to develop and present mitigation evidence." *Id.* ("the

123

effect of improper victim impact evidence was highlighted by the conspicuous absence of counterbalancing mitigation evidence from the defense."). In this case, just as in *Cargle*, the prejudice resulting the absence of a developed mitigation case and improper victim impact statements was "amplified" by the comments of the prosecutor that asked the jury "to condemn" Mr. Murphy and return a sentence of death. And, like *Cargle*, the strength of the state's case was greatly inflated by trial counsel's failure to put the prosecution's case and theory of the crime to meaningful adversarial testing. *See also Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (noting cumulative prejudice from counsel's ineffectiveness which included, among other things, failure to investigate and prepare adequately for trial, and failure to consult adequately with client).

The death sentence imposed on Mr. Murphy was substantially influenced by the cumulative error in this case and cannot stand.

### GROUND TWELVE – THE AEDPA IS UNCONSTITUTIONAL AS APPLIED

**Because the fundamental protections underpinning the procedural bars to relief under the AEDPA depend on a functioning state court system of indigent defense which does not exist in Oklahoma, the AEDPA is unconstitutional as applied to capital petitions for writs of habeas corpus issuing from the State of Oklahoma.**

The fundamental presumption underlying the imposition of exhaustion requirements (and other issue-barring parts) of federal habeas proceedings under the Antiterrorism and Effective Death Penalty Act (hereinafter the AEDPA), is that all meritorious issues will be recognized and raised in state court direct appeals and state court post-conviction proceedings. The assumption of the AEDPA is that, because state courts have had a full and fair opportunity to pass on the constitutionality of trials conducted under state law, all federal courts will need to do is to confirm that state court understanding of federal constitutional law is accurate and has been accurately applied. *See* H.R. Rep. No. 104-23, 104th Cong., 1st Sess. at 10 (1995) (A House report endorsing

124

the enactment of the AEDPA expressly says it establishes a "quid pro quo arrangement under which States are accorded stronger finality rules on federal habeas corpus review in return for strengthening the right to counsel for indigent capital defendants."); *Ad Hoc Committee of the Judicial Conference on Federal Habeas Corpus in Capital Cases*, 135 CONG. REC. S13471-04 (1989) (the "Powell Committee Report"); *Wright v. Angelone*, 944 F. Supp. 460, 463 (E.D. Va. 1996) (commenting that the statutory scheme of the AEDPA "envisions a quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants") (internal quotation omitted).

The limitations imposed under the AEDPA to claims arising out of Oklahoma create a "Catch-22" in which a defendant with meritorious issues cannot have those issues raised and heard in federal court. The typical scenario involves state direct appeal and post-conviction indigent defense counsel who fail to identify significant grounds for relief. Those grounds for relief are then barred from presentation in state court.[24] The grounds cannot be presented in federal court because they are barred by the exhaustion requirements of the AEDPA and the limitations in presenting claims based on the ineffectiveness of post-conviction counsel. Rules of procedure and form that endorse such a "Catch-22" are arbitrary and capricious and violate due process as applied.

---

[24]Oklahoma provides that "[a]ll grounds of relief that were available before the last date on which an application [for post-conviction relief] could be timely filed not included in a timely application shall be deemed waived." OKLA. STAT. tit. 22, § 1089 (D)(2). A factual claim is "available" if, though the exercise of reasonable diligence, it could have been ascertainable. *Id.* at (D) (9)(b). "A subsequent application for post-conviction relief shall not be considered, unless it contains claims which have not been and could not have been previously presented in the original application because the factual or legal basis was unavailable as defined in Section 1089(D)(9) of title 22." Okla. Stat. tit. 22, §9, rule 9.7 (G)(1) Post-Conviction Procedures in Capital Cases. Further, "[n]o subsequent application for post-conviction relief shall be considered by this Court unless it is filed within sixty (60) days from the date the previously unavailable legal or factual basis serving as a basis for a new issue is announced or discovered." *Id.* at (G)(3).

There are two fundamental problems with representation in Oklahoma which contribute to this result. First, inadequate representation of indigent defendants; and, second, a trial and appellate process that is biased and arbitrary.

