IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PATRICK DWAYNE MURPHY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-03-443-RAW-KEW |
| | ) | |
| MARTY SIRMONS, Warden, Oklahoma | ) | |
| State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Petitioner Patrick Dwayne Murphy was convicted following a jury trial in the District Court of McIntosh County, Case No. CF-1999-164A, of First Degree Murder in violation of 21 O.S.Supp. 1996, § 701.7(A). In accordance with the jury's verdict, Petitioner was on May 18, 2000 sentenced to death. On direct appeal, the Oklahoma Court of Criminal Appeals affirmed his conviction and death sentence. *Murphy v. State*, 47 P.3d 876 (Okla. Crim. App. 2002), *cert. denied*, 538 U.S. 985, 123 S.Ct. 1795, 155 L.Ed.2d 678 (2003).

On February 7, 2002, Petitioner filed an Application for Post-Conviction Relief in Oklahoma Court of Criminal Appeals Case No. PCD-2001-1197. On September 4, 2002, the Court granted relief on the sole issue of Petitioner's claim of mental retardation and remanded the case for an evidentiary hearing. *Murphy v. State*, 54 P.3d 556 (Okla. Crim. App. 2002). The trial court held an evidentiary hearing and concluded that insufficient evidence existed to create a fact question on the issue of Petitioner's claim of mental

retardation.  *See*, Findings filed on November 6, 2002, in the District Court of McIntosh County, Case No. CF-1999-164A.  Thereafter, the Oklahoma Court of Criminal Appeals denied Petitioner's application for post-conviction relief and again affirmed Petitioner's sentence.  *Murphy v. State*, 66 P.3d 456 (Okla. Crim. App. 2003).

On March 29, 2004, Petitioner filed a second Application for Post-Conviction Relief with the Oklahoma Court of Criminal Appeals raising three grounds for relief, to-wit: 1) the State of Oklahoma lacked jurisdiction to try him because the crime occurred in Indian country; 2) his mental retardation claim had been treated differently than all subsequent mental retardation claims, thereby depriving him of equal protection, and a deprivation of rights guaranteed by the Fifth, Eighth and Fourteenth Amendments; and 3) Oklahoma's protocol and procedures dealing with execution by lethal injection violated the United States Constitution against cruel and unusual punishment.  On December 7, 2005, the Oklahoma Court of Criminal Appeals denied relief on issues one and three and remanded the issue of mental retardation to the district court in McIntosh County for a jury trial.  *Murphy v. State*, 124 P.3d 1198 (Okla. Crim. App. 2005).[1]  Petitioner now seeks relief from his death sentence pursuant to 28 U.S.C. § 2254.

As a preliminary matter the Court notes that Marty Sirmons is currently the Warden at Oklahoma State Penitentiary.  The Court finds, pursuant to Rule 25(d)(1) of the Federal

---

[1]The District Court of McIntosh County has continued this trial several times.  Currently, the matter is set for trial on September 10, 2007.  *See*, McIntosh County District Court Case No. CF-99-00164A.

Rules of Civil Procedure, Marty Sirmons is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record.

## I. RECORDS REVIEWED

This Court has reviewed (1) the First Amended Petition for Writ of Habeas Corpus filed on September 10, 2004; (2) the Second Amended Petition for Writ of Habeas Corpus filed on December 28, 2005; (3) the Combined Response[2] to the First Amended and Second Amended Petitions for Writ of Habeas Corpus filed on April 6, 2007; (4) the Reply filed on May 10, 2007; (5) transcript of Preliminary Hearing held on December 1, 1999 and December 10, 1999, Volumes I and II, respectively; (6) transcript of Motion proceedings held on February 24, 2000; (7) transcript of Motions proceedings held on March 30, 2000; (8) transcript of Motions hearing held on April 6, 2000; (9) transcript of Jury Trial held on April 10, 11, 12, and 13, 2000, Volumes I, II, III, IV, IVA, and V; (10) transcript of Sentencing Proceedings held on May 18, 2000; (11) transcript of Evidentiary Hearing proceedings held on November 18, 2004, Volumes I and II, including exhibits attached thereto; and (12) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this Court. Although not listed specifically, this Court has reviewed all items filed in this case, with the exception of the transcript of proceedings held on October 29, 2002, including exhibits attached thereto and the transcript of the deposition of Faust Bianco, Jr., Ph.D, taken

---

[2]On March 30, 2007, this Court ordered Respondent to file a complete response to Petitioner's First Amended Petition and Seconded Amended and Supplemental Petition to allow Respondent an opportunity to exclude those portions of its original response which were no longer applicable to the actual issues herein.

on October 25, 2002, including exhibits attached thereto.[3] *See* Inventory of State Court Record, Dkt. No. 21, filed on July 16, 2004 and Inventory of State Court Record, Dkt. No. 52, filed on November 16, 2006.

As a result, this court finds that the records, pleadings and transcripts of the state proceedings provide all the factual and legal authority necessary to resolve the matters in the petition and, therefore, an evidentiary hearing is unnecessary. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)(*Sumner I*); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)(*Sumner II*).

## II. STATEMENT OF THE FACTS

Historical facts found by the state court are presumed correct, unless the petitioner rebuts the same by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Since Petitioner has failed to rebut the facts, as set forth by the Oklahoma Court of Criminal Appeals, this Court hereby adopts the factual findings made by the Oklahoma appellate court.

> In August of 1999, [Petitioner] was living with Patsy Jacobs, his alleged "common-law" wife. Ms. Jacobs had previously lived for three years with George Jacobs, the victim in this case, and had a child by him. [Petitioner] and Patsy had an argument about Jacobs a couple of days before Jacobs was murdered. [Petitioner] told Patsy that he was going to get Jacobs and his family one by one.
> On August 28, 1999, George Jacobs and his cousin Mark Sumka spent most of the day drinking and driving around Okmulgee, Okfuskee, and

---

[3]Although these transcripts were designated by the parties, the issue before the state court in the evidentiary hearing held on October 29, 2002, is not currently before this Court. The deposition of Dr. Bianco was apparently introduced in that hearing. Accordingly, other than ascertaining that both of these transcripts relate to an evidentiary hearing on the issue of Petitioner's mental retardation, this Court has not read these transcripts.

McIntosh counties. They reportedly drank two bottles of whiskey and numerous beers that day. At 9:30 p.m., they were headed to a Henryetta bar in Jacobs's Dodge Sedan. Jacobs was passed out in the back seat, and Sumka was driving. (Jacobs's post mortem blood alcohol level would later be determined to be .23)

Sumka and Jacobs passed [Petitioner] as he was driving in the opposite direction. Both cars stopped, and [Petitioner] backed up. [Petitioner] told Sumka to kill the car and get out. Meanwhile, two occupants of [Petitioner's] car, Billy Long and Kevin King, exited the car. Alarmed, Sumka drove away.

[Petitioner] and his companions pursued Sumka in [Petitioner's] car. [Petitioner] was eventually able to force Sumka to stop. At that point, someone from [Petitioner's] car arrived at Sumka's car and began hitting Jacobs.

Sumka got out of his car, but was stopped by [Petitioner] who said he was going to do to Jacobs what they had done to him. Sumka could hear the other two men hitting Jacobs. Sumka told [Petitioner] "that was enough, you know, he's passed out." [Petitioner] went over to Jacobs, while Long came over and hit Sumka in the nose. Sumka then saw King drag Jacobs out of a ditch.

Sumka fled momentarily, about one hundred yards from the assault. After five minutes, he decided to return. Upon his arrival, [Petitioner] and his two cohorts told Sumka if he said anything they would kill him and his family. King then smacked Sumka in the jaw. [Petitioner] reportedly instructed King and Long not to hit Sumka again.

Sumka testified that [Petitioner] then took a folding knife he was holding and tossed it into the woods. (The police later recovered this knife.)

Sumka ran over to where Jacobs was laying in a ditch. Jacobs was "barely breathing." Anderson Fields then drove up in another car and asked what was wrong with the guy in the ditch. (He also noticed a fleshy object and blood in the road.) The men told him Jacobs was drunk. They began approaching Fields's car, but he drove away. Fields then phoned the police and drove back to the scene. Everyone was gone. Jacobs lay in the ditch and was barely breathing. Fields found a slash across Jacobs's stomach and chest. His throat had been cut, his face was bloody, and his genitals had been cut off.

Upon [Petitioner's] instructions, Sumka had left the scene with [Petitioner], Long, and King. During the car ride, [Petitioner] told Sumka they had cut Jacobs's throat and chest and had cut off his privates. King told Sumka they had stuffed Jacobs's genitals into Jacobs's mouth. [Petitioner] then told everyone to take off their clothes because he was going to burn them.

The group later went to the home of Mark Taylor, [Petitioner's] cousin. [Petitioner] told Taylor he had killed Jacobs. [Petitioner] said he had cut Jacobs's stomach and throat, had "cut his dick and his nuts off," had shoved his genitalia into his mouth, and had tried to stomp on the victim's head like a pancake.

The group then traveled to King's house, where Jacobs's son George, Jr. was staying. [Petitioner] said he was going to do the same thing to Jacobs's son. But King's mother came out of the house and thwarted this plan. King went inside, and the rest of the group left. [Petitioner] then burned the bag of incriminating clothes.

When [Petitioner] arrived home that night, he told Patsy Jacobs that George Jacobs had been killed and that he had sliced his throat and stomach. Patsy testified [Petitioner] also said he had cut off Jacobs's genitals so "he won't fuck anyone anymore," including her.

When [Petitioner] was arrested, he admitted kicking Jacobs in the ribs and testicles and cutting his penis. He also admitted hearing Jacobs groan during the attack. He said Jacobs was left alive in a ditch; He was breathing and saying, "Oh."

A state criminalist testified that, after the victim's penis was severed, he was dragged to the side of the road, where his neck and chest were cut. Bloodstains on Jacobs's shoes indicate he had been in an upright position for part of the attack. The medical examiner described the cause of death as blood loss from the various cutting wounds, primarily the genital and neck wounds. Death was not immediate. Jacobs bled to death in somewhere between four to twelve minutes, perhaps even longer. He described the multiple lacerations and fractures the victim suffered to his face, neck, chest, and abdomen.

*Murphy v. State*, 47 P.3d 876, 879-880 (Okla. Crim. App. 2002).

Additional facts will be discussed as they become relevant.

### III. PETITIONER'S CLAIMS FOR RELIEF

Petitioner's Second Amended Petition (Dkt. No. 54) incorporates by reference his

First Amended Petition (Dkt. No. 33) and his Amended Reply to the State of Oklahoma's

Response to Petition for A Writ of Habeas Corpus by a Person in State Custody pursuant to

28 U.S.C. § 2254 (Dkt. No. 34), both of which were filed herein on September 10, 2004. In

his First Amended Petition, Petitioner raised eight (8) grounds for relief. Two (2) additional grounds were added in Petitioner's Second Amended Petition. Respondent, at the direction of the Court, filed a Combined Response to Petitioner's First and Second Amended Petition on April 6, 2007 (Dkt. No. 56). Petitioner filed a Reply on May 10, 2007 (Dkt. No. 65).