The facts of Mr. Murphy's case stand as evidence of an indigent defense system that is broken. Mr. Murphy's trial counsel was burdened by an appalling number of capital cases which had to be conducted in a ridiculously small amount of time. As a result, counsel's ability to investigate Mr. Murphy's case was compromised. Counsel did not know that the crime scene had been mislocated. He did not interview potential mitigation witnesses, or even meet with his client enough to prepare him for trial. All of the foregoing sections in this Petition (incorporated herein with exhibits by reference) stand as an indictment of the type of indigent defense provided in Oklahoma. *Cf. Williamson v. Ward*, 110 F.3d 1508, 1522 & n. 18 (10th Cir. 1997) (noting the appalling representation that was a direct consequence of the capital indigent defense system in Oklahoma). That poor trial performance detailed above was followed by equally poor direct appeal and post-conviction pleadings, which omitted key constitutional claims on Mr. Murphy's behalf as herein evidenced by the unexhausted claims contained in this Petition.

But not only is the system of indigent defense (that represented Mr. Murphy in all stages of his state proceedings) in Oklahoma broken – so also is the capital trial, appeal and post-conviction process in the courts of Oklahoma. *See generally Old Habits die Hard: The death penalty in Oklahoma* (Amnesty International April 2001) (AI Index AMR 51/055/2001) (discussing arbitrariness and inconsistency in sentencing, misconduct by prosecutors, the legal standards of aggravators in Oklahoma, etc.).

The combined effect of underfunded and unqualified capital defense trial lawyers, and a process for review of claim which is flawed, is that the fundamental underpinnings of the procedural

126

limitations set forth in the AEDPA regarding exhaustion and bar of claims related to ineffectiveness of post-conviction counsel (even when based on a due process right to statutorily guaranteed counsel instead of an Eighth Amendment right to counsel), are likewise flawed. Imposing the bars set forth in the AEDPA to preclude consideration of otherwise meritorious constitutional claims is arbitrary and capricious and a violation of due process of law. For this reason, Mr. Murphy respectfully requests the Court to hold the AEDPA unconstitutional as applied to him, and consider those habeas claims which, as a result of ineffectiveness of state court counsel, failed to be presented and exhausted in state court.

### GROUND THIRTEEN – LETHAL INJECTION

**The lethal injection of Mr. Murphy under the protocols currently in force in Oklahoma and any similar protocols violates the Eighth, Fifth and Fourteenth Amendments as does Oklahoma's procedure for devising said protocols.**

The State of Oklahoma proposes to execute Mr. Murphy by lethal injection.[25] Lethal injection by the protocols currently in force (and any other similar protocols) violates the Eighth and Fourteenth Amendments.

Execution of Mr. Murphy under alternative statutory methods,[26] should lethal injection be declared unconstitutional, would also be cruel and unusual under the Eighth and Fourteenth Amendments.[27]

---

[25]OKLA. STAT. tit. 22, § 1014 (A) provides: "The punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice."

[26]Oklahoma provides for execution by electrocution should lethal injection be determined to be unconstitutional. OKLA. STAT. tit. 22, § 1014 (B). In the event that both lethal injection and electrocution are found to be unconstitutional, Oklahoma provides for execution by firing squad. *Id.* at (C).

[27]Under evolving standards of decency evinced by the clear trend in the states favoring execution by lethal injection, a review of the Constitutionality of electrocution and firing squad

## A. Procedural Posture of this Claim

Although Mr. Murphy raises his objection to lethal injection as a habeas claim in this Petition, Mr. Murphy recognizes that an action under Title 42, section 1983 of the United States Code, is more likely the appropriate remedy to challenge the method of execution. *Cf. Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973) (challenge to length of confinement should be raised as a habeas proceeding; challenge to conditions of confinement should be raised under section 1983). Mr. Murphy desires to pursue the matter under section 1983 but presents this habeas claim to assure that the issue will not be waived should the Tenth Circuit decide, as at least one Circuit has apparently done, that all method of execution challenges must be characterized as habeas corpus actions. *Nelson v. Campbell*, 347 F.3d 910 (11th Cir. 2003), *cert. granted*, 124 S. Ct. 835 (2003).[28]

Mr. Murphy recognizes further it is unlikely this Court will reach the merits of the claim in the present habeas corpus proceeding. To the extent the claim is appropriately raised in these proceedings it bears some similarity to competency to be executed claims. The Supreme Court has held those claims may be preserved by raising them in an initial habeas corpus proceeding, although action on them is appropriately deferred to a subsequent proceeding. *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643-44 (1998). Perhaps most significantly, however, Mr. Murphy believes he is

---

would be required should this Court find the lethal injection protocol employed by the State of Oklahoma violates the Eighth Amendment. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958) (The Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.").