Petitioner's alleged errors can be summarized as follows: (1) ineffective assistance of counsel during the second stage of trial; (2) (a) the evidence was insufficient to support Oklahoma's "heinous, atrocious, or cruel" aggravator; (b) the jury instructions regarding this aggravating circumstance were inadequate; and (c) this aggravator is unconstitutionally vague and overbroad; (3) Oklahoma's "continuing threat" aggravating circumstance is unconstitutionally vague and overbroad; (4) failure to require the jury to find the aggravating factors outweighed the mitigating factors beyond a reasonable doubt violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights; (5) the victim impact evidence violated Petitioner's constitutional rights to a fundamentally fair sentencing proceeding as guaranteed by the Fifth, Eighth and Fourteenth Amendments; (6) failure to define life without parole denied Petitioner due process of law and the right to a fundamentally fair sentencing proceeding in violation of his Fifth, Eighth and Fourteenth Amendment rights; (7) the trial court erred in admitting Petitioner's post-arrest statement thereby violating Petitioner's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments; (8) the cumulative errors in Petitioner's case warrant habeas relief; (9) the state court proceedings

were void *ab initio* because the state court lacked jurisdiction over the crime; and (10)

Oklahoma's lethal injection protocol and procedures violate the Eighth Amendment.

## IV. STANDARD OF REVIEW

Since Petitioner filed his original petition in May, 2002, this case is governed by the

statute as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). *See*

*Lindh v. Murphy,* 521 U.S. 320, 326-327, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).

Pursuant to the AEDPA, this Court is precluded from granting habeas relief on any claim

adjudicated on the merits by a state court

> unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as determined by
> the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the

Court defined "contrary to" as a state-court decision that is "substantially different from the

relevant precedent of this Court." *Id.*, at 405, 120 S.Ct. at 1519. A decision can be "contrary

to" Supreme Court precedent "if the state court applies a rule that contradicts the governing

law set forth" in Supreme Court case law or "if the state court confronts a set of facts that are

materially indistinguishable from" a decision of the Supreme Court, but nonetheless arrives

at a different result. *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263

(2002), citing *Williams v. Taylor*, 529 U.S. at 405-406. Whereas, the "unreasonable application" provision is implicated when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. at 407. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, — U.S. —, — S.Ct. —, 2007 WL 1387923 (2007). Finally, the Supreme Court has made it clear that a state court is not required to cite Supreme Court caselaw, or even be aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early*, 537 U.S. at 8.

## V. PETITIONER'S ALLEGED ERRORS

### 1. Ineffective Assistance of Counsel

Petitioner first claims his trial lawyer failed to investigate, prepare, and present to the jury readily available and compelling mitigating evidence which, if presented, would likely have led to a different sentencing outcome thereby depriving Petitioner of his Sixth, Eighth and Fourteenth Amendment rights. Petitioner first raised this claim in his state court application for post-conviction relief. The Oklahoma Court of Criminal Appeals denied

relief, holding Petitioner was not deprived reasonably competent assistance of counsel under prevailing professional norms. *Murphy v. State*, 54 P.3d 556, 565 (Okla. Crim. App. 2002). Furthermore, the state appellate court, after viewing affidavits and evidentiary materials submitted in the post-conviction proceeding, said, in accordance with *Williams v. Taylor*, *supra*, there was no "reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented the additional mitigating evidence now identified by Petitioner and explained its significance. *Id*. Respondent asserts nothing presented by Petitioner establishes that the Oklahoma Court of Criminal Appeals decision denying relief on this issue was either contrary to or an unreasonable application of federal law.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court enunciated the legal standards which apply to claims of ineffective assistance of counsel in a criminal proceeding. First, the Court indicated that the defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms. In order to establish that counsel's performance was deficient, Petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Second, the defendant must establish that the deficient performance prejudiced the defense. *Id*. Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims. *Id.* at 696.

While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised. As the Supreme Court cautioned in *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. at 689. (citations omitted).

In deciding whether counsel was ineffective, a court must judge the reasonableness of the challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A defendant attacking an attorney's assistance must identify the particular acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment and then the court must determine, in light of all of the circumstances, whether the identified acts were outside the wide range of professionally competent assistance. *Id*. at 690. Courts are free to address the performance and prejudice components in any order and need not address both where a defendant fails to make a sufficient showing of one. *Id*. at 697.

While the failure to present available mitigating evidence is not *per se* ineffective assistance of counsel, reviewing courts must evaluate the reasons for counsel's failure to present mitigating evidence and then decide whether the failure, if due to an attorney's deficient performance, prejudiced the defendant. *Hale v. Gibson*, 227 F.3d 1298, 1314 (10th Cir. 2000) (quoting *Breechen v. Reynolds*, 41 F.3d 1343, 1365-1368 (10th Cir. 1994)). One of counsel's basic obligations is to make the adversarial testing process work. Since this testing process generally cannot function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, the Supreme Court has indicated a defense attorney "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. *See also, Stouffer v. Reynolds*, 168 F.3d 1155, 1167 (10th Cir. 1999). A reasonable investigation includes an investigation of the defendant's background for possible mitigating evidence. *Breechen*, 141 F.3d at 1366. In a capital case, this duty is strictly observed. *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997).

In deciding whether Petitioner's trial counsel rendered effective assistance with respect to the second stage of the proceedings, the Oklahoma Court of Criminal Appeals appears to have correctly applied Supreme Court precedent to the facts of this case, focusing on the prejudice prong of *Strickland*. Specifically, the Court said:

> . . . . we must review the mitigating evidence presented in Petitioner's trial, compare it to the mitigation evidence presented in the post-conviction record, and decide if the post-conviction evidence raises "a reasonable probability that the result of the sentencing proceeding would have been different" if

competent counsel had presented and explained the significance of all the available evidence.

*Murphy v. State*, 54 P.3d 556, 562 (Okla. Crim. App. 2002) (citation omitted).

The state court then undertook a thorough review of the mitigating evidence submitted in both stages of the trial and the jury instruction which told the jurors to consider a list of mitigating evidence which had been presented at trial. Next, the state court enumerated the additional "mitigating" evidence which was contained in the post-conviction affidavits. The state court then found that "the post-conviction affidavits and evidentiary materials do not demonstrate a failure by Petitioner's trial counsel to present mitigating evidence of a constitutionally deficient magnitude, as that in *Williams*." *Id.* at 564. Ultimately, the state court found Petitioner had failed to establish prejudice as a result of counsel's performance. *Id.*

Petitioner argues, however, that the Oklahoma Court of Criminal Appeals decision regarding ineffective assistance of counsel was wrong because "counsel cannot 'strategically' decide to not use information he did not investigate and develop." First Amended Pet., at pp. 18-19. While that critique may be logical syllogistically, contrary to Petitioner's assertions, the affidavit submitted by trial counsel, James Bowen, makes it clear that counsel actively pursued mitigation evidence and after completing a thorough investigation of Petitioner's background, he developed a reasonable trial strategy. *See*, State Post-Conviction Exhibit 14. In fact, counsel's affidavit indicates, prior to trial, counsel personally had several interviews with not only Petitioner's mother and Petitioner in

preparation for trial, but also other family members and witnesses.[4] *Id.* at ¶¶ 8 and 9. Although post-conviction counsel was able to obtain affidavits from the defendant's mother and another family member which established abuse of alcohol by Petitioner's mother while she was pregnant with Petitioner, despite numerous conversations with Petitioner's mother prior to trial, Petitioner's mother was not as forthcoming with trial counsel as she was with post-conviction counsel. Rather, Ms. Murphy "always maintained that her use of alcohol was minimal [while she was pregnant with Petitioner.]" *Id.* at ¶ 9. Trial counsel also spoke with other family members and witnesses, but "none ever contradicted Ms. Murphy's assertions." *Id.* Further, Petitioner acknowledged to Dr. Sharp that although "both of his parents consumed alcohol, it was his perception that his mother did not having (sic) a drinking problem, but that his father was most probably alcoholic." *See*, Defendant's Jury Trial Exhibit 4. Nonetheless, after Petitioner was evaluated by Dr. Jeanne Russell, counsel pursued this issue further by discussing the "absence of any visible characteristics of Fetal Alcohol Syndrome" with Dr. Russell. *Id.* If counsel had known this information prior to trial, he may have been ineffective for failing to develop and present it to the jury. Nevertheless, counsel cannot be deemed ineffective where potential witnesses, including family members, change their stories after trial. Further, based upon the active investigation counsel conducted, he developed a trial mitigation strategy which entailed presenting to the jury that Petitioner "was a low risk [for] future violence, that he was chemically dependent,

_____

[4]*See also*, State Post-Conviction Exhibit 7, ¶ 2 (one of the "mitigating" witnesses admits she was contacted prior to trial and questioned about Petitioner's background).

and mentally retarded." *See*, State Post-Conviction Exhibit 14 at ¶ 10. Further, counsel indicates he attempted "to focus on Petitioner's mental retardation and not present evidence that would possibly contradict, or call into question the fact that he was mentally retarded." *Id*. at ¶ 11. Moreover, as recognized by the Oklahoma Court of Criminal Appeals, the post-conviction affidavits conflict with each other and with the testimony at trial; they contain information which would have been as aggravating as it was mitigating; and they contain unreliable hearsay statements which would not have been admissible at trial. *See*, *Murphy v. State*, 54 P.3d 556, 565 (Okla. Crim. App. 2002). The affidavits certainly would have cast doubt upon evidence portraying Petitioner as mentally retarded. Consequently, failure to introduce this testimony cannot be deemed unreasonable trial strategy.

Petitioner also complains counsel was ineffective in failing to use his low IQ score advantageously, in further developing evidence that Petitioner had organic brain damage, and emphasizing Petitioner was unlike most criminals because he was not psychopathic. Despite Petitioner's assertions, evidence was presented to the jury to show Petitioner had tested in the mildly retarded range, that he potentially had organic brain damage from various head injuries as well as the amounts of alcohol he regularly consumed, and that he was not a psychopath.[5]

Next, Petitioner argues, because counsel tried several death penalty cases in a relatively short period of time, he failed to allocate a reasonable amount of time to investigate

---

[5]J.T.Tr. Vol. IV, pp. 875-898, 926 - 934, and Vol. V, pp. 1234 - 1239, and 1287 - 1314.

Petitioner's life history. In support of this conclusory allegation, Petitioner cites two things.

First, Petitioner asserts the ABA Guidelines mandated counsel spend 1800 hours on this case and since counsel tried four death penalty cases within a space of ten calendar months, he could not have allocated a reasonable amount of time to investigate Petitioner's life. The ABA Guidelines cited by Petitioner, however, were not adopted until February 2003, or approximately three years **after** Petitioner's trial. Further, the ABA Guidelines make it clear that many things other than the number of cases assigned to an attorney would have to be considered in ascertaining a reasonable workload for a given attorney.

Second, Petitioner asserts that trial counsel not only ignored his obligation to allot a reasonable amount of time to Petitioner's case, counsel "did virtually nothing with the time he had." To support this assertion, Petitioner inserts a footnote in his First Amended Petition which states, in part: "Trial counsel failed to investigate the scene of the crime" and counsel "did not view the scene of the crime." First Amended Petition at p. 27, footnote 7. No affidavit has ever been submitted to this Court or to the Oklahoma Court of Criminal Appeals to support Petitioner's bald assertions.[6] Additionally, whether or not counsel properly investigated the scene of the crime has absolutely no bearing on Petitioner's assertion that counsel was ineffective in investigating and/or uncovering potentially mitigating evidence. Here, counsel submitted an affidavit detailing actions he took during his investigation of

---

[6] While evidence at a hearing on jurisdiction established the crime scene had been described incorrectly by a witness at trial, neither the witness explaining the discrepancy nor any other witness testified regarding actions taken by trial counsel in preparation for trial. *See*, Evid. Hrg. Tr. Vol. I, at pp. 30 - 32 and 49 - 52.

potentially mitigating evidence in this particular case. Petitioner has never raised an ineffective assistance of counsel claim as it relates to the first stage of trial. Nonetheless, all of these attacks on the Oklahoma Court of Criminal Appeals decision are misplaced. The state court did not rest its decision on the first prong of *Strickland*, whether or not counsel was ineffective; but chose instead to focus on the second prong, whether Petitioner was prejudiced by counsel's actions.