[28]The Supreme Court granted certiorari to resolve "[w]hether a complaint brought under 42 U.S.C. § 1983 by a death-sentenced state prisoner, who seeks to stay his execution in order to pursue a challenge to the procedures for carrying out the execution, is properly recharacterized as a habeas corpus petition under 28 U.S.C. § 2254?" *Nelson v. Campbell*, 347 F.3d 910 (11th Cir. 2003), *cert. granted*, 124 S. Ct. 835 (2003).

entitled to relief on the other claims in the Petition and the lethal injection issue will be mooted as the court rules on those other claims.

**B.      Oklahoma's Lethal Injection Procedure Violates the Eighth Amendment Prohibition Against Cruel and Unusual Punishment**

Mr. Murphy's most basic concern is the Oklahoma lethal injection protocols create a substantial risk he will consciously suffocate and/or suffer excruciating pain as he is put to death. The principal reason for this concern is that there is no assurance the protocol used by the State of Oklahoma will render and maintain him unconscious while suffocating and painful drugs are injected into his veins.   Mr. Murphy's concern is enhanced by his understanding that such eventualities  appear to have occurred in Oklahoma, and under the current procedures used by Oklahoma, there is a reasonable likelihood that they will occur again during his execution.

**1.      The Eighth Amendment Prohibition Against Cruel and Unusual Punishment**

It has long been recognized the Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death. *In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . . ."). In *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), the Supreme Court noted the Eighth Amendment prohibits "physically barbarous punishments" and reached to "embod[y] broad and idealistic concepts of dignity, civilized standards, humanity" and "the evolving standards of decency that mark the progress of a maturing society." *Id.* (internal quotations omitted).   Recently, the Supreme Court explained that the Eighth Amendment prohibits causing "unnecessary pain" and conduct that "create[s] a risk of particular discomfort and humiliation." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (tying inmates to a hitching post).  A punishment is particularly Constitutionally offensive if it involves the foreseeable infliction of suffering. *See Farmer v. Brennan*, 511 U.S. 825,

129

842, 847 (1994) (Eighth Amendment is violated by prison officials when they know of a risk of serious harm and proceed without taking reasonable measures to abate the risk).

Applying these principles to execution by lethal gas, the Ninth Circuit has held that executions involving prolonged and conscious suffering violate the Eighth Amendment. *La Grand v. Stewart*, 173 F.3d 1144, 1149 (9th Cir. 1999). In support of its conclusion, the court observed:

> 'Inmates who are put to death in the gas chamber . . . do not become immediately unconscious upon the first breath of lethal gas. An inmate probably remains conscious anywhere from 15 seconds to one minute, and there is a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes. During this time, inmates suffer intense, visceral pain, primarily as a result of lack of oxygen to the cells. The experience of 'air hunger' is akin to the experience of a major heart attack, or to being held under water. Other possible effects of the cyanide gas include tetany, an exquisitely painful contraction of the muscles, and painful build-up of lactic acid and adrenaline. Cyanide-induced cellular suffocation causes anxiety, panic, terror, and pain.'

*Id.* at 1148-49 (quoting from and adopting the factual findings of the court in *Fierro v. Gomez*, 865 F. Supp. 1387, 1404 (N.D. Cal. 1994) regarding execution by lethal gas in California). As the following discussion will show, the same concerns that caused the Ninth Circuit to declare execution by lethal gas unconstitutional apply with equal force to the protocols by which Oklahoma implements death by lethal injection.

## 2.    The State of Oklahoma's Lethal Injection Protocol Risks Unnecessary Pain, Torture and Lingering Death

Mr. Murphy has a reasonable and good faith concern that it is not only foreseeable, but actually predictable, that death by lethal injection as it is currently carried out in Oklahoma risks unnecessary pain, torture, and a lingering death.

130

### a.    The Lethal Injection Process in Oklahoma

The Oklahoma Department of Corrections ("DOC") describes the lethal injection process

as involving the administration of a lethal combination of three chemical substances: sodium

thiopental (to cause unconsciousness); vecuronium bromide (to stop respiration); and potassium

chloride (to stop the heart). Two intravenous lines are introduced into the defendant by a licensed

phlebotimist and the lethal drugs are injected by executioners from hand-held syringes. The three-

drug cocktail is introduced in an alternating sequence, in alternating arms:

1.  sodium thiopental in the left arm, followed by a flush of saline in the left
    arm;
2.  vercuronium bromide in the right arm, followed by a flush of saline in the
    right arm;
3.  potassium chloride in the left arm, followed by a flush of saline in the left
    arm;

The process is then repeated, with the chemicals introduced in a different order:

4.  potassium chloride in the right arm, followed by a flush of saline in the right
    arm;
5.  sodium thiopental in the left arm, followed by a flush of saline in the left
    arm; and finally
6.  vercuronium bromide in the right arm, followed by a flush of saline in the
    right arm.