Petitioner asserts counsel's failure to properly investigate prejudiced him because he did not have "a good life and raising" as argued by the prosecutor during second stage closing arguments and counsel did not put on evidence to counter these arguments. Despite Petitioner's assertions, the jury heard evidence that Petitioner's childhood was not "good." Specifically, Ms. Murphy testified that Petitioner's father was not around and because of his mixed-race heritage, Petitioner had to endure cruel teasing from extended family members. Despite these shortcomings, both Petitioner and his mother testified he was a good child who could be proud of his accomplishments. J.T.Tr., Vol. V, at pp. 1318-1340. *See also,* Second Stage Jury Instruction No. 13, O.R. 413 (enumerates an exhaustive list of evidence which might be considered mitigating).

Furthermore, in assessing prejudice during the second stage, a court should "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003). This Court does not believe that the additional evidence regarding Petitioner's non-idyllic childhood would

have outweighed the aggravating circumstances found by the jury of continuing threat and the especially heinous, atrocious and cruel nature of the murder. This is particularly true where, as in this case, (1) significant evidence from an expert was introduced to establish that Petitioner would not be a continuing threat to society were he locked up in a secure facility and prevented from consuming alcohol;[7] and (2) the jury found the crime was especially heinous, atrocious or cruel, based in part, upon Petitioner's own admissions regarding slitting the victim's throat, cutting his stomach, cutting off of his genitalia and then leaving the victim out on a dark road to bleed to death.[8]

To the extent the Oklahoma Court of Criminal Appeals viewed not only the evidence submitted at trial, but also the evidence which could have been submitted, before deciding that Petitioner was not prejudiced by counsel's actions (*i.e.*, there is not "a reasonable probability that the result of the sentencing proceeding would have been different," *Murphy v. State*, 54 P.3d 556, 565 (Okla. Crim. App. 2002)), this Court finds, based upon the record herein, that the Oklahoma court's decision regarding prejudice was not an unreasonable application of Supreme Court precedent to the facts of this case. Accordingly, Petitioner's claim for relief based on ineffective assistance of counsel is denied.

---

[7] J.T.Tr. Vol. V, at pp. 1227-1261.

[8] J.T.Tr. Vol. II, at pp. 343 - 345 and Vol. III, at pp. 603, 668 - 669, 709 - 710; Vol. IV, 1025 and State's Trial Exh. No. 5.

**2.  Heinous, Atrocious, or Cruel Aggravator**

In his second ground for relief, Petitioner argues the evidence was insufficient to support Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance and that the jury instructions surrounding this aggravating circumstance were so deficient that they violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.  Respondent asserts the aggravator is not unconstitutionally infirm and the Oklahoma court's determination that the jury instructions accurately stated the applicable law is not contrary to, nor an unreasonable application of, clearly established federal law.

**A.  Sufficiency of the Evidence**

The United States Supreme Court held, in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), in a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, that a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Further, the Court indicated following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution."  *Id.*  In *Lewis v. Jeffers*, 497 U.S. 764, 782, 110 S.Ct. 3092, 3103, 111 L.Ed.2d 606 (1990), the Court said the principles enunciated in *Jackson* apply with equal force to federal habeas review of a state court's finding of aggravating circumstances.

Although aggravating circumstances are not "elements of any offense, see *Walton, Id.,* 497 U.S., at 648-649, 110 S.Ct., at 3054-3055, the standard of federal review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty. Like findings of fact, state court findings of aggravating circumstances often require a sentencer to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra*, 443 U.S., at 319, 99 S.Ct., at 2789.

*Lewis v. Jeffers*, 497 U.S. at 782.

As previously indicated, determinations of factual issues by a state court are presumed correct. 28 U.S.C. § 2254(e)(1). "A state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.* at 783.

Petitioner first raised this issue during his direct appeal. In rejecting the claim on the merits, the Oklahoma Court of Criminal Appeals found:

The crux of [Petitioner's] argument, . . . , is that the evidence of torture was insufficient because there was "nothing, absolutely nothing, in the record to show that (Jacobs) was consciously aware of the injury being inflicted." (citation omitted).

We disagree. [Petitioner] told the police Jacobs was groaning during the attack, and that he was still alive, breathing, and saying "oh" when they left him bleeding by the side of the road. The process of bleeding to death took as little as four minutes, possibly more than twelve. There was testimony that his severed genitals were placed in his mouth at one point, and, if true, the victim may still have been alive after this point, for the genitals were found at a distance from the body. There was also testimony that Jacobs had been in an upright position at one point, for blood was found on the top of his shoes. The medical examiner testified that, although the victim had a blood alcohol content of .23, a normal person would be impaired, but still able to function, at this level.

. . . . . . . . . Accordingly, we find the evidence admitted at trial, when viewed in a light most favorable to the State, was sufficient to find beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel. (citation omitted)

*Murphy v. State*, 47 P.3d 876, 883 (Okla. Crim. App. 2002).

Under Oklahoma law, before a jury can find that a murder was especially heinous, atrocious or cruel there must be proof that death was preceded by torture or serious physical abuse. *Turrentine v. State*, 965 P.2d 955, 976 (Okla. Crim. App. 1998). *See also*, OKLA. STAT. tit. 21, § 701.12(4) (1999). Two kinds of cases have been identified by the Oklahoma Court of Criminal Appeals in which "torture or serious physical abuse" will be found: "those characterized by the infliction of "great physical anguish" and those characterized by the infliction of "extreme mental cruelty." *Thomas v. Gibson*, 218 F.3d 1213, 1226 (10th Cir. 2000) (citing *Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995)). In *Spears v. State*, 900 P.2d 431, 443 (Okla. Crim. App. 1995), the court held "[t]o support a finding of serious physical abuse, the State must show the victim endured *conscious* physical suffering prior to death." (emphasis in original) *See also*, *Cheney v. State*, 909 P.2d 74, 81 (Okla. Crim. App. 1995) (Footnote 20 contains a summary of Oklahoma cases requiring conscious suffering to support evidence of heinous, atrocious or cruel aggravating circumstance).

Petitioner asserts there was no evidence to prove beyond a reasonable doubt that the victim was conscious at the time of the murder. Petitioner then recounts only evidence favorable to his assertion. While it is true the victim did not have any defensive wounds,[9]

---

[9] *See*, J.T.Tr., Vol. III, at p. 767.

unlike the facts in *Thomas*, the evidence clearly established the victim was groaning during the attack as Petitioner admitted "telling Agent Jones he was alive when we left, breathing, he was saying 'Oh.'"[10] Furthermore, the medical examiner indicated, even with a .23 blood alcohol content, a person would still possess the ability to speak, to function (although impaired), and to feel pain.[11] Although the medical examiner did not note any defensive wounds, he was unable to say whether or not the victim was unconscious at any particular point in time during the attack, other than saying he would have lapsed into unconsciousness immediately before death.[12] The jury also heard evidence that blood spatter indicated the victim would have been, at least partially, upright during part of the attack and there were blood stains on the top of the victim's shoes.[13] To the extent the medical examiner indicated the process of bleeding to death took at least four to five minutes[14] and Petitioner admitted the victim was saying "oh," this Court finds the determination by the Oklahoma Court of Criminal Appeals that there was sufficient evidence for a jury to determine beyond a reasonable doubt that the victim was conscious during at least part of the attack is not an unreasonable determination of the facts in light of all the evidence heard by the jury. In this Court's opinion, the evidence viewed in the light most favorable to the prosecution

---

[10]*Id.*, Vol. IV, at p. 1041.

[11]*Id.*, Vol. III, at p. 773.

[12]*Id.*, at pp. 774-775.

[13]*Id.*, at pp. 453-454 and 473.

[14]*Id.*, at p. 772.

overwhelmingly establishes the victim endured conscious physical suffering prior to death sufficient to support the jury's finding that this murder was "heinous, atrocious or cruel." Accordingly, Petitioner has failed to establish, pursuant to 28 U.S.C. § 2254(d)(2), that he is entitled to relief on this issue.

## B. Jury Instructions

Next, Petitioner argues the jury instructions were insufficient on the heinous, atrocious or cruel aggravator because they were not particularized to Petitioner's individual conduct. As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In attempting to set aside a state conviction based on erroneous jury instructions, a habeas petitioner has a heavy burden. Such errors are ordinarily not reviewable in a federal habeas proceeding, "unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997) (citing *Long v. Smith*, 663 F.2d 18, 23 (6th Cir. 1981)).

> "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977) (footnote omitted). The question in this proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process. *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155, 94 S.Ct. at 404.

*Maes v. Thomas*, 46 F.3d 979, 983 (10th Cir. 1995).

First, Petitioner asserts the jury should have been instructed not only whether the "murder" was heinous, atrocious, or cruel but whether Petitioner's individual conduct resulted in a death that was heinous, atrocious, or cruel. Petitioner seems to be arguing that he was not personally tied to the pre-death torture or serious physical abuse and, therefore, this aggravating circumstance could not be applied to any of his conduct. Based upon the evidence at trial, however, this argument is absurd. Petitioner admitted and bragged to at least three different people about amputating the victim's genitalia, as well as cutting the victim's throat and abdomen and stomping on his head.[15] Further, Petitioner told his cousin after he had cut the victim's "dick and nuts off," that he shoved them in the victim's mouth.[16] Such admissions individually tied Petitioner to the conduct supporting this aggravating circumstance.

Next, Petitioner complains the jury instructions were inadequate because they did not instruct the jury that they had to find the victim had consciously suffered before finding the aggravator applied to the facts of his case. Petitioner's jury was instructed that "the term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others." O.R. 404. *See also*, Oklahoma

---

[15] J.T.Tr., Vol. III, at pp. 603, 667-668, 697, 709-711.

[16] *Id.*, at p. 668.

Uniform Jury Instruction 4-73. The jury was further instructed, "[t]he phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse." O.R. 404. The Tenth Circuit Court of Appeals has consistently rejected challenges that this aggravator is unconstitutionally vague and upheld the use of Oklahoma's uniform jury instruction limiting this aggravator to those crimes where the death of the victim was preceded by torture or serious physical abuse of the victim. *See Workman v. Mullin*, 342 F.3d 1100, 1115-1116 (10th Cir. 2003) and cases cited therein. The instructions given in Petitioner's case clearly advised the jury that they could not find this aggravating circumstance unless they first determined the victim was tortured or physically abused such that a high degree of pain was inflicted upon him. *See* O.R. 404.

Finally, Petitioner asserts the Oklahoma Court of Criminal Appeals unreasonably applied federal law because *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), required the jury to find the victim "consciously suffered" beyond a reasonable doubt. The necessary finding by the jury, however, was that "the death of the victim was preceded by torture of the victim **or** serious physical abuse." A finding by the jury of either of these two elements beyond a reasonable doubt was sufficient to support this aggravating circumstance. *See*, *Turrentine v. State*, 965 P.2d 955, 975 (Okla. Crim. App. 1998). Since the jury necessarily found one or both of these elements prior to finding the aggravator applicable to Petitioner, Petitioner's claim that the Oklahoma Court of Criminal

Appeals decision upholding the jury's sentence was contrary to, or an unreasonable application of, clearly established federal law lacks merit. Furthermore, to the extent Petitioner argues he was deprived of his Fourteenth Amendment rights, this Court finds that because Petitioner's jury was properly instructed regarding this aggravating circumstance, Petitioner was not deprived of any constitutional rights. Therefore, Petitioner's claim for relief is denied.