*See* Aff. of Mike Mullin ¶ 13, attached hereto as Ex. S; and *compare with* Oklahoma DOC Lethal

Injection  Process  (website)  *found  at*  http://www.doc.state.ok.us/DOCS/CapitalP.HTM#

Execution%20Process (Feb. 12, 2004), attached hereto as Ex. T.

### b.    Intravenous Processes Always Carry Risk of Failure

The process of preparing and administering intravenous drugs is complex. *See* Aff. of Mark

J. S. Heath, M.D. ¶ 7, attached hereto as Ex. U. To begin, drugs must be mixed from a either a

powder or liquid into a solution form at a specific dosage. The drugs are then drawn into syringes

in preparation for introduction to intravenous lines. The intravenous ("IV") set-up is then prepared

which includes an IV bag, lines, and catheters for accessing the patient's veins.  Once inserted, the catheters are connected via tubing to IV fluid bags.  When the set-up is complete, the drugs can be injected from syringes into the IV lines in a downstream (toward the patient) direction.

This process is so complicated that, even in when performed by skilled personnel, there are risks.  In his affidavit attached to this Petition, Dr. Heath describes some of the problems that can occur in any IV therapy.  *See generally id.* ¶ 8 (a)-(n).  For example, the drugs must be mixed to the correct concentrations or dosages.  Nothing will proceed correctly, even with the perfect administration of IV fluids, if the drug dosages are inadequate to perform their intended functions. *Id.* ¶ 8 (a), (b).

It is also critical that the mechanical components of the IV system operate correctly.  However, it is not uncommon for there to be technical issues with the IV process.  IV drugs can infiltrate the tissue surrounding the catheter rather than correctly enter the vein.  *Id.* ¶ 8 (g), (i).  The result of infiltration is that the drugs intended to be delivered through the IV lines fail to reach the patient.

IV tubing can leak or become disconnected.  If leaks or disconnections occur, the drugs intended to travel through the IV lines will fail to reach the patient.  *Id.* ¶ 8 (f), (k).

The syringes that introduce drugs to the IV line system can be injected in the "upstream" (away from the patient) direction, instead of "downstream" (toward the patient).  The result of such a "retrograde injection" is that the drugs intended to travel through the IV lines will fail to reach the patient in the desired concentrations or fail to reach the patient entirely.  *Id.* ¶ 8 (e).

Thus, even with trained and proficient personnel, there are a number of difficulties that commonly occur during the administration of drugs through intravenous lines which create risk that

132

the lethal injection process will not proceed as planned. *See generally id.* ¶ 8 (a)-(n). These risks

are exacerbated by the protocols Oklahoma uses for execution by lethal injection. *Id.* ¶¶ 10-19.

### c.   The Risks Associated with Oklahoma's Lethal Injection Process

There are three principal risks with Oklahoma's lethal injection that exacerbate the inherent

risks of administration of drugs through intravenous lines: untrained personnel; choice of drugs; and

the two-line IV method.

### i.   Use of Persons Untrained in IV Procedures Creates an Unnecessary Risk of Flawed Executions that cause Conscious Suffering

As discussed in Warden Mullin's affidavit, in Oklahoma, IV tubes are inserted in a

condemned inmate by a licensed phlebotomist. *See* Aff. Mike Mullin ¶ 12, attached hereto as Ex.

S. Phlebotimists are specialists in drawing blood from patients, but not in inserting IV catheters.

*See* Aff. Mark J. S. Heath, M.D. ¶ 9, attached hereto at Ex. U. Given the imperative that, for the

execution to proceed as planned, the IV catheters must be correctly placed, having persons

potentially untrained and certainly unspecialized in the insertion of catheters creates extreme

concern. *See id.* ¶10.

Oklahoma uses three executioners with hand held syringes to deliver the deadly drugs. *See*

Oklahoma DOC Lethal Injection Process (website), *found at* http://www.doc.state.ok.us/DOCS/

CapitalP.HTM# Execution%20Process (Feb. 12, 2004), attached hereto as Ex. T. Hand-plunged

syringes risk human error. If a syringe is pumped too quickly, the resulting burst of pressure could

cause an infiltration of IV fluid into the tissue surrounding the vein or a "blow-out" of the

intravenous line from the vein. *See* Aff. Mark J. S. Heath, M.D. ¶ 8 (i), (j), attached hereto at Ex.