### 3. Continuing Threat Aggravator[17]

While acknowledging that the Tenth Circuit has repeatedly found Oklahoma's "continuing threat" aggravating circumstance constitutional, Petitioner nonetheless argues, in essence, that this aggravating factor is always unconstitutional because it is so vague and broad that it is a "standardless catchall" and it was unconstitutionally applied to his case in violation of his Sixth, Eighth, and Fourteenth Amendment rights. Further, Petitioner asserts the Oklahoma Court of Criminal Appeals' interpretation of *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) is unreasonable as applied to this case. Respondent counters that the Oklahoma Court's rejection of Petitioner's claims was neither contrary to nor an unreasonable application of clearly established federal law. Thus, Respondent urges this Court, pursuant to 28 U.S.C. § 2254(d)(1), to defer to the Oklahoma Court's decision.

---

[17]Oklahoma's "continuing threat" aggravating factor authorizes the imposition of the death penalty if the jury finds "the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." OKLA. STAT. tit. 21, § 701.12(7).

In *Jurek*, the Court upheld the use of the language "continuing threat to society" where the jury was allowed to consider any mitigating circumstances offered by the defendant. *See also Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). "The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Blystone v. Pennsylvania*, 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990). Notwithstanding the severity of the crime or a defendant's potential to commit similar crimes in the future, ". . . sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, . . ." *Abdul-Kabir v. Quarterman*, — U.S. —, 127 S.Ct. 1654 (2007). *See also, Brewer v. Quarterman*, — U.S. —, 127 S.Ct. 1706 (2007) and *Smith v. Texas*, — U.S. —, 127 S.Ct. 1686 (2007).

While Oklahoma's capital-sentencing system differs in some major aspects from the one upheld in *Jurek*, the use of the "continuing threat" language as an aggravator which would limit those upon whom the death penalty may be imposed is quite similar. First, an Oklahoma jury must find that the aggravating circumstances outweigh the mitigating circumstances before it is authorized to consider the death penalty. OKLA. STAT. tit. 21, § 701.11. In order to convince a jury that the death penalty should not be imposed, a defendant has the right to present "any relevant evidence . . . bearing on his character, prior record or the circumstances of the offense." *Chaney v. State*, 612 P.2d 269, 279-280 (Okla. Crim. App. 1980) (construing OKLA. STAT. tit. 21, § 701.10 which governs sentencing proceedings

in a first degree murder case).  The jury, in this case, was so instructed.[18]  As a result, this

Court finds Petitioner's jury received sufficient guidance to enable it to make an informed

decision regarding whether or not the death penalty was the appropriate punishment.  The

Oklahoma Court of Criminal Appeals' decision rejecting each of Petitioner's claims is

neither contrary to, nor an unreasonable application of *Jurek* to the facts of this case.

Furthermore, the Tenth Circuit Court of Appeals has consistently held the continuing

threat factor used in Oklahoma's statutory sentencing scheme is constitutional.  *Nguyen v.*

*Reynolds,* 131 F.3d 1340, 1352-54 (10th Cir. 1997), *cert. denied,* 525 U.S. 852, 119 S.Ct.

128, 142 L.Ed.2d 103 (1998)*.  See also*,  *Ross v. Ward,* 165 F.3d 793, 800 (10th Cir. 1999)

(citing *Castro v. Ward,* 138 F.3d 810, 816 (10th Cir.), *cert. denied,* 525 U.S. 971, 119 S.Ct.

422, 142 L.Ed.2d 343 (1998) and *Nguyen*) and *Fowler v. Ward*, 200 F.3d 1302, 1313 (10th

Cir. 2000), *cert. denied*, 531 U.S. 932, 121 S.Ct. 317, 148 L.Ed.2d 254 (2000).   Since

Petitioner has cited no new authority or compelling arguments, this Court finds this claim is

unpersuasive.  Accordingly, it is denied.

**4.  Jury Instructions Re: Balancing Aggravating and Mitigating Factors**

Issues regarding whether a jury was properly instructed are questions of law.  *United*

*States v. Voss,* 82 F.3d 1521 (10th Cir. 1996).  Accordingly, in order to grant relief on this

issue, the decision of the Oklahoma Court of Criminal Appeals must be "contrary to . . .

---

[18]*See* Jury Instruction Nos. 3-6 and 10-15, O.R. 403-406 and 410-415, respectively.

clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. §
2254(d)(1).

Petitioner admits the jury was properly instructed that, in the event they found the
aggravating factors outweighed the mitigating circumstances, they could consider the
sentence of death.[19] Petitioner argues, however, that *Apprendi v. New Jersey*, 530 U.S. 466,
120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428,
153 L.Ed.2d 556 (2002), required the jury to also be instructed that aggravating factors must
outweigh mitigating factors beyond a reasonable doubt. Since the jury was not so instructed,
Petitioner asserts his Sixth, Eighth and Fourteenth Amendment due process rights were
violated. In considering this claim during post-conviction proceedings, the Oklahoma Court
of Criminal Appeals held:

> On numerous occasions, prior to *Apprendi*, when criminal defendants
> have presented similar arguments to the one Petitioner raises here, this Court
> has stated its firm position that "specific standards for balancing aggravating
> and mitigating circumstances are not required" under Oklahoma's capital
> sentencing scheme. (citations omitted) Our position on this point has not
> changed as a result of the *Apprendi* decision, for the reasons set forth below.
> First, *Apprendi* was a five to four, non-capital decision that resulted in
> five separate opinions from the Supreme Court justices on distinguishable
> facts. Second, *Apprendi's* language does not, in our opinion, extend so
> broadly as to require a jury to find aggravating circumstances which have
> already been found by a jury to exist beyond a reasonable doubt, outweighed
> the mitigating circumstances beyond a reasonable doubt. Third, the United
> States Supreme Court's recent decision in *Ring v. Arizona*, 536 U.S. 584, 122
> S.Ct. 2428, 153 L.Ed.2d 556 (2002), while apparently extending *Apprendi's*
> holding to capital sentencing schemes, sheds no further light on the precise
> issue here. (footnote omitted) Fourth, under Oklahoma's capital sentencing

---

[19]*See* Jury Instruction Nos. 10 and 14, O.R. 410 and 414, respectively.

scheme, jurors are required to unanimously find statutory aggravating circumstances exist beyond a reasonable doubt, before the death penalty can be considered. At that point, the death penalty is in fact the maximum penalty, and the jury is simply deciding which of the three available punishments is proper, so long as aggravating circumstances outweigh mitigating circumstances.

*Murphy v. State*, 54 P.3d 556, 566 (Okla. Crim. App. 2002).

In *Kansas v. Marsh*, — U.S. —, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), the Supreme Court indicated as long as the state is required to prove aggravating circumstances beyond a reasonable doubt before a defendant is considered death-eligible, the "State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Accordingly, Petitioner has failed to establish that the Oklahoma Court's adjudication of this claim was contrary to or an unreasonable application of relevant Supreme Court precedent. Petitioner is, therefore, not entitled to habeas relief on this issue.

## 5. Victim Impact Evidence

In his fifth ground for relief, Petitioner asserts the victim impact evidence which explicitly called for his execution exceeded what is constitutionally permissible and violated his rights to a fundamentally fair sentencing proceeding as guaranteed by the Fifth, Eighth and Fourteenth Amendments. Petitioner raised this issue during direct appeal, and the Oklahoma Court of Criminal Appeals adjudicated the issue on the merits. Although Petitioner objected to specific comments contained within the victim impact statements immediately before the second stage proceedings began, he did not reurge his objections

when the statements were actually read in court. As a result, the Oklahoma Court of Criminal Appeals held Petitioner had waived all but plain error. *Murphy v. State*, 47 P.3d 876, 885 (Okla. Crim. App. 2002). Petitioner now asserts the Oklahoma Court of Criminal Appeals' "finding that trial counsel did not make a 'contemporaneous' objection strains credulity and is clearly unreasonable." First Amended Pet., at p. 70. Thus, Petitioner claims this Court is "free to depart from the OCCA's factual analysis of the claim." *Id*.

It is well-settled, however, that the contemporaneous objection rule is an independent and adequate state procedural ground. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Where a state court declines to address a claim based upon a state procedural requirement, the state court judgment is considered to rest on independent and adequate state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991), citing *Wainwright v. Sykes*, *supra*. Therefore, Respondent asserts the Oklahoma court's determination that Petitioner's failure to follow the state's contemporaneous objection rule waived review for all but plain error does not give this Court the right to review *de novo* Petitioner's victim impact claims.

Even though the Oklahoma Court of Appeals held Petitioner had waived all but plain error, it nonetheless considered all of the alleged errors in the victim impact statements in light of the principles enunciated in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). As a result, the issue before this Court is whether the decision of the

Oklahoma Court of Criminal Appeals was contrary to, or an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

The issue of victim impact evidence has been squarely addressed by the Supreme Court on several occasions. First, in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court in a 5-to-4 decision held that the Eighth Amendment prohibits a jury from considering a victim impact statement at the sentencing phase of a capital trial. The Court made clear that the admissibility of victim impact evidence was not to be determined on a case-by-case basis, but that such evidence was per se inadmissible in the sentencing phase of a capital case except to the extent that it "relate[d] directly to the circumstances of the crime." Thereafter, in *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the Court extended *Booth* to include prosecutorial statements to the sentencing jury regarding the personal qualities of the victim.

Later, in *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), the Court overruled *Booth* and *Gathers* holding:

> if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*See also*, *Jones v. United States*, 527 U.S. 373, 395, 119 S.Ct. 2090, 2105, 144 L.Ed.2d 370 (1999)( Eighth Amendment allows a capital sentencing jury to consider evidence of victim's

personal characteristics and the emotional impact of the murder on the victim's family.) If, however, the evidence introduced is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne* 501 U.S. at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-183, 106 S.Ct. 2464, 2470-2473, 91 L.Ed.2d 144 (1986)). As stated in *Darden*, the question a reviewing court must consider is whether the evidence introduced "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden, U.S.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

The Oklahoma Court of Criminal Appeals decision specifically discussed these relevant Supreme Court decisions holding:

> . . . . . [Petitioner] claims the victim impact evidence admitted in his trial exceed (sic) what is constitutionally permissible, i.e., it "characterized the offense, the perpetrator, and recommended the punishment", and thus deprived him of a fair trial and due process under the United States Constitution and the Supreme Court decisions in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) and *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). He claims Oklahoma's governing statute, 22 O.S.Supp. 1998, § 984(1) and this Court's interpretation thereof are unconstitutional. He also claims the statements were far more prejudicial than probative and that they contained hearsay and conjecture components.
>
> [Petitioner] specifically complains of the following from the written, but brief, victim impact statements that were read to jurors. First, the victim's brother Rueban stated he could not understand why [Petitioner] would want to kill his brother and that [Petitioner] "should get the death penalty for taking an innocent life. I pray that he will not ever get out of jail and do bragging." Second, the victim's brother Frank stated, "I believe in the Bible. I believe an eye for any (sic) eye and that they should be put to death." Third, the victim's sister Irene's statement commented on her anger at the "way (George) was

murdered" and took the position that her brother "had a right to be here and alive today."  Irene also stated, "I hope you see that no one in the world should ever be free who committed such a crime."  Fourth, the victim's sister Nadine stated, "I just hope and pray that these killers get the most severe punishment. There is no mercy for them." [Petitioner] claims these statements amounted to super-aggravators.