U. This risk is heightened if the executioners cannot observe the IV site (and therefore cannot see

if the pressure at which the drugs are pumped is causing a disruption to the IV site) and are not medical personnel trained in delivering drugs through intravenous lines. *Id.* ¶¶ 9, 15.

Oklahoma is prepared to use a "cut down" procedure to reach a vein if necessary. *See* Aff. Mike Mullin ¶ 7, attached hereto as Ex. S. A "cut-down" is an invasive medical procedure used when ordinary methods of reaching a vein are not possible. *See* Aff. of Mark J. S. Heath, M.D. ¶ 16, attached hereto as Ex. U. Warden Mullin's affidavit does not indicate the presence of anyone at the execution who would be qualified to perform such a medically invasive procedure, if it became necessary, as it could in any execution.

Training and experience is essential to the "success" of the execution as a humane process, and there is nothing in publically available information about Oklahoma's process that demonstrates that properly trained personnel are part of the process.

### ii.     The Chemical Cocktail Creates an Unnecessary Risk of Flawed Executions that cause Conscious Suffering

Not only does the participation of personnel untrained in the medical procedures required for insertion and maintenance of IV lines cause concern, but so also does the choice of drugs used in Oklahoma. Sodium thiopental, the first drug administered to the condemned inmate, is used to induce unconsciousness and is an ultra-short acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia. *See* Aff. of Mark J. S. Heath, M.D. ¶¶ 4, 5, 18. This short acting drug is typically used so that the patient can re-awaken and breath spontaneously if complications arise in inserting a breathing tube pre-surgery. Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process. Due to the chemical combination used in the Oklahoma execution process, there is also a risk that the sedative effect of the sodium thiopental can be neutralized by other

134

chemicals. *Id.* ¶ 8 (l). Additionally, sodium thiopental originates as a powder that must be mixed to create a fluid form of the drug for administration. *Id.* ¶ 8 (b). It is therefore essential that the drug be prepared by a qualified individual so that preparation risks are minimized. If anything occurs during the preparation or administration of the sodium thiopental that causes the drug to fail to reach the condemned inmate in the correct dosage at the correct time, the execution will not be humane. *Id.* ¶ 5.

The second chemical involved in the Oklahoma lethal injection process is currently vecuronium bromide. Although the chemical used in this second step has changed through time, it has always been a neuromuscular blocker, like vecuronium bromide, which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition, or sensation. *Id.* ¶¶ 4, 17. The neuromuscular blocker has the effect of rendering an individual unable to breath, yet unable to signal his or her distress. *Id.* ¶¶ 5, 17. While a neuromuscular blocker paralyzes skeletal muscles, including the diaphragm (which affects the inmate's ability to breath), it has no effect on consciousness or the perception of pain or suffering. *Id.* Thus, if the sodium thiopental does not reach or is not effective in rendering the inmate unconscious and maintaining him in that state, the neuromuscular blocker, will cause him to consciously suffocate and, when the third chemical, potassium chloride is administered, cause him to suffer excruciating pain. *Id.* ¶ 5. Further, the neuromuscular blocking drug will serve to mask the suffering of the inmate as he suffocates to death and/or suffers excruciating pain. This unnecessary suffering constitutes cruel and unusual punishment prohibited by the Constitution. Moreover, the masking effect of the neuromuscular blocker will further violate Due Process by vitiating the State created safeguard of having witnesses to the execution. Under a scenario where the second drug is effective but not the first, for example, the inmate's suffering might not be observable by witnesses because of the

135

paralytic effect of the neuromuscular blocker. The Due Process Clause protects the inmate's interest in this State mandated safeguard. *Hicks*, 447 U.S. at 346.

Perhaps the most serious concern regarding the neuromuscular blocking agents is that there is simply no need to assume the risk that any inmate will consciously suffer pain as a result of its administration. A neuromuscular blocking agent is not needed to carry out an execution. *See* Aff. of Mark J. S. Heath, M.D. ¶ 17. Moreover, neuromuscular blocking agents are disapproved for use in euthanasia of animals by the American Veterinary Medical Association because of the very risk of conscious suffering discussed herein. *See* 2000 Report of the AVMA Panel on Euthanasia at 680 ("A combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent."), attached hereto as Ex. V; *id.* at 681. It is deeply troubling to learn that the State of Oklahoma is using a drug to kill human beings which the AVMA prohibits for use in euthanizing animals.