[Petitioner] did not object to the statements when they were read in court, thus waiving all but plain error.  *Miller v. State*, 2001 OK CR 17, ¶ 36, 29 P.3d 1077, 1085.  We find no plain error occurred.

In at least three decisions, this Court has taken the position that *Payne* appears to have overruled *Booth* with respect to the issue of whether or not victim impact statements could include characterizations of the defendant, the crime, and opinions in regard to sentencing.  *See, e.g., Turrentine v. State*, 1998 OK CR 33, ¶ 94, 965 P.2d 955, 980, *cert. denied*, 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998) (finding characterizations and opinions about the crime, the defendant, and the appropriate punishment no longer barred by Supreme Court); *Ledbetter v. State*, 1997 OK CR 5, ¶ 27, 933 )P.2d 880, 890-91 (*Booth's* Eighth Amendment prohibition against such evidence has been apparently overruled by *Payne*); *Conover v. State*, 1997 OK CR 6, ¶ 60, 933 P.2d 904, 920 (*Payne* "implicitly overruled that portion of *Booth* regarding characterizations of the defendant and opinions of the sentence.").

We note here, however, that in footnote two of *Payne's* majority opinion and in Justice O'Connor's concurring opinion, the Supreme Court left open the question about admissibility of victim impact evidence regarding characterizations and opinions about the crime, the defendant, and the appropriate sentence because no such evidence was presented in that case. *Payne*, 501 U.S. at 830, 833, 111 S.Ct. at 2611-13.

Nevertheless, we note the Supreme Court has denied certiorari in *Turrentine*, and since that time, we have continued to approve of such evidence in other capital cases.  *See Young v. State*, 2000 OK CR 17, ¶ 83, 12 P.3d 20, *cert. denied*, 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001) ("victim impact witness' opinion as to the appropriateness of the death penalty is admissible, but is limited to the simple statement of the recommended sentence without amplification."); *Welch v. State*, 2000 OK CR 8, ¶ 40, 2 P.2d 356, 373, *cert. denied*, 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000) ("victim impact testimony may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence.").  We therefore reject [Petitioner's] contention that our interpretation of *Payne* and *Booth*, or for that matter our own statute, is erroneous or unconstitutional.

Furthermore, we find no plain error in the admission of the victim impact statements in question. While the brief testimony from the victim's brother--regarding his belief in the Bible and an "eye for an eye"-- was an inappropriate overamplification that should have been stricken, taken as a whole, the testimony was within the bounds of admissible evidence, and its focus did not have such a prejudicial effect or so skew the presentation to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty. *Short v. State*, 1999 OK CR 15, ¶ 59, 980 P.2d 1081, 1101, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). The *Cargle v. State*, 1995 OK CR 77, 909 P.2d 806 instruction was given, thereby insuring jurors understood the proper weight to give such evidence, including any that was borderline or that crossed over the line.

Accordingly, we find the victim impact evidence was not "so unduly prejudicial that it render(ed) the trial fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608. We further find the evidence did not act as a super-aggravator, nor do we find any support for [Petitioner's] bare claim that the statements "contain hearsay and conjecture components."

*Murphy v. State*, 47 P.3d 876, 884-886 (Okla. Crim. App. 2002) (footnotes omitted).

Even though the challenged evidence was admitted pursuant to 22 O.S. § 984(1),[20] Petitioner argues the Oklahoma Court of Criminal Appeals' assertion that *Payne* had overruled *Booth* in its entirety is contrary to, or an unreasonable application of, clearly established Supreme Court law. In support of his argument, Petitioner cites the Tenth Circuit's opinion in *Hain v. Gibson*, 287 F.3d 1224, 1238 (10th Cir. 2002), which expressly held "that the portion of *Booth* prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in *Payne* and remains valid."

---

[20]This statute provides: "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, *and the victim's opinion of a recommended sentence*; . . ." (Emphasis added).

Respondent, on the other hand, argues the Tenth Circuit's decision in *Hain* does not

constitute "clearly established Federal law, as determined by the Supreme Court of the

United States." 28 U.S.C. § 2254(d)(1).

Where the Supreme Court has not definitively ruled on a specific issue, it cannot be

said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." *Carey*

*v. Musladin*, — U.S. —, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). The Supreme Court has,

on numerous occasions, discussed what can be considered "clearly established Federal law"

relevant to death penalty cases. Some of those discussions were summarized in *Booth*, when

the Court stated:

> It is well settled that a jury's discretion to impose the death sentence
> must be "suitably directed and limited so as to minimize the risk of wholly
> arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96
> S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, POWELL,
> and STEVENS, JJ.); *California v. Ramos*, 463 U.S. 992, 999, 103 S.Ct. 3446,
> 3452, 77 L.Ed.2d 1171 (1983). Although this court normally will defer to a
> state legislature's determination of what factors are relevant to the sentencing
> decision, the Constitution places some limits on this discretion. See, *e.g., id.*,
> at 1000-1001, 103 S.Ct. at 3452-3453. Specifically, we have said that a jury
> must make an "*individualized* determination" whether the defendant in
> question should be executed, based on "the character of the individual and the
> circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct.
> 2733, 2743, 77 L.Ed.2d 235 (1983) (emphasis in original). See also *Eddings
> v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982).
> And while this Court has never said that the defendant's record,
> characteristics, and the circumstances of the crime are the only permissible
> sentencing considerations, a state statute that requires consideration of other
> factors must be scrutinized to ensure that the evidence has some bearing on the
> defendant's "personal responsibility and moral guilt." *Enmund v. Florida*, 458
> U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982). To do
> otherwise would create the risk that a death sentence will be based on
> considerations that are "constitutionally impermissible or totally irrelevant to

> the sentencing process." See *Zant v. Stephens, supra*, 462 U.S. at 885, 103 S.Ct. at 2747.

*Booth*, 482 U.S. at 502.

In *Payne* the Court made a special effort to acknowledge that the portion of the *Booth* decision which "held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment" was not before the Court.[21] As a result, at least five circuit courts have expressly recognized that this portion of *Booth* survived the holding in *Payne* and remains valid. *See United States v. Brown*, 441 F.3d 1330, 1352 (11th Cir. 2006); *Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) (en banc); *Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999); *Hain v. Gibson*, 287 F.3d 1224, 1238-39 (10th Cir. 2002); *United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir. 1998); and *Woods v. Johnson*, 75 F.3d 1017, 1038 (5th Cir. 1996).

Looking at Petitioner's arguments, it is clear that some of the victim impact testimony fell within the parameters authorized in *Payne*; but other portions of the testimony were improperly admitted. As can be seen from the recitation of the testimony by the Oklahoma Court of Criminal Appeals, *supra*, all four of the second-stage witnesses presented by the prosecution made remarks that they thought Petitioner should get "the death penalty" or should "never be free to commit such a crime" or should "just get the most severe

---

[21]*See, Payne*, 501 U.S. at 830, 111 S.Ct. at 2611, n. 2.

37

punishment."[22]  Additionally, in the state's final closing argument, the prosecutor again re-emphasized portions of what each victim had told the jury, including that two of the family members thought the Petitioner should get death.[23]  Since the testimony clearly exceeded the personal characteristics of the victim and the emotional impact of the crimes on the family, this Court finds the Oklahoma Court of Criminal Appeals decision is contrary to "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Therefore, this Court must decide two issues.  First, in looking at the testimony which should not have been admitted, was the constitutional error resulting from the admission of the improper portions of the victim impact statements harmless beyond a reasonable doubt?  *Welch v. Sirmons*, 451 F.3d 675, 703-704 (10th Cir. 2006) and cases cited therein.  Second, was the overall victim impact evidence so unduly prejudicial that it rendered Petitioner's trial fundamentally unfair?  *Payne*, *supra*, 501 U.S. at 825, 111 S.Ct. at 2597.

After carefully examining the trial transcript, this Court concludes any error was harmless, in that the objectionable portion of the victim impact evidence did not have a substantial and injurious effect or influence in determining the jury's recommended death sentence.  Furthermore, when the overall victim impact evidence is considered in conjunction with all of the evidence introduced in both the first and second stages of Petitioner's trial, this

---

[22]J.T.Tr., Vol. V, at pp. 1219 - 1225.

[23]J.T.Tr., Vol. V, at pp. 1398.

Court agrees with the Oklahoma Court of Criminal Appeals' conclusion that this evidence was not so unduly prejudicial that it rendered Petitioner's trial fundamentally unfair. Specifically, the prosecution alleged, and the jury found, the existence of two aggravating factors, both of which were amply supported by the evidence. In light of the jury's finding that the murder was especially heinous, atrocious, or cruel and that Petitioner posed a continuing threat to society, this Court finds that the improper aspects of the victim impact evidence simply did not play and could not have played a substantial role in the jury's assessment of the death penalty in this particular case. Further, the overall length of the victim impact testimony relative to the length of the entire trial and the fact Petitioner offered four witnesses after the objectionable portion of the testimony, convinces this Court that the evidence did not infect the trial with unfairness such that the resulting conviction was a denial of due process. *Darden.* Accordingly, Petitioner's claim for relief is denied.

## 6. Failure to Define Life Without Parole

Relying on *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), Petitioner's sixth ground for relief alleges that failure to define the sentencing option of "life without parole" where the jury was asked to consider future dangerousness deprived him of due process of law and the right to a fundamentally fair sentencing proceeding in violation of the Fifth, Eighth, and Fourteenth Amendments. Respondent again asserts the Oklahoma Court of Criminal Appeals' decision is neither contrary to nor an unreasonable determination of clearly established federal law.

In *Simmons*, the Supreme Court held where the State argues in a capital sentencing proceeding that the petitioner presents a future threat, due process requires that he be permitted to inform the jury that he is parole ineligible. In this case, the jury was given three discrete sentencing options when the trial court instructed them as follows:

> The defendant in this case has been found guilty by you, the jury, of the offense of murder in the first degree. It is now your duty to determine the penalty to be imposed for this offense.
> Under the law of the State of Oklahoma, every person found guilty of murder in the first degree shall be punished by death, or imprisonment for life without the possibility of parole, or imprisonment for life with the possibility of parole.

O.R. 401, Second Stage Jury Instruction No. 1. The Tenth Circuit has consistently held that instructing on these three options, without any additional explanation, satisfies *Simmons*. *Johnson v. Gibson*, 254 F.3d 1155, 1165 (10th Cir. 2001), *cert. denied*, 534 U.S. 1029, 122 S.Ct. 566, 151 L.Ed.2d 439 (2001) (citing *Mayes v. Gibson*, 210 F.3d 1284, 1294 (10th Cir. 2000)).

As can be gleaned from the summary of Petitioner's arguments by the Oklahoma appellate court and the ruling thereon, it is clear that Petitioner's jury received more information than is constitutionally mandated or has ever been required by controlling Supreme Court precedent. Specifically, the Oklahoma Court of Criminal Appeals summarized Petitioner's arguments before the trial court and on appeal as follows:

> . . . . . . [Petitioner] claims the trial court's failure to define life without parole denied him due process of law and a fundamentally fair trial. To support this proposition, [Petitioner] points to a motion he filed prior to trial in which he requested the trial court to allow testimony or "evidence"

regarding "the effects and conditions of a sentence of life without the possibility of parole."

Contrary to [Petitioner's] claim, this motion was not a request for the trial court to provide the jury with instructions regarding the actual meaning of life without parole. Rather, it was a request to produce *evidence* to the jury during the second stage regarding distinctions between the sentencing options, relief available from the Department of Corrections, and the conditions and restrictions associated with a sentence of life without parole.