### iii.	The Two-Line IV Method Creates an Unnecessary Risk of Flawed Executions that cause Conscious Suffering

Untrained personnel and the drug cocktail each add risk of flawed executions that cause conscious suffering of pain. When combined with the two-line IV method employed by Oklahoma, the risks rise exponentially. As Dr. Heath has explained, the two-line method is "blatantly reckless." Aff. Mark J. S. Heath, M.D. ¶ 15. With a two-line method, Oklahoma doubles the risk that an IV line will become blocked, that the intravenous injection will diffuse into the surrounding tissue rather than be delivered into the vein, that the vein will "blow out," or that another similar eventuality will occur that results in an ineffective delivery of one or more of the drugs. The most grave risk is that one line will remain open while the other line is blocked. In such a scenario, it is possible that the drug intended to achieve unconsciousness will not be delivered, leaving the inmate

fully or partially awake when he is suffocated by having his respiration stopped and killed by having his heart stopped. *See* Aff. of Mark J. S. Heath, M.D. ¶ 5. Sadly, there is reason to believe that just such eventualities have occurred during Oklahoma executions.

### d.    Oklahoma Executions Have "Gone Wrong"

The principal concerns highlighted above almost certainly played a role in prior executions which have "gone wrong." Dr. Mark Heath has reviewed witness reports from three Oklahoma executions and has concluded that these executions are inconsistent with the successful administration of a large does of pentothal. *See* Aff. Mark J. S. Heath, M.D. ¶ 12; *see also* Decl. of Pat Ehlers, attached hereto as Ex. W; and Aff. of Catherine Burton, attached hereto as Ex. X.

After reviewing the descriptions of the LaFevers execution, Dr. Mark Heath has concluded that the scenario described was consistent with IV infiltration. *See* Aff. Mark J. S. Heath, M.D. ¶ 12. If an infiltration occurred, it is possible that Mr. LaFevers was not rendered unconscious by administration of the sedative and that he suffered tremendously when the paralytic agents were introduced to his body.

Other executions have also "gone wrong." The Death Penalty Information Center describes the executions of Robyn Lee Parks and Scott Dawn Carpenter as producing spasms and shaking in the defendants. *See Post-Furman Botched Executions*, Death Penalty Information Center at http://www.deathpenaltyinfor.org/article.php?scid=8&did=478 (Feb. 4, 2004), attached hereto as Ex. Y. As Dr. Heath has explained, a correctly administered suite of drugs which begins with drugs intended to produce unconsciousness would not result in spasms and gasping. *See* Aff. of Mark J. S. Heath, M.D. at ¶12.

137

### e.   **Executions in Oklahoma Need Not Risk Conscious Suffering**

The procedure Oklahoma follows for inducing death is not used because it is the only reasonable way to conduct executions. It is not necessary to use phlebotomists to access veins, or to use untrained personnel who cannot see the IV site to administer the lethal drugs. It is not necessary to use paralytic drugs to induce death. Most importantly, it is not necessary to use a two-line IV process. The State of California publically describes its execution process and explains that while it introduces two intravenous lines to the defendant, the second line is held in reserve in the case of blockage or malfunction in the other. *See Lethal Injection Procedures*, California Department of Corrections, found at http://www.corr.ca.gov/CommunicationsOffice/ CapitalPunishment /lethal_injection.asp (Feb., 13, 2004), attached hereto as Ex. Z. California, therefore, never risks a situation where one IV line is open and delivering drugs, while the other line becomes blocked and fails to deliver drugs. During the California process, if a line becomes blocked, the subsequent drugs either are not delivered at all through the blocked line, or the back-up line is used in place of the blocked line.

### f.   **Discovery into the Lethal Injection Process is Required**

The information that Mr. Murphy has regarding lethal injection in Oklahoma has been compiled from the Oklahoma Department of Corrections public website, documents filed by the Department of Corrections in other cases challenging the lethal injection protocol which were subsequently circulated among the defense community, and affidavits and newspaper reports from witnesses who have observed executions that have appeared to have "gone wrong" in Oklahoma. What Mr. Murphy knows of the protocols for lethal injection in Oklahoma suggests that there are inadequate safeguards regarding: the manner in which the execution is to be carried out; the minimum qualifications and expertise required of the personnel performing the critical tasks in the

lethal injection procedure; and appropriate criteria and standards that personnel must rely upon during the lethal injection procedures. Further, the execution procedures discussed publically by the Department of Corrections appear to have been arrived at without consultation with anesthesiologists or other qualified personnel, without adequate study or application of appropriate expertise, and without compliance with Oklahoma's Administrative Procedures Act.