Be that as it may, the motion was not denied, as [Petitioner] suggests. Rather, the trial judge ruled he would allow argument regarding this issue, but no evidence. (O.R. at 192). The trial judge specifically stated defense counsel could write the words "life without parole" for jurors during arguments, and underline the words "without parole." He also allowed defense counsel to tell jurors that "life without parole means life without parole." Defense counsel went even further than this, telling jurors that they had the option of "putting him in prison for the rest of his life . . . don't give him the possibility of parole."

This is not a case where a specific instruction was requested and refused, nor is it a case where the jury sent back a note asking for additional information on what life without parole means. Indeed, this is a case where jurors were told, essentially, that life without parole means what it says.

Moreover, this Court has, in numerous instances, stated that the meaning of life without parole is self-explanatory and that an instruction on its meaning is not required. *Powell v. State*, 2000 OK CR 5, ¶ 127, 995 P.2d 510, 536, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258 (2000); *Howell v. State*, 1998 OK CR 53, ¶ 8, 967 P.2d 1221, 1225, *cert. denied*, 528 U.S. 834, 120 S.Ct. 93, 145 L.Ed.2d 79 (1999); *McCracken v. State*, 1994 OK CR 68, ¶ 49, 887 P.2d 323, 334, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). Accordingly, we find [Petitioner] was not denied due process or a fundamentally fair trial when the trial judge allowed even more information on this issue than is currently required.

*Murphy v. State*, 47 P.3rd 876, 886 (Okla. Crim. App. 2002). After reviewing the record

below, this Court finds the decision of the Oklahoma Court of Criminal Appeals on this issue

was not an unreasonable determination of clearly established federal law as determined by

the Supreme Court of the United States. Thus, Petitioner is not, pursuant to 28 U.S.C. § 2254(d), entitled to relief on this issue.

## 7. Admission of Petitioner's Post-arrest Statements

In his seventh ground for relief, Petitioner asserts the state court improperly denied his request to suppress his post-arrest statements to police because the statements were neither voluntarily or knowingly given. Petitioner argues, under the totality of the facts, his post-arrest waiver of his right to counsel was not the product of a rational intellect and a free will as required by *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).[24] Respondent asserts this claim lacks merit and that the Oklahoma Court of Criminal Appeals' determination that Petitioner's statement was properly admitted is not based on an unreasonable assessment of the facts from the record nor contrary to, or an unreasonable application of, clearly established federal law.

Without question, Petitioner was entitled to the rights recognized by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which imposed upon the police a duty, prior to the initiation of questioning, to "fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Miranda*, 384 U.S. at 468-470, 86 S.Ct. at 1624-1626). "If the individual indicates in any

---

[24]This is the only authority Petitioner cites in support of this ground for relief.

42

manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Miranda*, 384 U.S. at 473-474, 86 S.Ct. at 1627. *See also*, *Edwards v. Arizona*, 451 U.S 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). A suspect may, however, waive his *Miranda* rights so long as the waiver is "made voluntarily, knowingly and intelligently." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. An inquiry into whether an accused effectively waived his right to counsel, involves two distinct inquiries.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). Finally, in *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994), the Supreme Court stated:

> . . . if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. . . . . Rather, the suspect must unambiguously request counsel.

In this case, Petitioner argues not that he was intimidated, coerced or deceived into waiving his rights, but that he was "confused about his rights." First Amended Pet. at p. 78. Respondent argues Petitioner did not unequivocally request an attorney. Combined Response

at p. 34.  Respondent further argues Petitioner has failed to show that the Court of Criminal

Appeals' decision involved an unreasonable application of the law to the facts.  *Id*. at p. 36.

In considering Petitioner's claim on the merits, the Oklahoma Court of Criminal

Appeals made the following factual determinations:

> . . . . .[Petitioner] claims a custodial statement he gave after his arrest
> violated his right to counsel.  He claims the statement should have been
> suppressed, and the trial court erred by admitting it at trial, following the
> *Jackson v. Denno* hearing held on its admissibility.  In that hearing, the trial
> judge found [Petitioner] voluntarily and knowingly waived his right to counsel.
>
> [Petitioner] specifically points to transcript excerpts of his interrogation
> in which he seemed to have been confused about whether or not he was
> entitled to an attorney, whether or not he was going to ask for an attorney, and
> whether or not he could speak to the officers with an attorney present.
>
> For example, after receiving the *Miranda* warning and being asked if
> he desired to speak to police officers, [Petitioner] stated, "Well, I can't answer
> that right now.  I don't know this, this I'm not for sure if I'm gonna have an
> attorney."  The police then told [Petitioner], "It is your right to have an
> attorney. Do you want one or do you want to talk to us? It's your choice.  Do
> you want an attorney yes or no?" [Petitioner] asked, "Well, can I still talk to
> ya'll and still have an attorney present?"  The officers responded, "Do you
> want, you want an attorney? You can have an attorney.  If not, you can talk to
> us right now.  It's your choice.  I can't tell you what to do." [Petitioner]
> replied, "I mean, I mean, your (sic) saying I can't do both?"  The officer said,
> "Yeah.  Eventually sure.  If you want an attorney, we'll get you an attorney.
> If that's what your (sic) saying."
>
> Similar exchanges continued until [Petitioner] eventually agreed to talk
> to the police without an attorney present.  He then signed a waiver to that
> effect.

*Murphy v. State*, 47 P.3d 876, 881 (Okla. Crim. App. 2002).  Petitioner has not shown, by

clear and convincing evidence, that these factual determinations are incorrect.  Therefore,

this Court must presume the factual determinations to be correct.  28 U.S.C. § 2254(e)(1).

The appellate court then applied the principles enunciated by the Supreme Court in *Davis, supra*, to determine whether or not Petitioner had unambiguously requested counsel, holding:

> We see no violation of [Petitioner's] constitutional right to counsel from these transcripts or from the testimony given at the *Jackson v. Denno* hearing. Like *Dennis v. State*, 1999 OK CR 23, 990 P.2d 277, [Petitioner's] proposition rests entirely on his ability to get this Court to agree that his vague and noncommittal statements to police officers somehow invoked his right to counsel. However, we find his statements do "not even reach the level of an ambiguous request for counsel, and of course, police are not required to stop questioning when faced with an ambiguous request." *Dennis*, 1999 OK Cr 23, ¶ 6, 990 P.2d at 279-80 (construing *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994)).

*Murphy v. State*, 47 P.3d 876, 881-882 (Okla. Crim. App. 2002).

This Court finds the Oklahoma Court of Criminal Appeals applied the correct legal standards enunciated by the Supreme Court in *Davis*. Based upon the state court's application of the proper legal standard to the facts of this case, this Court finds Petitioner has failed to establish that he is entitled to relief on this issue, pursuant to 28 U.S.C. § 2254(d).

## 8. State Court Jurisdiction

Petitioner argues in his Second Amended Petition (Dkt. No. 54) the State of Oklahoma lacked jurisdiction to try him for murder because both he and the victim are Indian and his crime occurred in "Indian country." Thus, Petitioner asserts jurisdiction over the crime rested exclusively in the federal government pursuant to 18 U.S.C. § 1153. Petitioner first raised this issue in his Original Petition for Writ of Habeas Corpus filed herein on March 5,

2004. Dkt. No. 14, at p. 18. At the time of filing his original petition, however, Petitioner recognized that the claim had not been presented to the state court, but advised the Court since jurisdiction presented a federal question, it should never be subjected to procedural bar. Subsequent to the filing of his Petition in this Court, on March 29, 2004, Petitioner filed a second or subsequent application for post-conviction relief in the Oklahoma Court of Criminal Appeals. *Murphy v. State*, Case No. PCD-2004-321. On August 30, 2004, this Court entered an order, pursuant to *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), "that the petition [would] be dismissed on September 13, 2004 unless, prior to that time, the petition [was] amended to drop all unexhausted claims" (Dkt. No. 27). Thereafter, on September 10, 2004, Petitioner filed his First Amended Petition which omitted this particular claim (Dkt. No. 33).

In the second post-conviction proceeding, the Oklahoma Court of Criminal Appeals granted an evidentiary hearing which was held in the state district court on November 18, 2004. Thereafter, on December 7, 2005, the Oklahoma Court of Criminal Appeals denied relief on Petitioner's challenge to jurisdiction, finding Petitioner did not commit his crime in Indian country, and therefore, the State of Oklahoma had properly exercised jurisdiction over Petitioner. *Murphy v. State*, 124 P.3d 1198 (Okla. Crim. App. 2005), *cert. denied*, — S.Ct. —, 2007 W.L. 1582962 (2007). Petitioner claims the Oklahoma appellate court's decision is clearly contrary to and/or an unreasonable application of federal law to the facts of the case. Respondent, on the other hand, argues the decision was neither contrary to nor

an unreasonable application of clearly established federal law as determined by the Supreme

Court.

Petitioner admits, following the evidentiary hearing in state court and the Oklahoma

Court of Criminal Appeals' adjudication of this issue, there are no relevant facts in dispute.

Accordingly, this Court's consideration of the legal issues involved herein are based upon

the following findings of fact of the Oklahoma Court of Criminal Appeals:

> The record reflects Petitioner is an enrolled member of the Muscogee (Creek) Nation, as was the victim, George Jacobs. Both are "Indians" for purpose (sic) of 18 U.S.C. § 1153, as both sides readily admit.

*Murphy v. State,* 124 P.3d 1198*,* 1200 (Okla. Crim. App. 2005) (footnote omitted).

> We readily accept the District Court's findings as to the source of the fatal wound and where it was inflicted. For jurisdictional purposes, the crime took place on both the northbound lane of Vernon Road (i.e., the road's eastern side in the N/2 SW/4 and the S/2 NW/4 of Section 27, Township 9 North, Range 13 East, McIntosh County) and the adjacent ditch. Plus, as the parties and District Court agree, both sites (the site of the fatal wound and the ditch where George Jacobs died) are within the boundaries of the three-rod (49.5 feet) area created along the section line by a 1902 Creek Nation Treaty with the United States. *See* Act of June 30, 1902, 32 Stat. 500, 502, § 10.
> . . . . .We find the record, witness testimony, treaty language, and relevant cases all support a finding that the State of Oklahoma's interest in the area in question is in the nature of an easement or right-of-way.

*Id.* at 1202.

> . . . . . .In the instant case, the record shows the crime occurred on land originally allotted to Lizzie Smith, a member of the Creek Nation. However, all surface rights to the property have since been conveyed away to non-Indians. Thus, non-Indians own the actual physical property upon which the crime occurred, . . . . .
> However, not all of the fee interest in the original allotment has been conveyed to non-Indians. According to the evidentiary hearing record, while

non-Indians own the surface and eleven twelfths of the minerals in the tract where the crime occurred, one twelfth of the mineral interest remains restricted with the Indian heirs of Lizzie Smith.

*Id.* at 1204.

George Jacobs was murdered in McIntosh County in August of 1999. The crime occurred on a county section line road in a remarkably rural, heavily treed location, without any sort of improvement noticeable in the photographs, except perhaps a rickety barbed wire fence. The crime occurred approximately one mile north of the small town of Vernon, a town supposedly established by freed black slaves, and four or so miles from the equally small town of Hanna.

Authorities investigated the matter during the relevant time period. As a result state murder charges and a bill of particulars were filed against Petitioner. Trial was held in April of 2000, and Petitioner was convicted of First Degree Murder. Since then the matter has been continuously on appeal.

. . . . .federal authorities have never attempted to exercise jurisdiction over this crime in the five years since it occurred. Meanwhile, the State of Oklahoma has spent considerable time and money prosecuting and defending Petitioner in the district and appellate courts.