Mr. Murphy's concern over Oklahoma's procedures is heightened by several inconsistencies between the recent DOC affidavit and the process described on the DOC website. The affidavit describes a three drug cocktail administered in alternating arms in sequence, then administered again to the inmate in a different sequence. That is not the process described on the website and there is no medically justified reason for the second administration of the three drug cocktail in a different sequence.

Further, Warden Mullin's affidavit describes a wide variety of chemicals used as a paralytic agents, the use of which is not medically justified. *Compare* Aff. Mike Mullin ¶ 9, attached hereto as Ex. S. *with* Aff. Mark J. S. Heath, M.D. ¶ 19, 17, attached hereto as Ex. U.

Finally, the DOC has stated "[t]hat the Oklahoma Department of Corrections has no information or belief that any executions have resulted in any undue pain or suffering to any inmates." *See* Aff. Mike Mullin, at ¶16, attached hereto as Ex. S. As the press reports and statement discussed above detail, several inmates appear to have suffered during the lethal injection process.

Although Mr. Murphy believes the information presented herein is sufficient to show the existence of a justiciable controversy and support the relief he requests, he believes that discovery on lethal injection protocol in Oklahoma is warranted and indeed necessary because there is yet much we do not know about Oklahoma's lethal injection procedure. *See* Aff. Mark J. S. Heath, M.D. ¶ 10-14.

Undersigned counsel have attempted to find out more about the lethal injection process in Oklahoma by less intrusive means than requesting discovery through the Court. On behalf of Mr. Murphy, the undersigned counsel presented a request for public information to the Department of Corrections. *See* Letter from Lisa S. McCalmont to the Office of Public Affairs, Oklahoma Department of Correction (Feb. 10, 2004), attached hereto as Ex. AA. Undersigned counsel met in person with the public affairs officer of the Department of Corrections and was told that the only publically available information on lethal injection in Oklahoma would be found on the DOC website, which we had already accessed. It appears that formal discovery is the only channel left open to Mr. Murphy to procure further necessary information about the lethal injection process. Given the gravity of the concerns discussed herein, discovery into the processes and procedures utilized by the DOC is warranted and reasonable.

The New Jersey Appellate Court recently evaluated a similar challenge to the State of New Jersey's procedures and processes for implementing lethal injection as cruel and unusual in *In re Readoption with Amendments of Death Penalty Regulations*, __ A.2d __, No. A-0899-01T1, 2004 WL 314936 (N.J. Super. Ct. App. Div. Feb. 20, 2004). There, the court acknowledged many of the concerns raised in this Petition, for example, that the "DOC does not have medical expertise, and nothing in the record suggests medical consultation" on issues key to the lethal injection process. *Id.* at *2. The court concluded that on the record developed in that case "several of the regulations challenged by appellant appear to be arbitrary and capricious." *Id.* The court, therefore, concluded that "the regulations as a whole, as they now stand, may not be implemented by carrying out of a sentence of death." *Id.* The court then ordered production of documents withheld by the New Jersey DOC on claims of privilege and assertions of penological objectives and safety concerns and commented that "mere recital of the shibboleth that the safety, security and orderly operation of the

140

Capital Sentencing Unit require [certain] restrictions"on access to information is not sufficient to justify a refusal to produce documents showing that the DOC has followed reasoned and careful process in adopting its lethal injection protocols. *Id.* at \*3. The court then ordered the stay of the lethal injection regulations until reconsideration with the information previously withheld could be evaluated. *Id.* at \*6. The opinion of the New Jersey Superior Court is consonant with the request for discovery presented in this Petition. Legitimate concerns regarding lethal injection processes and protocols warrant investigation in Oklahoma, just as it did in New Jersey.

For these, and all the foregoing reasons, Mr. Murphy respectfully requests this Court grant Mr. Murphy discovery into the procedures, processes and protocols used in Oklahoma's lethal injection process. Among other things, Mr. Murphy specifically requests all medical records regarding autopsies of those executed by lethal injection in Oklahoma, especially data which reflects blood toxicity levels of chemicals in executed inmates. This information should show whether executed inmates in Oklahoma have received doses of the agents intended to produce unconsciousness sufficient to render the execution process humane. *See* Aff. Mark J. S. Heath, M.D. ¶ 13 (discussing the use of blood toxicity levels from North Carolina executions which revealed levels of pentothal insufficient to produce unconsciousness).