This case presents two separate and distinct estates in land, i.e., a surface estate and a mineral estate, each subject to being severed and separately conveyed. The uncontradicted evidence shows that the surface estate was separated from the mineral estate on the land where the crime occurred. Also, the uncontradicted evidence shows that, as to the surface estate, the Indian allotment had been extinguished by conveyances to non-Indian landowners prior to the time of the crime.

Even as to the remaining Indian allotment mineral estate, the uncontradicted evidence was that all but 1/12th had been extinguished by conveyances to non-Indians.

*Id.* at 1206.

Petitioner asserts the decision of the Oklahoma Court of Criminal Appeals is clearly contrary to and/or unreasonably applied federal law because the crime scene is "Indian country." Petitioner asserts the land is "Indian country" under two separate theories. First, Petitioner argues the crime scene is a restricted Indian allotment in which all Indian right and

title has never been extinguished. Second, Petitioner alleges the crime scene falls entirely within the historical territorial boundaries of the Muscogee (Creek) Nation and, thus qualifies as "land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a). Respondent asserts the Oklahoma Court of Criminal Appeals' decision that Petitioner's crime was not committed in "Indian country" for purposes of the Indian Major Crimes Act is neither contrary to, nor an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

At the outset, this Court would note that Oklahoma exercised jurisdiction over all of the lands of the former Five Civilized Tribes based on longstanding caselaw from statehood until the Tenth Circuit in *Indian Country, U.S.A. v. State of Oklahoma*, 829 F.2d 967 (10th Cir. 1987) found a small tract of tribally-owned treaty land existed along the Arkansas River in Tulsa County, Oklahoma. *See*, *Marlin v. Lewallen*, 276 U.S. 58, 48 S.Ct. 248, 72 L.Ed. 467 (1928) (detailing history of the Creek Nation and the treaties and/or congressional enactments applicable to Creek lands, recognizing "tribal courts were abolished" and a "body of laws adopted from the statutes of Arkansas and intended to reach Indians as well as white persons, except as they might be inapplicable in particular situations or might be superseded as to any of the Five Civilized Tribes by future agreements."); *Ex Parte Nowabbi*, 61 P.2d 1139 (Okl. Crim. App. 1936); *Oklahoma Tax Commission v. United States*, 319 U.S. 598,

602, 63 S.Ct. 1284, 1286, 87 L.Ed. 1612 (1943) (Court distinguished the treatment of five-civilized tribes from treatment of other Indian tribes observing, "*Worcester v. Georgia*, 6 Pet 515, 8 L.Ed. 483, held that a state might not regulate the conduct of persons in Indian territory on the theory that the Indian tribes were separate political entities with all the rights of independent status - *a condition which has not existed for many years in the State of Oklahoma.*" (emphasis added)); and *United States v. Hester*, 137 F.2d 145, 147 (10th Cir. 1943) ("Indians residing in Oklahoma are citizens of that State, and they are amenable to its civil and criminal laws.") Thereafter, because no Supreme Court case had ever addressed the issue of jurisdiction as it relates to lands within the former "Indian territory," the Oklahoma Courts began to reverse criminal cases involving jurisdictional controversies holding "Indian country" jurisdiction was not precluded in what was "Indian Territory" before statehood. *See*, *State v. Brooks*, 763 P.2d 707 (Okla. Crim. App. 1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *State v. Klindt*, 782 P.2d 401 (Okla. Crim. App. 1989) (overruling *Ex Parte Nowabbi*, 61 P.2d 1139 (Okla. Crim. App. 1936) and holding State of Oklahoma never assumed criminal and civil jurisdiction over any "Indian country" within its borders)[25] and *Cravatt v. State*, 825 P.2d 277 (Okla. Crim. App. 1992).

Title 18 U.S.C. § 1151 defines "Indian country,"[26] in relevant part, as:

---

[25]Since historically Oklahoma exercised civil and criminal jurisdiction over all lands within the former "Indian territory," despite what the Oklahoma Court of Criminal Appeals said in *Klindt*, it could be argued that Oklahoma had, in fact, assumed jurisdiction prior to the enactment of 67 Stat. 588, one of the statutes relied upon by the Oklahoma Court of Criminal Appeals to overturn *Ex parte Nowabbi*, and thus, no further action was required to maintain jurisdiction.

[26]This statute was first enacted on June 25, 1948.  62 Stat. 757.

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, . . . . and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

In *Worcester v. Georgia*, 31 U.S. 515, 520, 6 Pet. 515, 8 L.Ed. 483 (1832), the Supreme Court, in effect, defined an Indian reservation as "a distinct community, occupying its own territory, with boundaries accurately described, in which . . . [state laws] can have no force. . ." While the historical boundaries of once tribally owned land within Oklahoma may still be determinable today, there is no question, based on the history of the Creek Nation, that Indian reservations do not exist in Oklahoma. State laws have applied over the lands within the historical boundaries of the Creek nation for over a hundred years. *See*, Oklahoma Enabling Act, 34 Stat. 267 and other cases cited herein. *See also*, *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 215, 125 S.Ct. 1478, 1490, 161 L.Ed.2d 386 (2005) (acknowledging "jurisdictional history" and the fact that "a contrary conclusion would seriously disrupt the justifiable expectations of the people living in the area" are proper considerations in determining Indian issues.) Further, even Petitioner's expert witness admitted "[t]here was never a formal Creek Nation 'reservation' . . . . ." *Murphy v. State*, 124 P.3d 1198, 1207 (Okla. Crim. App. 2005).

Petitioner argues, however, that the crime scene falls entirely within the historical boundaries of the Muscogee (Creek) Nation and thus falls within the "Indian reservation" prong of the definition of "Indian country" because the Muskogee (Creek) Nation has never

been disestablished. *See*, Second Amended Pet. at p. 22. Petitioner cites numerous Supreme Court cases dealing with general principles of Indian law. Petitioner does not, however, attempt to explain how the Supreme Court's recognition that the Five Civilized Tribes have always been treated differently than other Indian tribes affects the application of these general principals of Indian law. *See Worcester v. Georgia*, *supra*. In *Oklahoma Tax Commission v. United States*, 319 U.S. 598, 603, 63 S.Ct. 1284, 1286, 87 L.Ed.1612 (1943), the Supreme Court recognized that the underlying principles of Indian law applicable in tax cases "do not fit the situation of the Oklahoma Indians."

While Petitioner is correct that the question of disestablishment "turns on the facts and circumstances under which the treaties between the Creek Nation and the United States were signed," Second Amended Pet. At p. 23, another important consideration is the subsequent treatment of the lands. *See South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343-344, 118 S.Ct. 789, 798, 139 L.Ed.2d 773 (1998); *Hagen v. Utah*, 510 U.S. 399, 410-411, 114 S.Ct. 958, 965-966, 127 L.Ed.2d 252 (1994); and *Solem v. Bartlett*, 465 U.S. 463, 470-472, 104 S.Ct. 1161, 1166-1167, 79 L.Ed.2d 443 (1984). A careful review of the Acts of Congress which culminated in the grant of statehood to Oklahoma in 1906, as well as subsequent actions by Congress, leaves no doubt the historic territory of the Creek Nation was disestablished as a part of the allotment process. *See*, *Marlin v. Lewallen*, *supra*; *Indian Country, U.S.A. v. State of Oklahoma*, 829 F.2d 967 (10th Cir. 1987); Act of May 27, 1908, ch. 199, 35 Stat. 312; Act of June 14, 1918, ch. 101, 40 Stat. 606; Act of April 10, 1926, ch.

115, § 1, 44 Stat. 239; Act of Aug. 4, 1947, ch. 458, § 1, 61 Stat. 731; S. Rep. No. 1232, 74th Cong., 1st Sess. 6 (1935) (Senate Committee on Indian Affairs recognized in connection with the enactment of the Oklahoma Indian Welfare Act that "all Indian reservations as such have ceased to exist" in Oklahoma) and 25 U.S.C.A. § 1452(d) (Congress defined the term "reservation" to encompass "former Indian reservations in Oklahoma").  For these reasons, this Court finds the Oklahoma Court of Criminal Appeals' decision refusing to find the crime occurred on an Indian "reservation" is not contrary to nor an unreasonable application of Federal law as determined by the United States Supreme Court.

Further, in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Court defined an "allotment" as "a term of art in Indian law.  U.S. Dept. of the Interior, Federal Indian Law 774 (1958).  It means a selection of specific land awarded to an individual allottee from a common holding." *Id*. 406 U.S. at 142, 92 S.Ct. at 1466.  The Oklahoma Court found the title to the land upon which the situs of the crime occurred, "was conveyed to the Creek allottees who owned the property abutting the road." *Murphy v. State*, 124 P.3d 1198, 1204 (Okla. Crim. App. 2005).  While recognizing that the situs of the crime contained a 1/12th restricted mineral interest, however,  the Oklahoma Court of Criminal Appeals also noted that such an interest would be "unobservable."  There can be no question, based on the facts herein, that all Indian title to the surface interest of the subject property, including the right-of-way, has long been extinguished.  While restricted Indian interests to the mineral estate still exists, the Major

Crimes Act was not enacted to cover crimes occurring on subsurface unobservable mineral interests. Rather, the crimes enumerated in the Act are crimes which would occur on the surface of the land, *i.e.* murder, manslaughter, kidnapping, maiming, incest, etc. Congress simply was not, by enacting the Major Crimes Act, concerned with crimes which could occur on the mineral interest of an Indian allotment. Furthermore, Petitioner fails to identify any arguable nexus between the restricted Indian mineral interest and the crime of murder.

Petitioner cites no authority to support his argument that retention of a fractional subsurface mineral interest is sufficient to subject the surface interests of the land to exclusive federal criminal jurisdiction pursuant to 18 U.S.C.§ 1151(c). Rather, Petitioner simply cites Supreme Court authority which stands for the general proposition that Indian allotments are considered "Indian country." The facts in each of the cases cited, however, are clearly distinguishable from the facts in this case in that the surface estates had not been transferred to non-Indians. *See*, *United States v. Ramsey*, 271 U.S. 467, 470-72, 46 S.Ct. 559, 560, 70 L.Ed. 1039 (1926) (original Osage Indian allotment conveyed in fee and subject to a restriction against alienation for a period of 25 years, which period had not elapsed, and restrictions against alienation had not been removed); *United States v. Pelican*, 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914) (holding "trust allotment" during the trust period remains "Indian country"); *United States v. Hellard*, 322 U.S. 363, 64 S.Ct. 985, 88 L.Ed. 1326 (1944) (United States had interest in restricted Indian allotment partition proceedings brought by full blood heirs).

Finally, Petitioner asserts the Oklahoma court's observation that recognizing retention of "Indian country" status based solely on restricted subsurface mineral estates would seriously burden both the state and federal governments is contrary to Supreme Court law which recognizes that ". . . checkerboard jurisdiction is not novel in Indian law. . ." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). This Court finds, however, that "checkerboard" jurisdiction based not upon the observable surface estates, but upon the subsurface estates, would indeed be not only a novel approach, but also a totally unworkable and unenforceable approach. Such an approach would require an extensive title research prior to assumption of jurisdiction by either the state or federal court every time a crime occurs. Additionally, as recognized by the Oklahoma Court of Criminal Appeals, in situations where supposed heirs of the original allottee have never been judicially determined, a quiet title suit would have to be initiated before assumption of jurisdiction by either governmental entity could occur thereby returning Oklahoma to the anarchy which existed prior to the establishment of federal courts in the former Indian territory.[27] Accordingly, this Court finds the Oklahoma Court of Criminal Appeals determination that the land in question had its "Indian country" characteristics extinguished through conveyances to non-Indians is neither contrary to nor an unreasonable interpretation of Federal law as determined by the Supreme Court.