After discovery, Mr. Murphy requests an evidentiary hearing into Oklahoma's execution procedures, and then a preliminary and permanent injunction barring the State of Oklahoma from executing Mr. Murphy under the current Oklahoma lethal injection protocol or any similar protocol. Mr. Murphy requests that the State of Oklahoma be required to administer lethal injections in a manner that is humane and in compliance with the United States Constitution.

The execution of Mr. Murphy by Oklahoma's current execution protocol violates the Eight Amendment ban on cruel and unusual punishment and the absence of public protocols deny Mr.

Murphy Due process under the Fifth and Fourteenth Amendment. Mr. Murphy respectfully requests the Court grant habeas corpus relief on this ground.

## **REQUESTS FOR RELIEF**

Mr. Murphy requests:

1.  A full and fair evidentiary hearing as to the Petition as a whole and particularly as to any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the state;

2.  Discovery ordered by the Court into the Oklahoma Department of Corrections process and protocols for implementing executions;

3.  Sixty (60) days after the date upon which the evidentiary hearing transcript is prepared in which to file a memorandum of law in support of the petition for writ of habeas corpus addressing facts developed at that hearing and previously known facts;

4.  A Writ of Habeas Corpus to have petitioner brought before the Court so he may be discharged from his unconstitutional confinement and restraint, and so that he may be relieved of his unconstitutional sentence; and

5.  Any and all other relief as my be appropriate and to dispose of the matter as law and justice requires.

**WHEREFORE**, Mr. Murphy prays that the Court grant him all relief to which he may be entitled in this proceeding.

Dated this 4th day of March, 2004.

Respectfully submitted,

*Lisa S. McCalmont*

LISA S. McCALMONT
Assistant Federal Public Defender
Oklahoma Bar No. 017096
SCOTT BRADEN
Oklahoma Bar No. 001040
Assistant Federal Public Defender
Death Penalty Federal Habeas Corpus Division
215 Dean A. McGee, Suite 109
Oklahoma City, OK 73102
(405) 609-5930 (Telephone)
(405) 609-5932 (Facsimile)

**COUNSEL FOR PETITIONER,
PATRICK DWAYNE MURPHY**

143

## CERTIFICATE OF SERVICE

I certify that on March 4, 2004, I sent a copy of the foregoing Petition for Writ of Habeas

Corpus to <u>David M. Brockman</u> at the office of the Oklahoma Attorney General, via first class mail

fully prepaid, return receipt requested at the fol lowing address:

Office of the Attorney General
State Capitol Building, Suite I12
2300 N. Lincoln Boulevard
Oklahoma City, OK 73105

Lisa S. McCalmont

# **LIST OF EXHIBITS**

Document Title                                                                                                                     Exhibit

Enrollment Verification of Patrick D. Murphy ....................................... A

Enrollment Verification of George Jacobs ............................................ B

Affidavit of Mr. Anderson Fields, Jr. ............................................... C

Affidavit of Mr. Anderson Fields, Sr. ............................................... D

Affidavit of Jeff O'Dell [Realty Affidavit] .......................................... E

31 Stat. 861 (1901) ................................................................ F

32 Stat. 500 (1902) ................................................................ G

Affidavit of Mike Evett ............................................................ H

Selected Sections of the Muscogee (Creek) Nation Criminal Code ...................... I

Letter from Jim Bednar, Director of the Oklahoma Indigent Defense System,
to Lisa S. McCalmont (Feb. 23, 2004) ................................................ J

Affidavit of Eldon Kelough ......................................................... K

Affidavit of W. R. Hopkins ......................................................... L

Affidavit of Elizabeth Murphy (January 22, 2004) .................................... M

Affidavit George Rawlings .......................................................... N

Affidavit William Lee Fletcher ...................................................... O

Affidavit of Dr. Timothy J. Derning ................................................. P

Affidavit James C. Bowen ........................................................... Q

Affidavit Richard Lerblance ......................................................... R

Affidavit of Mike Mullin ........................................................... S

Oklahoma DOC Lethal Injection Process (website) .................................... T

145

Affidavit of Mark Heath, M.D. ...................................................... U

2000 Report of the AVMA Panel on Euthanasia (selected pages) ........................ V

Declaration of Pat Ehlers .......................................................... W

Affidavit of Catherine Burton ...................................................... X

*Post-Furman Botched Executions*, Death Penalty Information Center ..................... Y

*Lethal Injection Procedures*, California Department of Corrections ....................... Z

Letter from Lisa S. McCalmont to the Office of Public Affairs, Oklahoma
Department of Correction (Feb. 10, 2004) .......................................... AA