---

[27]*See, Harjo v. Kleppe*, 420 F.Supp. 1110, 1121 (D.D.C. 1976) (discussing the recurrent problems as a result of an inadequate court system to resolve civil and criminal disputes).

**10. Lethal Injection**

In his second amended petition, Petitioner asserts that lethal injection under the protocols and procedures currently in force in Oklahoma places him at an unnecessary risk of conscious pain and suffering in violation of the Eighth Amendment. Respondent argues this claim is improperly raised in this federal habeas proceeding and should, therefore, be denied. Alternatively, Respondent asserts Petitioner's claim is procedurally barred.

Petitioner first raised this issue in the original petition for writ of habeas corpus filed herein on March 5, 2004 (Dkt. No. 14). As indicated previously, on August 30, 2004, Petitioner was notified his Petition would be dismissed on September 13, 2004, unless prior to that time, the Petition was amended to drop all unexhausted claims (Dkt. No. 27). On September 10, 2004, Petitioner filed his First Amended Petition which did not include this issue as a ground for relief (Dkt. No. 33).

Thereafter, Petitioner filed a second application for post-conviction relief with the Oklahoma Court of Criminal Appeals. In refusing to consider this issue, the Oklahoma court, after summarizing the narrow scope of review available under Oklahoma's Post-Conviction Procedure Act, OKLA. STAT., tit. 22, § 1089(C)(1), stated:

> In proposition three, Petitioner claims, for the first time, that Oklahoma's lethal injection procedure violates the Eighth Amendment prohibition against cruel and unusual punishment. He claims Oklahoma's "protocols" for carrying out such executions create a substantial risk of conscious suffocation or conscious suffering of excruciating pain and that several such Oklahoma executions have "gone wrong."
>
> Petitioner has waived any error relating to this claim by failing to raise it in his May 3, 2001 direct appeal brief and his February 7, 2002 post-

56

conviction application.  He admits the claim was available in March of 2001.
Moreover, the statute upon which such executions are based, 22 O.S. 2001, §
1014(A), has not been amended since 1977.

*Murphy v. State*, 124 P.3d 1198, 1209 (Okla. Crim. App. 2005) (footnotes omitted).

As a general rule, if a petitioner has failed to present a claim to the state courts in the

manner prescribed by the procedural rules of the state, the state court may deem the claim

defaulted.  *Wainright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).  Where

a state prisoner defaults his federal claims in state court based upon an independent and

adequate state procedural rule, federal review of his habeas claims will be barred.  *Coleman*

*v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991).  If the

state court's finding is separate and distinct from federal law, it will   considered

"independent."   *See Ake v. Oklahoma*, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53

(1985); *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998), *cert. denied,* 525 U.S. 933, 119

S.Ct. 345, 142 L.Ed.2d 284 (1998).  If the finding is applied "evenhandedly to all similar

claims", it will be considered "adequate."  *Maes v. Thomas*, 46 F.3d 979 (10th Cir. 1995),

*cert. denied* 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995) (citing *Hathorn v.*

*Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 2426, 72 L.Ed.2d 824 (1982)).  Where the state-

law default prevented the state court from reaching the merits of the federal claim, the claim

ordinarily cannot be reviewed in the federal courts.  *Ylst v. Nunnemaker*, 501 U.S. 797, 111

S.Ct. 2590, 115 L.Ed.2d 706  (1991).  "Review is precluded 'unless the prisoner can

demonstrate cause for the default and actual prejudice as a result of the alleged violation of

federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *See Breechen v. Reynolds*, 41 F.3d 1343, 1353 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995) and cases cited therein. As noted in *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998), *cert. denied,* 525 U.S. 950, 119 S.Ct. 378, 142 L.Ed.2d 312 (1998), the procedural default rule is not a jurisdictional rule; rather, it is based upon the principles of comity and federalism.

Petitioner argues, however, that the Oklahoma Court of Criminal Appeals finding as to when Petitioner first could have raised this issue was incorrect. Specifically, Petitioner claims the information only became available on January 12, 2004, when the State revealed through an affidavit of Warden Mike Mullin certain information regarding Oklahoma's lethal injection procedures. Additionally, Petitioner argues Oklahoma's procedural bar is not fairly and evenhandedly applied because the Oklahoma Court of Criminal Appeals allowed his jurisdictional and mental retardation claims to be raised in his second post-conviction application. As Respondent points out, Petitioner's "Indian country" issue went to jurisdiction and therefore, could be raised at any time. Additionally, Petitioner's mental retardation issue arose as a result of new Supreme Court caselaw. Therefore, Respondent urges this Court to apply a procedural bar to Petitioner's claim.

The Tenth Circuit has held Oklahoma's post-conviction statute, OKLA. STAT., tit. 22 § 1089, which bars review of claims that could have been raised on direct appeal including issues involving fundamental, constitutional rights, is an "adequate, as well as independent,

state ground" which can effectively bar federal habeas review. *Steele v. Young*, 11 F.3d 1518, 1521 (1993). Merely because the Oklahoma court authorized two of Petitioner's claims to be raised in a subsequent post-conviction application does not establish that the rule is not evenhandedly applied.

Petitioner also argues he can establish "cause and prejudice" for failing to develop this claim sooner. While a showing that a factual or legal basis for a claim was not previously available to counsel has been deemed "cause," the record in this case does not support Petitioner's assertion that the issue was not discoverable. Rather, the Oklahoma Court specifically found that the factual basis of the claim was available before Petitioner ever filed his direct appeal. *Murphy v. State*, 124 P.3d 1198, 1209 (Okla. Crim. App. 2005). This finding of fact by the Oklahoma court is presumed correct. 28 U.S.C. § 2254(e)(1). Accordingly, this Court finds Petitioner's claim regarding Oklahoma's lethal injection protocol is procedurally barred.

Assuming arguendo, that this claim were not procedurally barred, this Court would find Petitioner's claim lacks merit. Specifically, Petitioner alleges that lethal injection causes unnecessary pain and suffering or that any number of accidents could occur with the equipment, personnel, or chemicals involved in the process which might lead to unnecessary pain and suffering. Many other forms of execution which are undoubtedly more painful or intrusive than lethal injection have withstood Eighth Amendment cruel and unusual punishment challenges. *Compare Campbell v. Wood*, 18 F.3d 662, 681-683 (9th Cir. 1994),

*cert. denied*, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994) (holding hanging is not cruel and unusual simply "because there may be some pain associated with death"); *Felker v. Turpin*, 101 F.3d 95, 97 (11th Cir. 1996), *cert. denied*, 519 U.S. 989, 117 S.Ct. 450, 136 L.Ed.2d 345 (1996) (holding no merit to Petitioner's claim that death by electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments); and *Gray v. Lucas*, 710 F.2d 1048, 1061 (5th Cir. 1983), *cert. denied*, 463 U.S. 1237, 104 S.Ct. 211, 77 L.Ed.2d 1453 (1983) (holding the pain and terror resulting from death by cyanide gas does not render such execution method unconstitutional).[28]

Furthermore, in *Hamilton v. Jones*, 472 F.3d 814 (10th Cir. 2007), *cert. denied*, — U.S. —, 127 S.Ct. 1054, 166 L.Ed.2d 783 (2007), the Tenth Circuit held Petitioner had failed to show "a substantial likelihood of prevailing on the merits" on a similar claim that Oklahoma's lethal injection protocol violates the Eighth Amendment's cruel and unusual punishment prohibition. Accordingly, this Court finds Petitioner's claim is frivolous.

## 11. Cumulative Error

Petitioner asserts, in his eighth ground for relief, that the cumulative effect of the errors in his case warrant relief. Even though the Oklahoma Court of Criminal Appeals, in addressing this issue in Petitioner's direct appeal, held: "We have found no error, and thus we find no cumulative error." *Murphy v. State*, 47 P.3d 876, 887 (Okla. Crim. App. 2002),

---

[28]*But see, Hill v. McDonough*, — U.S. —, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) (holding, without ruling on constitutionality thereof, that cruel and unusual challenge to a particular method of lethal injection was properly raised as § 1983 action).

Petitioner asserts this ruling cannot be deemed an adjudication of the issue within the meaning of 28 U.S.C. § 2254(d). Petitioner then suggests this Court should review this issue *de novo*. However, cumulative error analysis should only be implemented where there are two or more actual errors. *See United States v. Rivera*, 900 F.2d 1462, 1470-1471 (10th Cir. 1990)(holding that a cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors). Although this Court found a harmless error occurred in admitting some of the victim impact evidence, that is the only error which was found in this case. Thus, cumulative error analysis does not apply. *See Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999) and *Jackson v. Shanks*, 143 F.3d 1313 (10th Cir. 1998), *cert. denied*, 525 U.S. 950, 119 S.Ct. 378, 142 L.Ed.2d 312 (1998). Accordingly, this argument also lacks merit.

## VI. CONCLUSION

After a thorough review of the Second Amended Petition for Writ of Habeas Corpus, the Respondent's Response, Petitioner's Reply, and the state court records filed herein, this Court finds Petitioner has failed to establish that he is currently in custody in violation of the Constitution, laws or treaties of the United States as required by 28 U.S.C. § 2254(a). Therefore, for the reasons stated herein, Petitioner's Second Amended Petition for Writ of Habeas Corpus (Dkt. No. 54) is hereby denied. Additionally, for the reasons set forth herein, Petitioner's request for an Evidentiary Hearing is denied.

Finally, on May 10, 2007, Petitioner filed a Second Motion for Stay and Abeyance of Habeas Proceedings arguing, since this Court denied his first request for a stay (Dkt. No. 30) the Supreme Court in *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), granted a district court authority to stay and hold in abeyance federal habeas petitions in limited circumstances. In *Rhines*, however, the Court indicated in order to ensure that the purposes of the AEDPA are not thwarted

> . . .stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Id.*, U.S. at 277, S.Ct. at 1535.

Petitioner claims he has shown good cause because he "has two claims currently pending in other courts, both of which he has demonstrated are at least potentially meritorious."[29] Dkt. 66, at p. 6. Respondent, however, asserts Petitioner's abeyance "should be denied as nothing more than a deliberate dilatory attempt 'to prolong [his] incarceration and avoid execution of the sentence of death.'" Dkt. 67, at p. 3 (citation omitted).

Since the filing of this motion, the United States Supreme Court has denied certiorari on the issue of jurisdiction. *Murphy v. Oklahoma*, — S.Ct. —, 2007 W.L. 1582962 (2007).

---

[29]The two claims Petitioner is referring to are: (1) jurisdiction and (2) mental retardation.

The issue of mental retardation is not currently pending before this Court. Therefore, any state court proceedings addressing that issue are not relevant to the issues currently before this Court. For these reasons, this Court finds Petitioner has failed to establish good cause for this Court to grant a stay in this matter.

**ACCORDINGLY IT IS HEREBY ORDERED THAT:**

1. Marty Sirmons is substituted for Gary Gibson as the party Respondent and the Court Clerk is directed to note such substitution on the record.

2. Petitioner's request for habeas relief (Dkt. No. 54) is denied.

3. Petitioner's request for an evidentiary hearing, contained within his Petition, is denied.

4. Petitioner's Motion for Stay and Abeyance of Habeas Proceedings (Dkt. 66) is hereby denied.

**It is so ordered on this 1ˢᵗ day of August, 2007.**

**Dated this 1ˢᵗ Day of August 2007.**

J4h4i0

Ronald A. White
United States District Judge
Eastern District of Oklahoma